**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**SAMANTHA L. GARRETT,**

       **Plaintiff,**

v.                              **CASE NO: 8:17-cv-2874-T-23AAS**

**UNIVERSITY OF SOUTH FLORIDA**
**BOARD OF TRUSTEES,**

       **Defendant.**

_____/

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Defendant, UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES ("Defendant" or "USF"), moves for summary judgment on all of the Plaintiff's remaining claims.[1]

**MEMORANDUM OF LAW**

The Plaintiff, Samantha Garrett ("Garrett" or "Plaintiff"), claims that USF discriminated against her based on her gender in violation of Title IX of the Education Amendments of 1972 ("Title IX") by its deliberate indifference to her complaint of sexual misconduct by another student. As the undisputed facts establish, USF was far from deliberately indifferent to the Plaintiff's complaint. Instead, USF invited the Plaintiff to file a complaint and responded quickly and promptly to that complaint. It took remedial action against accused student, imposing the sanction of deferred suspension, and it offered Garrett an opportunity to seek more severe sanctions through a hearing and appeal. It is undisputed that Garrett did not take advantage of this opportunity. Instead, she repeatedly refused to have a hearing on her complaint and sought to have

---

[1] On April 18, 2018, the Court granted, in part, the Defendant's motion to dismiss. (See Order (Dkt. No. 35)). It dismissed the second count of the complaint as redundant. The Court also allowed the Plaintiff's claim of retaliation to proceed, based on her assertion that she was charged with a violation of the code of conduct in retaliation for complaining about the disposition of her complaint. (Id. at 12-13).

the sanctions increased against the accused student without a hearing.  When USF refused to violate the due process rights of the accused student, Garrett withdrew her appeal.  Having been unable to obtain the specific sanctions sought through USF's process, Garrett has filed the instant lawsuit, asking this Court to force USF to expel the accused student, without a hearing,[2] and alleging that USF violated Title IX when it did not impose the discipline that Garrett wanted.  The United States Supreme Court has been clear – Title IX offers no relief for this type of claim.

Additionally, Garrett alleges that USF retaliated against her when she was referred for a student conduct violation.  Garrett cannot establish a genuine dispute of material fact with respect to her retaliation claim.  First, the Plaintiff did not engage in protected activity by making a good faith complaint of a violation of Title IX.  Next, Garrett cannot dispute that the student conduct board found, based on its interpretation, that Garrett violated USF's policies when she surreptitiously recorded a conversation with Crystal Coombes, Senior Deputy Title IX Coordinator.  Garrett does not dispute that she made this recording.  There is no evidence of disparate treatment or pretext.  Moreover, the result of the disciplinary process was a warning letter.  As a matter of law, this warning letter is not an adverse action as a matter of law.

I.   **STATEMENT OF UNDISPUTED FACTS**[3]

   **A.  Garrett Is a Doctoral Student at USF**

Garrett and the accused student, Andrew Thurston, are both degree-seeking doctoral students and teaching assistants at USF in the Industrial and Organizational Psychology program.  (Pl. 73-74; MC X4).  While they are enrolled in the same program, Thurston is further along in the

---

[2] See Resp. to I#14.
[3] The Defendant's supporting materials are attached along with an index.  The Defendant cites to declarations or depositions by using the declarant or deponent's initials along with a pinpoint citation, except for Garrett who is referred to as "Pl." or "PX" for exhibits.  References to interrogatories or admissions will be made by identifying the answering party, followed by the number of the pertinent response.  The facts recited herein are for purposes of summary judgment only.  USF reserves the right to challenge Garrett's assertions should this Motion be denied.

program than Garrett.  (MC X4).  In addition, in 2016 and 2017, they did not attend classes together, taught different classes, and were involved in different research projects with different professors.  (Pl. 186; PX3:200757).  Their offices also were on different floors of the psychology building.  (<u>Id.</u>).  There are, however, certain program-wide events where all doctoral students are invited to attend, such as brown-bag lunch programs.[4]  (Pl. 35).

### B.  The Relationship Between Thurston and Garrett Before November 12, 2016

Before November 12, 2016, Garrett and Thurston were best friends.  (Pl. 167).  During this litigation, Garrett produced a true and accurate copy of all of the text messages between her and Thurston.[5]  (Pl. 339-40; PX13).  Prior to the events of November 12, 2016, Thurston and Garrett exchanges thousands of text messages where they spoke about dating other people, their love for one another, Garrett feeling lonely, Garrett's breast size and a naked picture she gave to Thurston's roommate, having sex with other people, and the genitalia of one of the men that Garrett dated.  (Pl. 101-104, 378-80, 382; PX13:201934, 201955-57, 201969-70, 201995, 202045, 202063, 202071, 202111, 202150, 202153-55, 202161).[6]  Thurston also asked Garrett why she was complaining about Thurston's lack of flirting.  (PX13:202149; Pl. 390).

On November 11, 2016, Thurston invited Garrett to join his family for Thanksgiving dinner.  (PX13:202208; Pl. 391).  Later that night, Thurston and Garrett were together at Thurston's apartment.  (PX13:202214, Pl. 393-94).  At 1:32 a.m., Garrett texted Thurston, "Btw did I make you uncomfortable?"  (PX13:202214; Pl. 393-94).  She explained "I didn't even think

---

[4] A brown-bag lunch "is a meeting where a guest speaker gives a presentation for an hour on a Friday." (Pl. 35; <u>see also</u> Pl. 163).

[5] Joanna Ellwood conducted the investigation of Garrett's complaint of sexual misconduct.  (MC X4).  Although Ellwood requested Garrett provides copies of her text messages with Thurston (PX3:200687), Garrett admits that she did not provide a copy of all the text messages she exchanged with Thurston, even though she had access to these messages and produced them in this litigation. (Pl. 340, 358, 379, 381-82, 390-91; PX13).  She decided which text messages to provide to Ellwood.  (Pl. 381).

[6] Garrett admits that she did not tell Ellwood about these conversations.  (Pl. 379, 381-82, 390-91).

about the fact that you might not be ok with me sitting on your lap." (PX13:202214; Pl. 394). Thurston responded that he was fine with it and he appreciated the physical contact. (PX13:202214). Garrett then asked: "It really didn't annoy you honestly?" (Id.). Thurston assured her that he liked it. (Id.). The next morning, on November 12, 2016, Thurston texted Garrett and said "everyone thinks we're dating because you sat on my micropenis." (PX13:202215). Garrett responded, "I will never sit on your micropenis again." (Id.). She also admitted she "initiated sitting on [Thurston's] micropenis." (Id.).[7]

### C. Garrett's Description of the Assault

On November 12, 2016, Garrett contends that Thurston sexually assaulted her. (MC X4). Garrett's statement of the alleged assault is set forth in the investigative report.[8] (MC X4). The following facts are undisputed by the Plaintiff. (Resp. to I#7; MC X4; Pl. 249).

Garrett and Thurston were close, personal friends, who communicated their love for each other frequently. (MC X4). On November 12, 2016, Garrett and Thurston engaged in consensual kissing and touching. (MC X4; Resp. to I#7: 000027-31; Pl. 253). Garrett also changed into more comfortable clothes after Thurston repeatedly suggesting it. (Pl. 252). The Plaintiff's allegation is summarized as:

> Thurston continually touched and coerced Garrett in a sexual manner without her consent. The touching included kissing, taking her bra off, taking her shorts off, trying to pull her underwear off and then penetrating her vagina with his fingers. Garret voiced her wishes to Thurston to stop by repeatedly saying "no" and "this is not going to happen." Thurston ignored her wishes and touched her repeatedly.

(MC X4). Garrett alleges that Thurston "finally stopped" and thereafter she went to the bathroom where she stayed for 20 minutes, hoping Thurston would fall asleep so she could leave. (Id.). She

---

[7] Garrett could not recall if she shared these text messages with Ellwood. (Pl. 394-95).
[8] Garrett admitted that this statement was accurate, then asserted that there were 7 inaccuracies in the report, and finally said in her deposition that the incident is described in the Title IX report. (Resp. to I#7; Pl. 249). Garrett also asserts that the statement provided to the police after the USF investigation also is accurate. (Resp. to I#7:00027-31).

walked to her side of the bed and began to put her clothes back on.  (Id.).  Thurston "asked her to stay and to lay with him again," which she did out of fear. (Id.).

When Thurston went to the bathroom, she "jumped out of bed and put her clothes back on." (Id.). Thurston came out of the bathroom and asked, "What are you doing?" (Id.). When Garrett said she was going home, Thurston told her to get back in bed and to go to sleep. (Id.). She did so, again "out of fear," and both she and Thurston slept with no further issue. (Id.). The next morning, Garrett and Thurston "made an agreement that they would never cross the 'friend line again.'" (Id.).  Garrett did not immediately report the incident to USF or law enforcement.

### D.  The Relationship Between Thurston and Garrett After November 12, 2016

Garrett admits that, after the assault, she did not have any obligation to see or speak to Thurston again, but she did.  (Pl. 273).  Garrett and Thurston resumed texting the next day. (PX19:000132-134).[9]   In one of these messages, Garrett sent a picture of her clothed chest to Thurston and her girlfriends where she obviously was not bearing a bra and her nipples were evident. (Pl. 213; PX19:000134).  A few minutes later, Thurston texted Garrett that he was afraid that he ruined their friendship by coming on to her.  (PX19:000134).  Garrett assured him that nothing had changed.  (Id.).  She said, "We made out.  It's not a big deal.  Everything's still the exact same." (Id.).  Thurston said he thought that Garrett was into him now.  (Id.).  Garrett denied it, but that she "[l]ove[s] getting turn down by someone [she] wasn't even interested in."  (Id.). She said that she did not feel like talking to him anymore.  (PX19:000135).  Garrett then told Thurston that he assaulted her. (Pl. 169; PX19:000135).  According to Garrett, Thurston said he did not remember the assault, and she does not dispute this statement.  (Pl. 249).

After Garrett accused Thurston of assaulting her, but before reporting it to USF, Garrett

---

[9] Thurston provided all of these text messages in PX19 to Ellwood during the investigation.  (MC X4).

admits that she and Thurston spent the night together at his apartment in his bed on two occasions.[10] (Pl. 37-38, 168-169, 235-36).   She could not recall the exact number of times that she was at Thurston's residence after November 12, 2016.   (Pl. 235-36).   With respect to the sleepovers, she admits that she initiated the first one and Thurston initiated the second one, but she did not spend the entire night with him.   (Pl. 37, 168-70, 236).   Garrett also admits that Thurston did not do anything during either sleepover to cause her to fear for her safety.   (Pl. 170, 237).

On November 19, 2016, the week after the alleged assault, Garrett and Thurston were texting about her ability to have an orgasm.   (Pl. 399; PX19:000146).   Garrett told Thurston that she was unable to have an orgasm due to her medications. (PX19:000146; Pl. 400).   Garrett then stated:   "But like last weekend I got really close but it just didn't happen, which is why I think the meds aren't going to let me."   (PX19:000146).[11]

### E.  Garrett's Text Messages with Another Student

On November 21, 2016, Garrett exchanged text messages with another student, Maryana Arvan, where they discussed Thurston.[12] (PX18).   Garrett sent these text messages before making any report to USF about the alleged assault.   (Pl. 264).

After asking for details about a woman that Thurston was dating and then looking up information about her, Garrett replied:   "No, but he's definitely my best friend.   So if he goes from seeing me (at his request) every day and telling me he loves me 24/7 to completely different if he starts dating someone I'm 100% going to be extremely pissed."   (PX18: 200369-378; Pl. 263). She

---

[10] According to Garrett, at least one of these sleepovers was after Thurston called himself a monster and said that there was no way to fix it.  (Pl. 239-40).

[11] Garrett contends that this statement does not relate to the night of November 12, 2016, but the night of November 11, 2016, when she contends she was with her ex-boyfriend.  (Pl. 400-01).  However, as the text messages establish, on Friday, November 11, 2016, Garrett spent the night with Thurston, which is when she sat on his lap. (PX13:202214).  Regardless of what meaning Garrett now ascribes to this message, she does not dispute that she sent this message, Thurston received it, the text message does not mention her ex-boyfriend, and that Thurston provided this message to Ellwood during the investigation.  (PX19:000146; Pl. 404).

[12] Despite having access to these text messages, Garrett did not provide them to Ellwood.  (MC X4).

admits that she was seeing him almost every day and she did not want to stop. (Pl. 247; PX18:200418).  After this exchange, Garrett told Arvan that Thurston assaulted her, but she said she was "not afraid of him doing it again."  (PX18: 000394, 000396).  At this time, Garrett did not want to make a complaint to the police or to the university under Title IX.  (Pl. 267).  She said: "I did not want it to have to go that far."  (Pl. 267).  She also told Arvan:  "I completely forgive him." (Pl. Ex. 18: 200406).  Garrett admits that, at that time, she did forgive him.  (Pl. 272).

Garrett asserts that she went from being concerned about Thurston and forgiving him after the assault to wanting him removed from the program because Thurston did not go to therapy.  (Pl. 273).  It was not because of any act taken by Thurston towards Garrett.  (Pl. 273).

### F.  Garrett's Arrest under the Baker Act

On the morning on November 23, 2016, Garrett texted Thurston inquiring whether he still wanted her to go to Thanksgiving dinner with him.  (PX19:000159).  Thurston reassured Garrett that he wanted her to come to his house for Thanksgiving.  (Id.). Garrett responded that she was going to stop by to give him a hug, but Thurston said that he was working at home.  (Id.).  Garrett and Thurston then made plans to see each other that night around 9:00 p.m.  (Id.; PX13:202305, 202307; Pl. 407).  They also made plans to drive together to Thurston's house for Thanksgiving dinner the next day.  (PX13:202306; Pl. 406).

A couple of hours later, Garrett sent Thurston a series of text messages indicating that she was taking alcohol and pills and wanted to harm herself.  (PX13:002308-09; Pl. 210, 282, 408-15).  Garrett admits to sending the text messages to make Thurston feel sorry for her or make him feel guilty.  (Pl. 210, 282).  At 8:21 p.m., Thurston responds, "What did you do?  I'm on my way." (PX13:002308; Pl. 410).  At 9:12 p.m., Garrett texts Thurston, "Just come back, watch me drink, and make sure I sleep on my back." (PX13:202309; Pl. 413).  Garrett admits that she wanted

Thurston to come see her that night.  (Pl. 414). At 9:19 p.m., she asks him to "please come over." (PX13:202309).  At 10:11 p.m., she send him the following text message:  "That's it.  If you're going to blow my hair up and tell other people, I'm going the same."  (PX13:202309; Pl. 415).

Garrett contends that Thurston came to her apartment without her consent, but this is not supported by her own undisputed text messages. (Pl. 37, 275; PX13:202308-09).  According to Garrett, when Thurston arrived at her apartment, he asked her what she was doing, and she said that she was having a drink.  (Pl. 87).  He then accused her of trying to kill herself, which she denied.  (Pl. 88).  Garrett then told him to leave, and he did not leave initially.[13]  (Pl. 37, 88).  After Garrett continued to yell at him, he left and Garrett locked the door.  (Pl. 88, 280).  However, Thurston had a key to her apartment[14] and he used the key to enter her apartment with another person when she did not answer the door.  (Pl. 166, 276-77).  Garrett admits that she had a gun in her house, including on that night, and she kept the gun on counter in a holster.  (Pl. 284).

When Thurston returned, he started yelling at her, but she does not remember what he was yelling about.  (Pl. 167, 280).  She yelled at him to leave.  (Pl. 280).  Thurston then left and he called the police.  (Pl. 277, 280).  After Thurston left the apartment, Garrett sent him a text message informing him that she was "going to tell people what [he] did."[15]  (Pl. 281; PX13:202309).  She does not recall when the police arrived.  (Pl. 282).

After the police arrived, they asked to see her phone to read the text messages that she sent to Thurston that suggested she was going to kill herself.  (Pl. 282).  She showed them her text messages, and they said that she would need to be taken to the hospital.  (Pl. 285).  She told them

---

[13] The Plaintiff admits that she did not fear any threat of bodily harm at this time. (Pl. 166).

[14] Garrett gave Thurston a key to her apartment so that he could feed and walk her dog.  (Pl. 276).  Garrett did not take the key away from Thurston after the assault.  (Pl. 276).  Thurston attempted to return the key on November 18, 2016, but Garrett refused to take it back.  (PX13:202259-60).

[15] This is the text message she sent at 10:11 p.m. (PX13; 202309). Additionally, Garrett contends that Thurston "gave a false testimony to the police," but she admits that she does not know what information Thurston provided to the police and the police conducted their own investigation.  (Pl. 82, 202-03, 207, 275, 321).

that she sent the text messages to make Thurston feel guilty and that Thurston was her rapist.  (Pl. 286).  They told her that she had no choice, and that they determined she was a danger to herself.  (Pl. 285).  As a result, she was arrested under the Baker Act.  (Pl. 167).  This night was the only time that Thurston came to her apartment without her consent.  (Pl. 36-37).

In addition to the police officer's determination, the facility decided that Garrett should be held while she was being evaluated.  (Pl. 200, 207, 297, 322; Pl. Ex. 11, 22).  After this evaluation, the facility determined that Garrett should be admitted for stabilization as she was an imminent danger to herself.  (Pl. 200, 207-08, 297; Pl. Ex. 11, 22).  Garrett told the case manager that she had been sexually assaulted, and the case manager discussed the possibility of Garrett pressing charges.  (Pl. 300-01; Pl. Ex. 22).  Although Garrett blames Thurston for this commitment, she does not dispute that the police and the facility each made an independent determination.  (PX22).

### G.  The Plaintiff's Text Messages to Another Student on November 23, 2016

After Garrett had been taken to the hospital, she sent a text message to Arvan.  (PX23; Pl. 302-03).  At 10:40 p.m., she asked Arvan:  "Can you pleas come pick me up from the hospital."  (PX23).  Arvan replied that she was sorry she missed Garrett's call.  (PX23; Pl. 304).  Garrett responded, "Apparently I'm being admitted to a fucking in patient facility or psych ward" and then she said, "AJ will be dropping out of the program this semester." (PX23).  Arvan said her heart was broken over the entire situation.  (Id.).  Garrett replied, "Oh he isn't the one who told me," and then she said, "But after this there's no way I'm ok with him staying in the program." (Id.).  Garrett admits that she had not made any complaint to the university before she sent these text messages.  (Pl. 306).  She also admits that, before she sent these text messages, she never told anyone, except Thurston, that she was fearful of Thurston.  (Pl. 306).  Garrett ceased contact with Thurston after she sent these text messages.  (Pl. 306).

### H.  Garrett's Disclosure to Dr. Allen and Meeting with Jonathan Monti

On December 5, 2016, Dr. Tammy Allen, a USF professor, met with Garrett, and Garrett disclosed that she had been assaulted by Thurston on November 12, 2016.[16]  (TA X1).  Thereafter, at 9:06 p.m., in accordance with USF's policies, Dr. Allen reported the incident, including that Garrett wanted Thurston removed from their academic program.  (PX3:200675; TA X1).  The next day, it was referred to Maria Zale Cutsinger and Jonathan Monti in the Office of Student Rights and Responsibilities (OSRR) to handle this matter.  (TA X1; JM X1; JM X2).   Coombes found that there was sufficient information in Dr. Allen's report to conduct an inquiry.  (JM X1).

After disclosing the assault to Dr. Allen, Dr. Allen referred Garrett to the Center for Victim Advocacy to obtain the support of a victim advocate.  (PX3: 200675; Pl. 76-77).  Megan Deremiah, a victim advocate, was assigned to support Garrett.  (Pl. 76-77; PX3:200675).  In Deremiah's first meeting with Garrett, Garrett told her that she did not want to report Thurston to law enforcement, but she either wanted him out of the program or prohibited from attending social events.  (PX3: 200678; Pl. 302).  In a phone call with Deremiah the next day, Garrett again restated that she was "extremely against" filing a police report.  (PX3:200679).  She also decided not to seek a sexual violence injunction against Thurston.  (Id.).  Instead, Garrett decided to pursue the student conduct process.  (Id.).  Deremiah explained the sanctions under the student conduct process can range from writing a paper, to suspension, to expulsion.  (PX3: 200685).  She further explained that, although expulsion is an option, "it is somewhat rare that it comes to that."  (PX3: 200688).  She cautioned Garrett that, if she is only going through the process to obtain that outcome, then "she should think through if this is right for [her]."  (Id.).

On December 6, 2016, USF sent an initial contact letter to Garrett, acknowledging the

---

[16] Garrett, however, did not tell Dr. Allen that, subsequent to the alleged assault, she had spent the night at Thurston's house in his bed with him where she did not have any fear for her safety.  (Pl. 238).

report by Dr. Allen of a possible violation of USF's sexual misconduct policy or code of conduct. (MC X6; JM X2).  In this letter, USF informed Garrett of USF's policies and her various options, including filing a report with law enforcement.  (MC X6). In response to this letter, Garrett contacted Jonathan Monti, stating that she would like to file a formal complaint.  (JM X1).  As a result, Garrett met with Monti on December 9, 2016, for an initial information session.[17] (JM X4).

In this meeting, Monti explained to Garrett the resources available to her, including the offices to contact to request a change in academic assignment, no-contact order, counseling, or other interim accommodations to address any of Garrett's concerns.  (JM X4).  Garrett "requested that no interim measures be put in place at this point in time," and Monti explained that she could request interim measures at any time.  (JM X4).  Garrett admits she knew she could request a no-contact order and she told USF she did not need one. (Pl.71-72; JM X4).[18] He also explained the process[19] and informed her of her right to file a complaint with law enforcement, which she declined.  (JM X4; Pl. 301).  Monti confirmed this information in writing. (PX21; Pl. 245).

## I.   USF's Investigation of the Plaintiff's Complaint

On December 9, 2016, Joanna Ellwood was assigned to investigate Garrett's complaint. (PX21).   She met with the Plaintiff, Thurston, and other witnesses identified by Garrett or Thurston, including Garrett's parents.  (JM X1; JM X2; JM X11).  In addition, Thurston provided her with 1,438 text messages between him and Garrett. (MC X4:000015; PX19).[20]  These text messages showed continuing contact between Garrett and Thurston.  (Pl. 311).  Garrett was aware

---

[17] Monti also met with Thurston to conduct an informational session with him.  (JM X2; JM X5).

[18] On December 13, 2016, Deremiah recounted Garrett said "she does not have concerns for her safety in regards to the offender." (PX3: 200695).  While Garrett does not recall making this statement, she also denies making it. (Pl. 243, 246).  She does not deny that Deremiah made this note. (Id.).

[19] From this initial meeting with Monti, Garrett understood she could have a hearing as part of this process.  (Pl. 307).

[20] In response to the Defendant's request for admissions, Garrett initially denied the authenticity of the messages.  (Pl. 228; PX19).  However, in her deposition, she admitted that she does not dispute the content the messages.  (Pl. 228-29).  Instead, she says that this report "mixes up the sender and the receiver of the texts," which is corrected in her copy of the text messages.  (Pl. 228; PX13).

that Thurston had provided his text messages to Ellwood, but she did not provide Ellwood with copies of all of her text messages with Thurston.  (Pl. 358-60).

On December 13, 2016, Ellwood requested that the Plaintiff submit her written statement so that they could meet, which they did on December 21, 2016.  (JM X2; PX3:200695).  On January 10, 2017, Ellwood reminded Garrett that she could provide accommodations to her if they were needed.  (PX3:200701).  Garrett again did not request a no-contact order.  (Id.).  On January 24, 2017, Ellwood met with Garrett, updated her on the investigation, and gave her an opportunity to submit additional evidence and respond to Thurston's information.  (JM X1; PX3:200706; Pl. 311).  Garrett corrected information provided by Thurston as well as provided another statement and additional evidence. (JM X1; Pl. 311-12).  Garrett admits that she had the opportunity during the investigation to provide all of the evidence that relates to whether the events of November 12, 2016, were nonconsensual and the remedy that she needed.  (Pl. 314, 323).

On February 14, 2017, Ellwood completed her report and provided it to her director, Maria Zale Cutsinger.  (PX3:200709).  In this report, Ellwood identified "undisputed information" including that Garrett and Thurston were "close, personal friends who communicated their love for each other frequently" and that, on November 12, 2016, both engaged in "consensual kissing, removing of bra and touching of breasts."  (MC X4).  She also reported "disputed information" including Thurston's contention that he was intoxicated on the night of the alleged misconduct and that he received consent for all activity which took place between him and Garrett.  (MC X4). Then Ellwood stated:  "According to the information above, it appears to the Investigator that there is sufficient evidence to substantiate the presence of non-consensual sexual intercourse and non-consensual sexual contact."[21]  (MC X4) (underlining in the original).

---

[21] As this language undisputedly establishes, contrary to Garrett's representation, Ellwood did not reach a conclusion that Thurston was responsible, but that there was sufficient evidence to present formal charges. (JE 12, 19; CC X3).

Thereafter, on March 9, 2017, Cutsinger sent a letter to Thurston with a copy to Garrett. (CC X3; PX3:000716; JM Decl. X2).   In this letter, Cutsinger told Thurston that there was sufficient evidence to proceed with formal charges of non-consensual sexual contact and non-consensual sexual intercourse.[22] (CC X3).   She explained that Thurston has two choices; he could accept responsibility and the proposed sanctions or he could elect a formal hearing.  (CC X3). Cutsinger explained that the proposed sanctions were deferred suspension with review until May 4, 2018, attend two required meetings with Cutsinger, and abide by a no-contact order while enrolled at USF.[23]   (CC X3).   The sanctions would only be imposed if Thurston was found responsible or accepted responsibility.  (CC X3).  Cutsinger also explained that a formal hearing "may result in determinations and sanctions that are more severe, less, or the same as those set forth in this Disposition Letter." (CC X3).  Thurston had 5 days to make his decision.  (CC X3).

Garrett also received this letter and told Deremiah that she was not satisfied with the recommended sanctions, but she "wants to avoid a hearing and does not want to appeal this decision."  (PX3:200716).  Instead, she said that she was going to file a police report and seek a sexual violence injunction.[24]  (PX3:200716).

### J.   USF Issues No-Contact Order on March 9, 2017

---

[22] This process also is set forth in the student code of conduct.  (MC X1:001272).  After the investigation, the referral is dismissed or moves forward with recommended charges and sanctions.  (Id.).  At this time, the charged student is offered the choice to accept responsibility or request a formal hearing and has 5 days to make that decision.  (Id.).  At a formal hearing, as provided in USF's policy, the charges may be upheld or dismissed and the sanctions may be more or less severe.  (MC X1:001272).  Thus, the investigation does not determine guilt or innocence, responsibility or not, but only whether there is sufficient evidence to move forward with the charges and the recommended sanctions if the charged student is found responsible.  (Id.; JE 12).

[23] Garrett complains that she was not able to submit a victim impact statement prior to the development of the recommended sanctions.  (Pl. 309).  However, during the investigation Garrett had the opportunity to submit two written statements to Ellwood.  (Pl. 310; MC X4).  There was no limitation on the information that Garrett could provide in these statements.  Garrett cannot identify any information that she would have provided in a victim impact statement that USF did not have when it determined the recommended sanctions.  (Pl. 309-311, 315, 323).  In addition, Garrett also was given the opportunity to proceed with a formal hearing where she would have had the ability to provide another statement before the conduct board made a decision.  (Pl. 307-09; MC X1:001287).  Garrett, however, elected to withdraw her appeal.  (PX2).

[24] No criminal charges have been filed against Thurston and Garrett's petitions for injunction have been denied. (PX3:200724; Certified Orders in 17-DR-16715 and 17-DR-5507).

13

On March 9, 2017, after Garrett saw Thurston enter the room where she was proctoring an exam, she contacted Ellwood to request a no-contact order.  (Pl. 71; JM X1).  Garrett left the room as Thurston was walking in, he did not say anything to her, and he did not try to make contact with her.[25]  (Pl. 63, 70).  This was the first time that she had seen Thurston since she disclosed the incident to Dr. Allen on December 5, 2016.  (JM X1).  As a result of Garrett's request, Ellwood issued a no-contact order to Thurston.  (JM Decl. X1).

### K.  USF Imposes Sanctions on Thurston

On March 17, 2017, Thurston voluntarily agreed to accept responsibility and the proposed sanctions for the charges.  (CC X3; JM X1).  As a result, USF imposed the sanctions on Thurston, including the deferred suspension with review and no-contact order.[26]  (JM Decl. X3; Pl. 53-54).  On March 20, 2017, Cutsinger informed Garrett that Thurston had accepted responsibility and USF had imposed sanctions.  (JM Decl. X3; PX3:200729).  Garrett asserts that the sanctions are not appropriate in light of the circumstances of the offense.  (Pl. 44).  Based solely on Garrett's interpretation of this letter, she believed she could appeal the sanctions without hearing and without involving the actual appeal process. (Pl. 57-58).

USF's procedure provided that both the complainant and respondent have equal rights to appeal the decision of the formal hearing within 5 days of the letter providing notice of the decision.  (CC X11:000389).  The appeal must be submitted in writing to the Dean of Students.  (CC X11).  The Dean of Students may accept, modify, or reject the decisions and/or sanctions from the formal hearing. (CC X11).  This decision can include increasing the sanctions to

---

[25] According to Garrett, prior to the no-contact order, it seemed like she and Thurston had an understanding that they stay away from each other during the investigation because they both avoided campus.  (Pl. 71).

[26] Upon satisfying certain conditions, the deferred suspension could be converted to conduct probation for the remainder of time that Thurston was enrolled at USF.  (CC X3).  In addition, Thurston was cautioned that any violation of the code of conduct, including any contact with Garrett, could result in immediate suspension.  (CC X3).

suspension or expulsion, which, in that case, would provide the charged student with another level of review.[27] (MC X1:001276).  In making her decision, the dean may consider the record of the hearing, any new information, and contact any of the participants in the hearing.  (CC X11).  The complainant and respondent also are entitled to access the recording of the hearing.  (CC X11).  The dean has 10 days to render a decision.  (CC X11).

However, the policy is silent as to whether the complainant and respondent would have a right to appeal when there is an acceptance of responsibility and sanctions and no formal hearing. (CC X11).  Under the Student Code of Conduct, for offenses other than sexual misconduct, there is no right to appeal when the charged student has accepted responsibility.  (MC X1:001274).

### L.  The Plaintiff Admits that Thurston Has Had No Contact with Her

Garrett complains that the sanctions were insufficient because there was "no separation from [her]" and she "believed that [she] needed [Thurston] to not be able to be close to [her]."  (Pl. 21-22).  However, there were only two instances where Thurston came into the same proximity as Plaintiff after the issuance of the no-contact order on March 9, 2017.[28]  (Pl. 62, 171).  During both of these instances, Garrett admits that Thurston did not say anything to her or make any attempt to have any contact with her.  (Pl. 27, 164).

One of these instances did not occur at USF.  (Pl. 22).  It occurred at a conference conducted by the Society for Industrial and Organizational Psychology from April 26 to 29, 2017.  (Pl. 22-24; Resp. to RFA#3).  This conference is not part of USF and is not limited to USF students or faculty.  (Pl. 23).  It is a large conference where students, professionals, and academics present

---

[27] Indeed, the policy provides that any final decision of USF may be reviewed by filing a petition for certiorari with the circuit court.  (MC X1:001279).  It is undisputed that Garrett never filed any such petition.

[28] Since December 5, 2016, there were only a total of 3 instances where Garrett saw Thurston – when she proctored one exam, the SIOP conference, and one brown-bag event.  (Pl. 24-30, 62-63, 71, 162, 164; see also id. at 165).  In each instance, Thurston made no comments or any attempt to communicate with Garrett.  (See id.).

their work and network.  (Pl. 23).  At the conference, Thurston stood in the line next to Garrett's line during registration.  (Pl. 24, 26).  She was not aware that Thurston attended any of her presentations, but she saw him attend some of the same presentations that she attended.  (Pl. 28).  She also saw him at receptions where everyone who was invited attended.  (Pl. 28).  Thurston did not talk to her or try to talk to her.  (Pl. 27, 31).  She does not know if he tried to make eye contact with her because she avoided eye contact with him.  (Pl. 27).  At one of the receptions, he was less than a foot away when he was speaking to another attendee at the reception who was standing behind Garrett, but that is the closest that he came to her.  (Pl. 31, 33).  No other instances occurred during the conference.  (Pl. 34).  Garrett admits that she is not aware of any authority of USF to prevent Thurston from attending the conference.  (Pl. 35).  Likewise, she admits that, even if USF had expelled Thurston, he still would have legally been able to come to her apartment[29] or make any contact that he wanted with her.  (Pl. 36).

The second instance occurred at a brown-bag event after the no-contact order was issued. (Pl. 162).  Garrett contends that Thurston violated the no-contact order because he was in the same room as her.  (Pl. 163, 164-65).  Thurston did not speak to Garrett or make any attempt to contact or communicate with her.  (Pl. 164).  This incident only occurred one time.  (Pl. 164).

At the meeting with Coombes, which was after the SIOP conference, Coombes reminded Garrett of the no-contact order and directed her to report any violations.  (PX14: 54:30).  Garrett confirmed that there have been no violations of the no-contact order.  (PX14: 54:51).

### M. The Plaintiff Filed an Appeal and Dean McDonald Explained the Process

Garrett appealed the sanctions to Dean Danielle McDonald, the dean of students.  (JM X2). On April 4, 2017, Dean McDonald contacted Garrett to set up a meeting for the next day to discuss

---

[29] Garrett admits that, since making the disclosure to Dr. Allen, Thurston has not come to her apartment.  (Pl. 36)

the appeal process.[30]  (PX4; Pl. 59-60; JM X2).  The Plaintiff admits that USF could have simply denied her appeal.  (Pl. 323).

On April 5, 2017, Dean McDonald told Garrett that the sanctions could not be increased without an appeal and giving Thurston an opportunity for a hearing.[31]  (Pl. 19, 50; PX3:200743). USF had not had any instance in the past where a complaining party sought to appeal when there had been no formal hearing. (PX3:200743; PX5; Pl. 19, 58).  USF gave Garrett the opportunity to appeal the decision while preserving Thurston's due process rights.[32] (PX3: 200743; PX5).  Dean McDonald had developed this process before the meeting on April 5, 2017.  (PX5; Pl. 59).

As Dean McDonald explained to Garrett, after the respondent accepts the charges, then she has the right to appeal.  (PX3:200743; PX5).  If the complainant files an appeal, the USF provides an opportunity to the respondent to decide whether he wants a hearing by a board or administrator or whether he wants to leave the initial review decision and move forward with an appeal of sanctions without a hearing.  (PX3:200743; PX5).  If the respondent elects a hearing, then the procedure provided that USF would follow the established hearing process, which included Garrett's right to be present during the fact-gathering at the hearing, her right to insist on a hearing before an administrative officer instead of a conduct board with student representation, and her right to present evidence and avoid direct contact with other participants.  (PX5; MC X1:001285-87).  The conduct board or hearing officer would then hold a hearing, reach a conclusion, and

---

[30] In a separate meeting, Dean McDonald also met with Thurston to review the appeal process with him.  (JM X2).

[31] While the Plaintiff initially testified that this procedure required her to start over (Pl. 19, 45-46, 324), she later admitted that the process did not require her to start over with the investigation and determination of charges.  (Pl. 325).  Instead, it provided for a hearing and Thurston would not be bound by his acceptance of responsibility.  (Pl. 324-25; PX5).  Coombes also explained to Garrett that the appeal procedure did not require her to start over. (PX15:002602-03; PX14: 52:21).  She explained that the finding made as a result of the investigation would stand along with the recommended sanctions. (PX15:002603; PX14: 52:21).

[32] Thurston had accepted responsibility under USF's process based on the representation of the sanctions that would be imposed.  (PX5; CC X3).  When the appeal afforded to Garrett provided the possibility that sanctions could be increased up to and including expulsion, USF sought to provide Thurston with notice and a hearing before such an action could be taken.  (PX5).

impose sanctions, which could be greater sanctions and could include expulsion.  (PX14: 52:54; PX5).  After the hearing, the parties would each have an opportunity to appeal to Dean McDonald who, after reviewing the hearing and evidence, also could increase the sanctions.  (Id.).

This written procedure provided a specific timeline for the prompt conclusion of this process.  (PX5; Pl. 58-59).  After this meeting on April 5, 2017, Garrett understood that, regardless of whether Thurston elected a hearing, she could appeal the sanctions under this process.  (Pl. 61, 307-08; PX5).  She admits that she ultimately declined this opportunity, which could have resulted in increased sanctions against Thurston.  (Pl. 308; PX2).

Dean McDonald explained that Garrett had until April 10, 2017, to make a decision on whether she wanted to proceed with the appeal, and Thurston will have the same time to request a hearing.[33]  (PX3:200743).  Dean McDonald also encouraged Garrett to speak to Coombes to determine whether any other interim measures could be put in place.  (PX3:200743).  At this same time, the faculty in the psychology department also were considering whether they could remove Thurston from the program, even though the student conduct process did not result in expulsion. (PX3:200730; JA X2).  After this meeting with Dean McDonald, Garrett told Deremiah that "she wants to avoid a hearing at all costs."  (PX3: 200743).

**N.  The Plaintiff's Attempt to Have Thurston Removed by Other Means**

On April 6, 2017, Deremiah and Garrett met with Coombes.  (PX3:200746).  Coombes explained that she would review whether certain remedies could be put into place even if Garrett did not appeal the sanctions. (Id.).  Garrett asked that Thurston be prohibited from entering the psychology building, attending any events, or parking in the parking lot.  (Id.). Coombes agreed to review these options.[34]  (Id.).  Coombes also agreed to obtain an extension of time for Garrett

---

[33] On April 10, 2017, Thurston reported to Monti that he had elected a hearing under the appeals process.  (JM X2).
[34] The Plaintiff contends that Coombes told her that she could make it look as if Thurston had been suspended, but

to decide whether she wanted to retract her appeal, which Coombes did.  (PX3:200746, 200749).

### O.  Garrett Elected to Withdraw Her Appeal

On April 10, 2017, Garrett notified Dean McDonald that she wanted to retract her appeal and pursue "potential remedies through interim measures."[35]  (PX2; Pl. 13).  Garrett asked Dean McDonald to formally close her case and finalize the sanctions.  (Id.).  Dean McDonald, however, did not immediately accept Garrett's withdrawal of her appeal.  (PX2).

On April 11, 2017, Garrett met with Coombes to discuss the possible remedies. (PX3:200757).  Coombes explained to Garrett that she needed to confirm her withdrawal of the appeal if she still wanted to retract the appeal after the meeting.  (PX3: 200757). In this meeting, Coombes told Garrett could not grant the remedies she requested of excluding Thurston from the building, parking lot, and events. (PX3:200757).  However, Coombes did explain that she was able to provide Garrett with the opportunity to perform a remote research position or internship position over the summer.  (PX3:200757).[36]  Coombes also agreed to speak to the department, at Garrett's request, to obtain a year-long internship.  (PX3:200757).  Coombes informed Garrett that her professors would work with her if she needed an incomplete or withdrawal of a class.  (Id.).

In addition to meeting with Coombes, at 10:02 a.m. on April 12, 2017, Dean Allison Cleveland-Roberts informed Garrett that the department did not have the authority to remove Thurston from the program based on a code of conduct violation.  (TA X2).  She explained that OSRR is the only department who has authority to remove a student from campus, except when

---

she admits that Coombes told her, before she withdrew her appeal, that she was unable to do this.  (Pl. 184-86).

[35] Deremiah advised Garrett that she did not have to retract her appeal to obtain these remedies, but Garrett did anyway. (PX3:200750).  In addition, Garrett contends that she was not represented by a lawyer at this time, but she admits that she was receiving legal advice.  (Pl. 14, 41, 172).

[36] At the Plaintiff's request, this accommodation was made, which allowed her to continue to receive the stipend and a tuition waiver even though she was not on campus.  (PX3:200760).  Garrett also requested an incomplete for one of her classes as an accommodation, which was granted.  (PX3:200763).  Additionally, when an instructor complained that Garrett had been failing to show up to proctor several exams and teach her labs, the faculty set up a meeting with Garrett to discuss any other accommodations that could be provided to Garrett.  (TA X5).

the issue relates to an academic one.[37]  (TA X2).

Despite knowing that USF could not exclude Thurston from the building, parking lot, or event and that the department could not remove Thurston from the program under academic standards, Garrett still sought to retract her appeal, which would have given her the opportunity to obtain increased sanctions, including expulsion.  (PX2; PX3:200743).  As a result, on April 12, 2017, at 7:50 p.m., Dean McDonald notified the Plaintiff that she had accepted her withdrawal of the appeal.[38]  (PX2; JM X2).  At no time did Dean McDonald refuse to process Garrett's appeal under the process that she outlined.  (Pl. 45-46).

### P.  Garrett's Meeting with Crystal Coombes on May 18, 2017

Garrett and Deremiah met with Crystal Coombes on May 18, 2017, to determine whether there were any other available voluntary remedies.  (Pl. 186-87, 415; PX14; PX15).  This meeting occurred in closed-door conversation in Coombes's office.   (PX14; Pl. 425-26, 433).  Unbeknownst to Deremiah and Coombes, Garrett secretly recorded this meeting on her phone.  (Pl. 194, 417-18, 426; CC X20; PX14).  Thereafter, she purported to make a transcript of the meeting and represented that she had deleted the recording.  (Pl. 182, 329; CC X19; PX24).  Garrett, in fact, had not deleted the recording and produced a copy of the recording on the last day of discovery.  (Pl. 330; Pl. 416-17).  Despite Garrett's testimony that the transcript was an accurate portrayal of the recording, she later admitted that this was not true and she omitted certain information.  (Pl. 330-31, 424-26, 435-36).  In particular, at the end of the recording, when Deremiah and Garrett were leaving Coombes's office, Garrett told Deremiah that she had recorded

---

[37] Although Garrett complained to the department that she "would not have gone through this process if I wasn't under the impression that by doing so I was giving the department the power to make the appropriate decision," (TA X3), Deremiah informed Garrett on December 13, 2016, that Thurston may not be removed from campus even if he is found responsible.  (PX3:200687).

[38] As Garrett requested, Dean McDonald informed Thurston that Garrett had retracted her appeal and she explained that "the original charges and sanctions are in effect and are the final decision of USF." (JM X2).

the meeting and that she knew that she could not use the recording.  (Pl. 179-81, 436; CC X20; PX15; PX14: 53:53).  This admission is missing from her transcript. (PX14; PX15; Pl. 435).

Prior to the meeting with Coombes, Garrett also secretly recorded her conversation with Deremiah.  (Pl. 425).  In this conversation, Garrett told Deremiah that she was going to North Carolina to stay for an undetermined amount of time.  (Pl. 428; PX14: 5:18).  She did not have any reason to return to Tampa, because she could perform her research from any location.  (Pl. 428-29; PX14: 5:33).  While she did not have to return, she did.  (Pl. 429).

During the meeting with Coombes, Coombes explained to Garrett that she had inquired whether Thurston would agree to any voluntary measures to stay away from the USF campus, but Thurston declined to do so.  (Pl. 177, 186-87; PX15:002589).  At the conclusion of this meeting, Coombes explained that Garrett had three options.  (PX3:200784; PX15:002603; PX14: 51:12).  First, Garrett could leave everything as is, which leaves the no-contact order and sanctions in place, and report any violations of the sanctions or no-contact order.  (Id.).  Second, Garrett could file a new complaint asserting that there was a violation of the previous process or some other instance of discrimination, which would be investigated.  (Id.).  Third, Garrett could seek to have her appeal reinstated and proceed to a hearing.  (Id.).[39]

Before the Plaintiff left the room, Coombes asked for an opportunity to, once again, explain the no-contact order and encourage Garrett to report any violations.  (PX14: 54:30; Pl. 436).  At first, Garrett declined, but then Coombes explained the order anyway.  (PX14: 54:38).  Coombes explained that the order prohibits directed, specific, targeted contact with her.  (PX14: 54:42).  Garrett responded, "I got it."  (Id.).  Coombes explained that she wants to make sure that Garrett

---

[39] Garrett had told the faculty that the only option that Coombes gave her was to leave the program.  (CC X18).  Garrett's transcript of this meeting along with the recording establishes that this representation was not accurate.  (PX14: 51:12; PX15:002603).

understands because Garrett has a right to report it.  (PX14: 54:44).  Coombes also told Garrett

that, if it is happening, then Garrett needs to report it immediately.  (PX14: 54:48).  Garrett

responded, "No, I know.  It doesn't qualify under the description."  (PX14: 54:51).  Garrett omitted

this conversation from her transcription of the meeting.  (PX15; Pl. 436).

### Q.  The Plaintiff's Violation of Code of Conduct

As instructed by her director, Deremiah reported to student conduct Garrett's secret

recording.[40]  (PX3:200788, 200791; CC X20).  As a result, Jonathan Monti, in OSRR, conducted

an investigation.  (CC X20; JM X12).  He concluded that formal charges should be presented

against Garrett for violating USF's policy because she made an audio recording of a private

meeting without the knowledge and consent of the participants.  (CC X20; JM X13).  Monti also

noted that Garrett admitted to making this recording during her initial review meeting.  (CC X20).

While Garrett contends that she was not aware that she could not secretly record the

conversation with Coombes, she admits that she told Deremiah that she knew that she could not

use the recording.[41] (Pl. 181, 191).  She concedes she has never been told in any syllabus that she

had a right to record a conversation with a professor in a closed-door meeting.  (Pl. 194).  On May

19, 2017, Deremiah contacted Garrett to inform her that she was reporting her to student conduct

because Garrett illegally recorded the conversation.  (PX3: 200790).  Garrett reported that she

deleted the recording after Deremiah told her it was illegal, and Garrett believed Deremiah that the

recording was illegal. (Pl. 182-83, 416).[42]

---

[40] Deremiah offered to connect Garrett with another advocate or an outside advocacy agency.  (PX3:200792).

[41] She also admits that she is unaware of any First Amendment right that she had to surreptitiously record a conversation.  (Pl. 197).

[42] The Plaintiff contends that she needed to record the meeting because she has such severe memory loss that she could not leave the meeting and take notes.  (Pl. 189).  She said that she would forget between the meeting and immediately after when she sat down to take notes.  (Id.).  Nonetheless, Garrett does not dispute that she never sought permission from Coombes to record this meeting for that purpose or any other purpose.  Additionally, while she testified that she has severe memory loss, she equally asserted that it has no impact on her perception of this case or her ability to testify accurately.  (Id.).

Garrett, however, declined to accept responsibility for the charges and she proceeded to a conduct board hearing on the charges.[43]  (CC X20; JM X15).  Prior to the hearing, she was informed of the identity of the witnesses,[44] permitted to review the notes of her initial review meeting, and allowed to review other documents in the file.  (CC X20; JM X15).  She also was provided with the opportunity to present any new evidence prior to the hearing.  (CC X20; JM X15).  Further, she was permitted to submit questions in advance of the hearing.  (Id.).

The conduct board consisted for four members; two of the members were students.  (JM Decl. X4:002144).  The conduct board could uphold or dismiss the charges as well as impose less or more severe sanctions.  (MC X1:001272).  The board concluded that Garrett was responsible for a violation of USF's policy, explaining: "Given the information provided, it is more likely than not the student violated policy 4.21 based on our interpretation of 2016 Florida Statute Chapter 934."  (MC X17).  As a result, it concluded that the sanction should be a warning letter, which was implemented.[45]  (MC X17).  There was no harm to Garrett.  The sanction is not on her transcript and it is only retained for one year after graduation.  (JA X1, MC X1:001292).  After the formal hearing, Garrett had the ability to appeal, but she did not.  (MC X17; JM Decl. ¶ 8).

## II.   LEGAL ARGUMENT

### A.  Garrett Cannot State a Discrimination Claim

As a matter of law USF may be held liable under Title IX only for its own actions and therefore may be liable for discriminatory acts, including sexual harassment, committed by a

---

[43] Garrett contends that the recommended sanctions for her acceptance of responsibility were more severe than those imposed on Thurston.  This is not accurate.  The recommended sanction was for the Plaintiff to attend two ethics workshops, not a deferred suspension as imposed on Thurston. (JM X15). However, the recommended sanctions were not imposed in this case.  (MC X17).  Instead, she was given a letter of warning.  (Id.).

[44] Coombes was identified as a witness, but she did not testify. (JM Decl. X4:002147).  Coombes submitted a witness statement, but it was not considered (Id.).

[45] As provided in USF's policy, it is the least severe sanction available.  (MC X1:001288-89).  It is "an official notice that states that if there is a repeated violation of University policy, rules or regulations, the student can expect additional conduct sanctions."  (MC X1:001288).

student against another student only if it was deliberately indifferent to the known acts of

harassment.  Davis v. Monroe Cty. Bd. of Ed., 526 U.S. 629, 640-41, 643 (1999).  To be liable,

USF must exercise "substantial control over both the harasser and the context in which the known

harassment occurred."  Id. at 645.

The Eleventh Circuit explained this standard in Hill v. Cundiff, 797 F.3d 948, 968 (11th

Cir. 2015):

> A Title IX recipient is liable for student-on-student sexual harassment if it is
> deliberately indifferent to sexual harassment of which [it] has actual knowledge
> that is so severe, pervasive, and objectively offensive that it can be said to deprive
> the victims of access to the educational opportunities of benefits provided by the
> school. The standard for student-on-student sexual harassment claims is far more
> rigorous than a teacher-on-student harassment.

The focus of an inquiry to determine whether an educational institution is to be held liable is to

determine whether an official who has authority to institute corrective measures has actual notice

of and is deliberately indifferent to the misconduct. Gebser v. Lago Vista Independent School

District, 524 U.S. 274 (1998).

In interpreting Title IX, the Supreme Court also has cautioned that courts should refrain

from second-guessing disciplinary decisions made by school administrators:

> School administrators will continue to enjoy the flexibility they require so long as
> funding recipients are deemed "deliberately indifferent" to acts of student-on-
> student harassment only where the recipient's response to the harassment or lack
> thereof is clearly unreasonable in light of the known circumstances.

Davis, 526 U.S. at 648 (citing New Jersey v. T.L.O., 469 U.S. 325 (1985)).  Noting the importance

of this principle, the Court wrote:

> We stress that our conclusion here – that recipients may be liable for their deliberate
> indifference to known acts of peer sexual harassment – does not mean that
> recipients can avoid liability only by purging their schools of actionable peer
> harassment or that administrators must engage in particular disciplinary action.

Id.  As a result, the Supreme Court held that Title IX does not afford the plaintiff a "right to make

particular remedial demands" and a school does not have to suspend or expel a student to avoid liability under Title IX.  Id. at 648-49; see also Order (Dkt. No. 35) at 9.

As this Court already has recognized, in order to succeed on a hostile educational environment claim, Garrett must prove that USF's response was clearly unreasonable in light of the known circumstances.  See Davis, 526 U.S. at 648; see also Order (Dkt. No. 35) at 8, 12.  This is a determination that can be made as a matter of law.  See Davis, 526 U.S. at 649 ("This is not a mere 'reasonableness' standard . . . [and thus,] [i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment. . . . could not identify a response as not 'clearly unreasonable' as a matter of law.").

### 1.  USF's Response Was Not Clearly Unreasonable

Garrett alleges that USF's response was clearly unreasonable because USF's resolution allowed the peer student to remain on and participate in activities conducted on campus. Specifically, she asserts that the sanctions were inappropriate in light of the circumstances of the offense.  (Pl. 44).  However, Garrett must show more than she would have made a different decision or that USF is mistaken.  She must establish deliberate indifference.  Garrett cannot satisfy this high burden.  See Doe v. Sch. Bd. of Broward County, Fla., 604 F.3d 1248, 1259 (11th Cir. 2010) (Deliberate indifference is an exacting standard; school administrators will only be deemed deliberately indifferent if their "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."); Saravanan v. Drexel University, Civil Action No. 17-3409, 2017 WL 5659821, at *7 (E.D. Penn. 2017) ("Deliberate indifference claims impose a significant burden on the plaintiff and consequently rarely proceed beyond a motion to dismiss.").

It is undisputed that the alleged sexual assault was committed off-campus in circumstances

that were not within the control of, or known to, USF,[46] and that three weeks after this event, she invoked USF's established policies and procedures to disclose the assault to Dr. Allen.   Garrett sought to have Thurston suspended or expelled from USF, a student in the same program as the Plaintiff. The Plaintiff does not dispute that USF followed its procedures by immediately accepting her complaint, conducting an investigation, filing charges, and proposing sanctions.

After Thurston accepted responsibility and the proposed sanctions, USF imposed the sanctions Thurston.  It imposed the sanction of deferred suspension under its code of conduct (MC X1:001288-89), but it did not expel or remove Thurston from campus.  As it is well established, the Plaintiff cannot use an action under Title IX to quibble with the sanction imposed.  Instead, USF's response must be so clearly unreasonable that it equates to deliberate indifference.  There is simply no evidence to support the contention in this action.

USF took several actions in response to the Plaintiff's complaint, which ultimately resulted in sanctions against Thurston.  When Garrett complained about the sanctions, it offered her the opportunity to obtain increased sanctions through a hearing and appeal, which she declined.  Specifically, as outlined in the undisputed facts above, USF took the following actions:

- It conducted an immediate investigation upon Garrett's disclosure to Dr. Allen.

- USF offered to implement interim measures, such as a no-contact order, upon receiving notice of Garrett's disclosure to Dr. Allen.  Garrett declined the interim measures.

- USF provided Garrett with a victim advocate that supported and advocated for her throughout the investigation, sanctions, and appeal process.

- The investigation was prompt and thorough, which provided Garrett with several opportunities to provide written statements and documents.  Garrett provided two written statements and some text messages, but she declined to provide all of the text messages between her and Thurston that were available to her, which USF did not discover until this

---

[46] USF is not responsible for the alleged assault by Thurston nor does Garrett contend that it is. See Davis, 526 U.S. at 644 ("Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment").  Specifically, she does not contend that the incident occurred on campus or in any circumstances in which USF could have prevented it.  (Resp. to I#1).

lawsuit was commenced.

- The investigation resulted in a conclusion that there was sufficient evidence to proceed with charges for non-consensual sexual contact and sexual intercourse.

- When Garrett requested a no-contact order after she saw Thurston on campus for the first time since December, USF issued the no-contact order on the same day (March 9, 2017).

- USF informed Garrett and Thurston of the charges and the recommended sanctions if Thurston accepted responsibility.

- Thurston voluntarily accepted responsibility and USF imposed a deferred suspension with two required meetings and a no-contact order.

- USF offered the Plaintiff an opportunity to appeal if she wanted to challenge the sanctions.

- While Garrett initially filed an appeal, she later withdrew it, giving up her right to seek greater sanctions against Thurston.  She admits that she had obtained the advice of counsel before making this decision.

- After the Plaintiff complained about the sanction and Thurston's mere presence on campus, USF gave Garrett more time to consider whether she wanted to withdraw her appeal and allowed her to investigate whether she could obtain other remedies or whether the department could take action against Thurston before it accepted her withdrawal of the appeal.

- Upon the Plaintiff's request, USF investigated whether it could impose additional remedies on Thurston that would exclude him from the psychology building, the parking lot, and events.  It explained to the Plaintiff that it could not impose these remedies outside of the conduct process, but it gave her an opportunity to file an appeal to obtain these remedies.

- Based on the Plaintiff's complaint of Thurston's mere presence, the department also investigated whether it could exclude Thurston from the program without violating his rights.  Ultimately, it concluded that it could not do so, but that greater sanctions could be achieved through the appeal process that was offered to the Plaintiff.

- Garrett elected to withdraw her appeal, even though she was aware that the department could not exclude Thurston from the program and USF could not prohibit Thurston from the building, parking lot, or events outside of the student conduct process.

- It is undisputed that Garrett did not appeal or seek judicial review of USF's final decision as provided under USF's policies.

- After the Plaintiff's complaint about Thurston's mere presence, USF did offer the Plaintiff additional remedies, which included obtaining relief from her professors, at her request, in certain courses, and approving a remote research assistant position that she requested where she was able to work remotely and keep her stipend and tuition waiver.

- USF also met with the Plaintiff several times to investigate the potential remedies to provide to the Plaintiff outside of the conduct process.

- USF repeatedly explained to the Plaintiff the remedy provided in the no-contact order and the Plaintiff admitted to Crystal Coombes that there has been no violation of that order.

- Coombes also offered the Plaintiff three options on May 18, 2017, after the Plaintiff continued to express her desire to exclude Thurston from campus, which included doing nothing and enforcing the sanctions in place, filing a new complaint asserting that there was an error in process or she was subject to additional discrimination, or seeking to determine whether her appeal could be reinstated and a hearing set.  The Plaintiff chose not to file a new complaint or to seek to have the appeal reinstated.

Based on the known circumstances, which are set forth in detail in the statement of undisputed facts, USF's response to both the Plaintiff's initial complaint of an off-campus sexual assault as well as her complaint about Thurston's presence was not clearly unreasonable.  Thurston's presence on campus is permitted under the imposed sanctions, and Garrett gave up her opportunity to increase the sanctions to exclude Thurston from campus.  Despite the Plaintiff's decision to give up her ability to obtain increased sanctions, USF, as outlined above, took numerous steps and imposed other remedies to respond to the Plaintiff's complaint about Thurston's presence.  As a result, there is no evidence that USF acted with deliberate indifference.

Instead of establishing deliberate indifference, Garrett merely disagrees with USF's disciplinary decision and she is attempting to use this litigation to obtain a particular disciplinary result – the expulsion of Thurston.  In particular, she is attempting to use this action to appeal USF's sanctions without having a hearing involving Thurston.  USF's process, as well as the due process requirements of the Fourteenth Amendment, did not allow this option.[47]  Likewise, as the Supreme Court recognized in Davis, Title IX cannot be used for this purpose.  Garrett has no right

---

[47] See Doe v. Valencia Coll., 903 F.3d 1220, 1234 (11th Cir. 2018) ("We would have serious doubts about the constitutionality of decision makers in this type of proceeding basing a decision on an assumption about either side telling the truth. The decision should be based on a fact finding, and if it is impossible to determine what the truth is, it should be based on the burden of persuasion.").

to seek a particular sanction under Title IX.  She seeks to impose liability on USF simply because it did not expel Thurston, despite the clear admonition from the Supreme Court that Title IX does not serve that purpose.  Indeed, as this Court acknowledged, "the decisions consistently recognize that the hasty suspension or expulsion of a student who allegedly harassed another student might violate the former's rights and might subject a university to suit from the suspended or expelled student."  Order (Dkt. No. 35) at 9.

Other courts also have held that a school's response is not clearly unreasonable when it decides not to expel or suspend a student, despite a finding of responsibility.  See, e.g., Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163, 315 F.3d 817, 825 (7th Cir. 2003) (finding the plaintiff's argument that "the school district must have effectively ended all interaction between the two students to prevent conclusively any further harassment . . . misunderstands the law"); Ha v. Nw. Univ., 14 C 895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014); Burch v. Young Harris Coll., 2:13-CV-64-WCO, 2013 WL 11319423, at *6 (N.D. Ga. Oct. 9, 2013); Clarke County Bd. of Educ., 3:06-CV-05 (CDL), 2007 WL 2226053, at *4 (M.D. Ga. Aug. 2, 2007); Clark v. Bibb County Bd. of Educ., 174 F. Supp. 2d 1369, 1374 (M.D. Ga. 2001).

In addition, there also is no dispute that, after the sanctions imposed on Thurston for the non-consensual sexual contact, Thurston did not engage in any other instances of non-consensual sexual contact or any inappropriate touching or sexual conduct of any kind.  (MB X2).  Indeed, the Plaintiff admits that she is not aware of any conduct or interaction with anyone else where Thurston posed a danger to any other woman on campus.  (Pl. 170-71).  In addition, it also is undisputed that he did not make any attempt to talk to Garrett or have any communication with her.  He did not make any remarks to her.  He did not touch her or engage in any attempt to make purposeful contact her.  Garrett never reported any such attempt to USF and specifically denied it

when Coombes inquired.  It is undisputed that Thurston has complied with all of the sanctions imposed by USF.  Thus, in terms of remedying the non-consensual sexual contact for which the sanctions were imposed, the sanctions accomplished that result and Garrett cannot establish that USF's response to her complaint was clearly unreasonable under the known circumstances.

Accordingly, Garrett's claim fails as a matter of law as she is unable to establish the exacting standard of deliberate indifference.

### 2.  Thurston's Presence Is Not Actionable Sexual Harassment

Moreover, the Plaintiff cannot establish an actionable sexual harassment claim based on Thurston's mere presence.  Because USF cannot be held liable for the assault, Garrett's complaint in this case is focused on her claim that Thurston's mere presence is actionable sexual harassment. Specifically, the Plaintiff complains that, on three occasions since she made the disclosure to Dr. Allen on December 5, 2016, she saw Thurston and he made no comments to her or any attempt to communicate to her.  (Pl. 165).  Only two of these instances occurred on the USF campus or under USF's control, and, of those instances, only one occurred after the no-contact order was issued. Nonetheless, the Plaintiff asserts that Thurston's mere presence alone on these three occasions creates an actionable hostile education environment.  (Pl. 171).  In addition to the fact that the Plaintiff cannot show that USF acted with deliberate indifference in response to this mere presence complaint, Thurston's mere presence does not create an actionable hostile education environment. Thurston's presence alone is not severe, pervasive, or objectively offensive as required to state a claim under Title IX.[48]

---

[48] Despite affirmatively stating that she did not fear for her safety to Deremiah, declining the issuance of a no-contact order when offered by Jonathan Monti, reporting only 3 times when she saw Thurston on campus from the date of her disclosure, and admitting that Thurston did not violate the no-contact order at any time, the Plaintiff asserted, for the first time, on October 15, 2017, that she fear for the safety of other students and suggested, again, that USF should remove Thurston from USF.  (TA X4; Pl. 318-20).  Garrett did not identify any other action taken by Thurston other than her alleged assault on November 12, 2016.  (TA X4).

As a matter of law, presence in an educational environment, without more, does not constitute a hostile educational environment.  To succeed on a hostile environment claim brought under Title IX for student-on-student harassment, the plaintiff must prove harassment that is "sufficiently severe" that it deprives its victim of access to educational opportunities. Sauls v. Pierce County School Dist., 399 F.3d 1279, 1284 (11th Cir. 2005).  "Whether gender oriented conduct rises to the level of actionable harassment often depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and victim, and the number of individuals involved." Hawkins v. Sarasota Cty. Sch. Bd., 322 F.3d 1279, 1288 (11th Cir. 2003).  Presence, however does not create an actionable hostile environment nor is it harassment for which USF may be held liable.  See Deweese v. Bowling Green Indep. Sch. Dist., 709 F. App'x 775, 777 (6th Cir. 2017);   Ha, 2014 WL 5893292, at *2 (concluding that the claim "that knowledge of the [respondent]'s presence on the campus caused her considerable grief" "is not actionable under Title IX").  Clifford v. Bd. of Regents of Univ. of Calif., No. 2:11–CV–02935–JAM–GGH, 2012 WL 1565702, at *7 (E.D. Cal. 2012).[49]

In Deweese, the plaintiff brought an action under Title IX, complaining that accused was found responsible and allowed to have a continued presence on campus over the plaintiff's objection. 709 F. App'x at 778.  The district court entered summary judgment for the school board, which the Sixth Circuit affirmed on appeal, concluding that the plaintiff's claim "would effectively foreclose remedial measures short of expulsion and undermine the 'flexibility" that the Davis Court took care to guard."  Id.  Similarly, in Clifford, the plaintiff argued that the mere presence on campus of members of a fraternity at which she had been assaulted constituted a hostile environment, but the court concluded that "[t]he fact that members of the fraternity continued to

---

[49] As the Court recognized in its Order, the authority cited by Garrett for the proposition that she can state a harassment claim based on mere presence "involves facts decisively different from this action."  Order (Dkt. No. 35) at 11.

attend classes at a large university campus after the alleged assault is insufficient to support a claim for hostile environment type harassment based on sex."  2012 WL 1565702, at *7.

It is undisputed that Thurston did not contact Garrett or in any way harass her by any means. She simply complains about his presence.  Even then, she admits that she only saw him on 3 occasions since she made the disclosure to Dr. Allen, and one of those occasions was a conference that was not held on the USF campus or under its control.  There is no evidence of any notice to or knowledge of any actions or conduct on the part of Thurston that was discriminatory, harassing, or in any way contributed to a hostile environment.  Garrett admitted to Coombes on May 18, 2017, that there was no violation of the no-contact order.

Garrett argues that she needs "separation" from Thurston based solely on the alleged assault. (Pl. 310-11, 314-15).  However, the undisputed facts established that, prior to the assault, Thurston and Garrett were good friends who frequently declared their love for each other.  Garrett and Thurston also engaged in consensual touching and cuddling.  After the alleged assault, Garrett did not seek separation, but sought to be in his presence almost every day and she communicated with him every day until she was arrested under the Baker Act.  She sent him a picture of her clothed chest with her nipples protruding from the shirt; she continued to profess her love for him as he did for her; she told another student that she completely forgives him; she sought to attend Thanksgiving dinner with Thurston at his parents' house; she spent two nights in his bed in his apartment, she initiated one of those sleepovers, and she did not fear for her safety; she insisted that Thurston retain a key to her apartment; and she told another student that she was going to be "extremely pissed" if Thurston started dating another woman and stopped spending time with her.

Garrett did not want "separation" and Thurston to leave the program until after he called the police and Garrett was arrested and held under the Baker Act.  Garrett does not dispute that

32

she threatened to harm herself and told this to Thurston before he called the police, the police decided to take her to the hospital after reviewing her text messages, and the facility decided to hold Garrett for treatment and stabilization under the Baker Act.

In the context of the undisputed facts regarding the surrounding circumstances, expectations, and relationship, Thurston's mere presence, as a matter of law, is not sufficiently severe, pervasive, and objectively offensive to constitute actionable harassment.  As a result, even if mere presence could be an actionable hostile environment in some case, the undisputed facts and circumstances do not support such a claim in this case.

### B.      The Plaintiff Cannot Establish a Retaliation Claim

While not set forth in the text of the statute, courts have interpreted Title IX to prohibit retaliation.  See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).  Garrett complains of retaliation when USF charged her with a violation of the Student Code of Conduct.[50]  The Plaintiff cannot establish that she had an objectively reasonable belief that she suffered sexual harassment, sexual discrimination, or a sexually hostile environment; that she suffered an adverse action that would make a reasonable person less likely to file a Title IX complaint at USF; or that USF's reason for charging her with a violation of the student code of conduct was pretext for retaliation.

In order to prove a case of retaliation which violates Title IX, the plaintiff must show 1) that she engaged in protected activity, 2) that the defendant took action that would have been materially adverse to a similarly situated reasonable person, and 3) a causal link between two events.  Bowers v. Bd. of Regents of Univ. Sys. of Ga., 509 F. App'x 906, 911 (11th Cir. 2013)

---

[50] To the extent that the Plaintiff's complaint could be read to assert some other type of retaliation claim, the Court, in ruling on Defendant's motion to dismiss, made it clear that the retaliation claim was limited to the assertion that she was charged with a violation of the student of conduct in retaliation for making a complaint under Title IX.  See Order (Dkt. No. 35))

(citing <u>Burlington N. & Santa Fe Ry. V. White</u>, 548 U.S. 2405, 2415 (2006)).

To establish the first element, the plaintiff must prove both a subjective and an objective belief that the conduct of which she complained constituted an illegal act.  <u>Knott v. DeKalb County Syst.</u>, 624 F. App'x 996, 997 (11th Cir. 2015).  Objective good faith is measured against the law of the circuit.  <u>See id.</u>  As established <u>supra</u>, Garrett cannot establish a good faith belief that USF acted with deliberate indifference or that Thurston's mere presence was actionable sexual harassment.  Thus, Garrett cannot establish she engaged in protected activity under Title IX.

Moreover, there is no evidence that USF's reason for the student conduct charge was pretext for retaliation.  As the undisputed facts establish, the student conduct referral was made by Deremiah after Garrett disclosed that she had surreptitiously recorded Coombes without her knowledge.  The Plaintiff does not deny that she engaged in this conduct.  The Plaintiff, however, disputes that she committed a violation of law.[51]  Yet, the conduct board did not conclude that Garrett committed a violation of law.  Instead, it concluded that she was responsible for a violation of USF's policy "based on [its] interpretation of" a Florida statute.  (MC X17).  The board made this determination based on *its interpretation* of the law.  It did not conclude that the Plaintiff actually violated the law.  There is no evidence that the board, which had two student members, had any other interpretation than the one set forth in the letter to Garrett.  The Plaintiff simply cannot present any evidence that her complaints played any role in the decision to discipline her under the student conduct process.  Thus, the Plaintiff cannot create any genuine issue of fact regarding this retaliation claim.[52]  <u>See Linson v. Trustees of Univ. of Pennsylvania</u>, CIV.A. 95-

---

[51] During the hearing, however, Garrett invoked her Fifth Amendment right against self-incrimination (JM Decl. X4:002151), which warrants an adverse inference that she actually did engage in this illegal conduct.  <u>See Coquina Investments v. TD Bank, N.A.</u>, 760 F.3d 1300, 1312 (11th Cir. 2014).

[52] Garrett contends that Deremiah violated her right to confidentiality when Deremiah reported this conversation to student conduct.  While it is USF's policy that most conversations with the victim advocate are confidential, this policy is not without exceptions and, as a University policy, is subject to interpretation by USF.  More importantly, in the context of the retaliation claim, there is no evidence of any disparate treatment in USF's interpretation of this

3681, 1996 WL 479532, at *5 (E.D. Pa. Aug. 21, 1996) (concluding that the only issue of facts raised was whether the university was mistaken in concluding that the plaintiff had engage in misconduct), aff'd sub nom. Linson v. Univ. of PA, 205 F.3d 1329 (3d Cir. 1999).

Moreover, even if the Plaintiff could establish an issue of fact on pretext, her claim fails for a more fundamental reason, there was no adverse action taken against the Plaintiff.  The Plaintiff was sanctioned only by the issuance of a warning letter.  The purpose of the warning letter was to educate the Plaintiff on USF policy and the law prohibiting the recording in a closed-door meeting. (MC X17).  Indeed, this sanction was particularly appropriate in this case as the Plaintiff claimed a lack of knowledge regarding the law and USF policy.  Thus, this warning letter served to educate the Plaintiff on her improper conduct.  It does not appear on the Plaintiff's transcript and the warning letter does not otherwise have any impact on the Plaintiff's education.  It is merely a statement educating her on her claimed ignorance that she cannot engage in this conduct, and, if she does, then she may be subject to discipline.  This type of warning letter is not an adverse action. Barnett v. Athens Reg'l Med. Ctr. Inc., 550 F. App'x 711, 713 (11th Cir. 2013); Hawkins v. Potter, 316 F. App'x 957, 962 (11th Cir. 2009); Clark v. Potter, 232 F. App'x 895, 897 (11th Cir. 2007).

## III.    **CONCLUSION**

For these reasons, USF respectfully requests that the Court enter judgment in its favor.

DATED this 9th day of November, 2018.

Respectfully submitted,

*/s/ Thomas M. Gonzalez*
Thomas M. Gonzalez
Florida Bar No. 192341
Sacha Dyson
Florida Bar No. 509191

---

policy.  There is no other instance that the Plaintiff can identify where USF did not require an advocate to report when the student disclosed that he or she has secretly recorded a University administrator during a closed-door meeting.

Thompson, Sizemore, Gonzalez
& Hearing, P.A.
Street: 201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Mail: Post Office Box 639
Tampa, Florida 33601
Telephone: 813-273-0050
tgonzalez@tsghlaw.com
sdyson@tsghlaw.com

and

Joanne M. Adamchak
Florida Bar No. 943037
Associate General Counsel
Office of the General Counsel
University of South Florida
4202 E. Fowler Avenue, CGS 301
Tampa, FL  33620-4301
Telephone: 813-974-2131
jadamcha@usf.edu
Attorneys for the Defendant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

this <u>9th</u> day of November, 2018, by CM/ECF electronic filing to the Clerk of Court and to the

following:

      Michael T. Dolce
      Cohen Milstein Sellers & Toll, PLLC
      2925 PGA Blvd., Suite 200
      Palm Beach Gardens, FL 33410
      <u>mdolce@cohenmilstein.com</u>
      Attorney for the Plaintiff

                        ***/s/ Thomas M. Gonzalez***_____
                        Attorney