IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO: 8:17-cv-2874-T-23AAS

SAMANTHA L. GARRETT,

                Plaintiff,

v.

UNIVERSITY OF SOUTH FLORIDA BOARD OF
TRUSTEES,

             Defendant.

_____/

## PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiff Samantha L. Garrett, by and through her undersigned counsel, hereby responds in opposition to Defendant's Motion for Summary Judgment (ECF No. 73), and states:

**INTRODUCTION**

Within the well-established standards for summary judgment, the material facts to Plaintiff's Title IX claims are, at a minimum, in dispute. The facts certainly do not, with all inferences drawn in Plaintiff's favor, compel summary judgment for the defense as a matter of law. See generally, Rule 56, Fed. R. Civ. P. Moreover, the facts clearly establish that Plaintiff has adequate grounds to meet the legal standards required to submit her Title IX claims to a jury.

On its face, Title IX provides, in pertinent part, that, "no person in the United states, shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 USC § 1681 (a). As the facts discussed below establish, Plaintiff's complaints of a sexually hostile

1

educational environment, arising from a clearly unreasonable response by USF to her report of sexual violence by a peer, resulted in a discriminatory atmosphere in which she was deprived of the ability to participate in and receive the benefits of her educational program.

## PERTINENT FACTS

USF's recitation of facts contains misrepresentations and material omission. The facts discussed here cannot be refuted by USF as they are largely testimony of its officials.

### USF Witnesses Acknowledge That a Hostile Environment Was Created

Not every sexual harassment victim necessarily has to be insulated from the perpetrator after the fact. It can be sexually harassing, for example, to be exposed to repetitive sexual jokes and that offense can be remedied without having to isolate the victim from the joke teller. A protective order against further communication with the victim should well suffice. But it is far different for a rape victim to have to face her rapist, in the same room, repetitively, while trying to pursue her studies. It is far different for a post-traumatic stress disorder victim to be exposed to the person who inflicted that harm and whose presence aggravates that harm. USF knows this.

While USF tries to deny a hostile atmosphere existed by forcing Plaintiff to attend educational programs and use facilities along-side the man who raped her (it is not in dispute that USF failed to insulate Plaintiff from him), USF's position is at odds with the testimony of its employees, including the key decision makers, who uniformly agree that it can be intimidating and sexually harassing for a rape victim to be forced into the same room as the rapist. ECF No. 79 at 17 (Professor Braun, Plaintiff's faculty advisor, calling that conclusion "logical."); ECF No. 82 at 16 – 17 (Maria Zale Cutsinger, director of the Office of Student Rights and Responsibilties ("OSRR")); Megan Deremiah Depo. at 46 – 47, 99 (stating that it can "absolutely" be "intimidating" for a sexual violence victim to remain in the same academic program as the

2

assailant, something Plaintiff did experience.)[1]  This essential fact is also implicitly acknowledged by USF policy permitting sex crime victims, while witnesses in disciplinary proceeding, to provide testimony outside offenders' presence.  ECF No. 82 at 25 – 26.

Crystal Coombes was USF's senior deputy Title IX coordinator.  ECF No. 80 at 3.  Her job duties included "operationally oversee[ing] Title IX", including input on policies and procedures. Id. at 5.  Coombes agrees that, under Title IX, a victim of sexual harassment or sexual violence, has "the right thereafter to be free of intimidation from the person who attacked" her.  Id. at 21.  She admits that it can be "intimidating" for a sexual violence victim to be exposed to the perpetrator of that violence afterwards, stating that, "I can't speak for what a person experiences and what they would think" and that a victim "could" be "upset by being in the same room as the perpetrator," and that "certainly some are."  Id. at 21, 26.  And she agrees that off-campus sexual violence can have an on-campus impact on the victim.  Id.  (Jonathan Monti, the interim associate director of OSRR, agrees that off-campus sexual violence can create a sexually hostile environment on campus; he attested to prior cases where victims objected to being in the same room as assailants after the fact.  ECF No. 84 a 3, 17.)  Further, she agrees that a single act of sexual violence, sufficiently serious, can give rise to a hostile environment that deprives a student of the ability to participate in or benefit from an educational program.  ECF No. 81 at 5.

Similarly, Ms. Zale Cutsinger admits that a sexually harassing environment, which intimidates the victim, can result from being forced into the same room as the attacker after the assault.  ECF No. 82 at 16 – 17.  She concedes that Plaintiff was "entitled to an educational environment that was free of intimidation and sexual harassment".  Id. at 17, 20.

---

[1]     Ms. Deremiah's deposition transcript is being filed contemporaneously with this response.

Plaintiff was severely traumatized by the assailant's presence and communicated that fact to USF administrators. Professor Tammy Allen, director of the psychology program, was the first to hear of Plaintiff's trauma. ECF No. 78 at 3, 7. Plaintiff described unlawful, nonconsensual vaginal digital penetration by Thurston and was visibly upset and crying when she made the report. Id. (Thurston's offense constituted a crime under Florida law, specifically sexual battery. ECF No. 82 at 21 - 22. USF acknowledges the end result of its investigation was to confirm that there was sufficient evidence to substantiate Plaintiff's claim of rape. ECF No. 73 at 12.)

In turn, Professor Allen reported to USF's Title IX officials that she observed Plaintiff was suffering "a high degree of stress" and that she was in therapy. Id. at 4. She saw text messages from Thurston accepting responsibility for what he did, including describing himself as "a monster." Id. She reported that Plaintiff wanted her assailant removed from the program, which had less than three dozen students, making him unavoidable if they were both to continue to participate at the same time. Id. at 4 – 5. Plaintiff never changed her original expressed need to have Mr. Thurston removed from the program. Id. at 13; see also, ECF No., 83 at 4 – 5 (Joanna Ellwood, the assigned Title IX investigator, attesting to the same)[2]; and Deremiah Depo. at 46 (USF victim advocate attesting to same). Professor Allen was specifically aware that Plaintiff felt intimidated by Thurston's presence in the same room after he raped her. ECF No. 78 at 12. She was aware too that Plaintiff feared for the safety of other students. Id. at 13; ECF No. 79 at 8.

Ms. Coombes, the highest-ranking Title IX official actively involved in this matter, recognized that Plaintiff's desire to have Mr. Thurston removed from the program was based on her fear and upset that he might attack her again. ECF No. 81 at 13 – 14.

---

[2]     Joanna Ellwood was employed as the assistant interim director of OSRR at USF; her job duties included administering student conduct cases and investigations. She reported to Ms,. Zale Cutsinger. ECF No. 83 at 2 – 3.

4

Professor Braun was aware that Plaintiff was suffering from post-traumatic stress disorder as a result of the attack. ECF No. 79 at 10. He recognizes that Plaintiff needed more than she got from USF's response to her complaints of sexual assault, specifically relief from the "sanctions" against Thurston, and he agreed she needed more and still needs more. ECF No. 79 at 11.

USF's effort now to characterize Plaintiff's fear of Mr. Thurston's presence as his "mere presence on campus" defies the facts. Ms. Coombes acknowledges that Plaintiff's request was to have Mr. Thurston banned from the educational areas that she needed to access, notwithstanding her efforts to achieve that, if necessary, by having him dismissed from the academic program. ECF No. 81 at 14. Further, Coombes was aware that Plaintiff suffered from mental health "triggers" of extreme anxiety if she saw Thurston's vehicle. Id. at 22.

**Plaintiff Undeniably Was Denied Access to Educational Opportunities and Facilities**

Because USF failed to implement necessary protection, Plaintiff was forced to forego academic opportunities and use of the educational facilities dedicated to her doctoral program.

For example, in order to avoid Thurston, Professor Allen knew that Plaintiff had to forego a summer on-campus teaching assistantship and instead accept an off-campus research assistantship. ECF No. 78 at 8. (Professor Braun was also aware that Plaintiff was attempting to achieve safety in this manner. ECF No. 79 at 6, 8). The distinction matters to Plaintiff's career prospects; it places her at an employment disadvantage in her field not to have teaching experience. ECF No. 78 at 8. Mr. Thurston was favored with maintaining a teaching assistantship. Id. at 9.

Megan Deremiah has been a certified victim advocate with the USF Center for Victim Advocacy for some three years. Deremiah Depo. at 8, 12 - 14. She is trained in victim response and advocates for her clients' needs, including the Title IX process. Id. at 18 – 19, 22 – 23. She provides emotional support and counseling for matters such as safety planning. Id. at 18 – 19.

5

Plaintiff was her client, beginning shortly after she filed her complaint against Thurston. Id. at 10 – 11, 43 – 44. Ms. Deremiah attested that the trauma aftermath Plaintiff suffered included the need to seek academic accommodations, including extensions of time to complete work, withdrawal from classes, and taking "incompletes" in classes. Id. at 48 – 49, 68; ECF No. 73-4 at 2.

While presiding over Plaintiff's disempowerment, USF empowered Thurston to control what remedial measures would be provided to Plaintiff. See, ECF No. 73 at 12. Professor Braun recognized that the result of USF's approach was to deprive Plaintiff of access to educational programs. ECF No. 79 at 17.

**Plaintiff's Withdrawal of an Appeal Was Not a Waiver of Her Demand for Safety Measures**

USF disingenuously argues that it offered Plaintiff an opportunity to "seek more severe sanctions though a hearing and appeal," as if it was not responsible for the ineffective sanctions in the first place. USF suggest that Plaintiff failed to accept the "opportunity" by withdrawing her appeal of the sanctions, attempting to cast the impression that Plaintiff waived her complaint to the non-existent sanctions against Thurston. In fact, prior to this case, USF lacked a procedure to allow Plaintiff to appeal "sanctions" that provide inadequate protection in the event that, like here, the perpetrator accepted responsibility for the charge and the offered "sanctions" without a hearing. ECF No. 82 at 32 and ECF No. 73 at 15.

A policy was created for use in this case (ECF No. 82 at 32), but its implementation was anything but clear and it was not merely an appeal of the sanctions, rather a complete re-start of the process. Deremiah Depo. at 83 – 89. Plaintiff was first assured that she could pursue the remedies she needed to be protected from Thurston without having to go through that additional trauma, which was the express reason she "withdrew" her appeal, only to be informed later that Thurston was given veto power over anything she requested and that any other relief would require

that she give up access academic programs and events.  Deremiah Depo. at 94 – 98.  (Professor Braun understood that Plaintiff at all times was seeking additional relief for protection from Mr. Thurston, even after the supposed decision to withdraw the "appeal."  ECF No. 79 at 5 – 6.)

Notwithstanding, USF argues that it was prevented by Plaintiff's withdrawal of her appeal from taking further action, citing the assailant's "due process rights" to a hearing.  As discussed herein, without any consent or participation by Plaintiff, USF first offered Thurston "sanctions" that provided no protection to Plaintiff and, in fact, no real punishment; he consented to that, waiving his right to a hearing in the process.  That is plainly USF's failing in the first instance, not Plaintiff's failure to fix it thereafter.

**The Perpetrator Was Not Actually Punished Based on Deliberate Indifference to the Class of Sex Crime Victims to Which Plaintiff Belongs; and Plaintiff's Needs for an Environment Free of Sexual Harassment Were Not Even Evaluated**

Contrary to Defendant's claim that it took remedial action against Thurston, it really did not for any practical purpose.  Further, the "sanctions" against Thurston were not intended to provide any remedy to Plaintiff; in fact, Plaintiff's needs were ignored and not even evaluated.

Maria Zale Cutsinger was the director of OSRR at USF.  ECF No. 82 at 3.  She oversaw the student code of conduct process.  Id. at 4.  She determined the "sanctions" to be imposed on Thurston.  Id. at 6.  Despite that key role, she did not speak with Plaintiff about what Thurston did to her, its impact on her, her needs, or her views on necessary sanctions.  Id. at 5 – 8, 13, 19.  Zale Cutsinger never sought to determine "what protection she felt she needed from her attacker."  Id. at 35.  In fact, she did not take into account at all what Plaintiff's wishes were.  Id. at 13.

Ms. Zale Cutsinger provided Thurston with proposed "sanctions" if he were to accept responsibility for the charges, including a "deferred suspension," which allowed him to remain on campus without restrictions; she did not discuss the offer with Plaintiff in advance.  ECF No. 82 at

10 – 11; see also ECF No. 78 at 10; ECF No., 79 at 5. The other "sanctions" imposed were for Thurston to attend two meetings with Zale over the following year to discuss his "academic and personal achievements." ECF No. 82 at 11. The first meeting did not even involve any discussion of Plaintiff. Id. at 11. The last "sanction" was the "no contact" order. Id. The order, which constrained Plaintiff as much as Thurston, was not discussed with Plaintiff in advance either. Id.

While USF lauds its "no contact" order, its presentation is inherently misleading. USF states that it issued the order after Thurston entered a room where Plaintiff was working, but fails to disclose that the order would not, in any way, bar Thurston from walking into another room at any time he wanted where Plaintiff was present. It was, in fact, only a "no communication" order. See, ECF No. 78 at 7, 10 (Professor Allen relating that Thurston was allowed to attend educational sessions even if Plaintiff was there, provided he not sit next to or talk to her; Plaintiff objected, so she had to forego attending); ECF No. 79 at 5 (Same by Professor Braun); ECF No. 80 at 14 (Same by Ms. Coombes); ECF No. 82 at 8 – 9, 12 (Same by Zale); ECF No. 84 at 12 (same by Jonathan Monti, saying "It's more about communication.") Nonetheless, USF could have enforced a no-contact order to restrict Thurston from being on certain parts of campus. ECF No. 84 at 12 - 13.

The "no communication" order is the only remedy USF put into place in response to Plaintiff having been raped by Mr. Thurston. ECF No. 80 at 27. While allowing Thurston to have direct, in-person contact with Plaintiff in academic settings after he raped her, and despite knowing that such contact would occur in academic and departmental events and programs, Ms, Zale Cutsinger gave no consideration to the distress Plaintiff would experience. ECF No. 82 at 12. She undertook no effort to determine the frequency of that contact and the impact on Plaintiff. Id.

When she determined the sanctions, Ms. Zale Cutsinger was aware that Plaintiff was suffering from a high degree of distress over the attacks and was in mental health care. However,

she did not account for these facts in determining sanctions; she stated that Plaintiff's mental health care status was of no "concern" to her. ECF No. 82 at 13. She did nothing to inform herself of Plaintiff's initial reaction to being raped, or of any long-term coping problems. Id. at 19. In fact, she has no knowledge of how the sanctioning process impacted Plaintiff at all. Id. at 20.

Ms. Zale Cutsinger relied only on the investigative report prepared by Joanna Ellwood in determining sanctions, which did not contain any information about the impact on Plaintiff or her mental health therapeutic needs, or her safety needs with respect to Thurston's ongoing presence. ECF No. 82 at 6, 14. Notably, USF provided no specific guidelines on sanctions to impose for offenses of the severe type committed by Thurston, only a broad range of options that would apply to any offense, reflecting deliberate indifference at the policy-making level, not just the operational level. Id. at 7 – 8, 22 – 23; see also ECF No. 84 at 11 (same by Jonathan Mont). Ms. Zale Cutsinger admits that she was provided no policies or procedures to consider a victim's reaction to victimization when deciding on what sanctions to impose on an offender. ECF No. 82 at 19.

According to Ms. Zale Cutsinger, the goal of the "sanctions" imposed on Mr. Thurston did not include providing any remedial measures the Plaintiff might need at all, including for restoration or maintenance of a non-sexually harassing environment. ECF No. 82 at 14 – 15. Instead, she indicates that remedial measures are the province of the Title IX Coordinator's office, in this case, Ms. Coombes. Id. at 15, 34. Further, Ms. Zale could not identify any violation of Mr. Thurston's due process rights that would occur by the Title IX office implementing remedial measures, even over his objection, after the sanctions were imposed by OSRR. Id. at 15 – 16.

Ms. Deremiah attested to the fact that USF officials handling the response to complaints of sexual violence have a "bias" against victims, like Plaintiff, who report rape by digital penetration, as opposed to penile penetration. Deremiah Depo. at 65 – 66. She testified that Joanna Ellwood

9

too concurred that this is what happened in this case. Id. at 86. She explains that the result, as here, is to impose minimal sanctions against the offender with no suspensions or expulsions. Id.

Ms. Deremiah also attested to the fact that the university officials likewise impose lesser sanctions in cases where the victim has not filed a police report, like here, despite the fact that USF officials admit that the victim's decision not to file a police report should not have such an impact. Deremiah Depo. at 67; ECF No. 84 at 18.

Those who knew Plaintiff and her needs best were disregarded and silenced. Professor Allen testified that the psychology department faculty were told by USF's administration that they were not to provide input as to what sanctions against Thurston might be necessary for Plaintiff's needs in the educational environment. ECF No. 78 at 11. Professor Braun testified that he was told he could have no input in the sanctions, nor in the remedial measures that Plaintiff might need. ECF No. 79 at 12. He was told that the Psychology Department could take no action itself against Thurston for Plaintiff's benefit, including accommodations for Plaintiff. Id. at 12 – 13.

Professor Braun agrees that while a "sanction" was imposed on Thurston, he was not, in fact, "punished" in any respect. ECF No. 79 at 13. He agrees that Plaintiff was not treated fairly by the university, specifically in connection with accommodations she needed for her safety and mental health, among other related matters. Id. He attested to a meeting with Ms. Coombes at which depriving Plaintiff of access to departmental education programs was discussed approvingly, whereby Thurston would be able to attend events that Plaintiff would then have to forego. Id. at 5 - 6. The "sanctions" against Thurston had already been determined at that time. Id. Ultimately, Thurston refused to cooperate in agreeing to forego any department educational events or programs, thus depriving Plaintiff of the ability to attend without endangering her mental

health.  Id. at 7, 17.  Braun agrees that USF did nothing to mitigate the impact on Plaintiff other than issue the "no communication" order.  ECF 79 No. 79 at 17.

**Nobody Took Responsibility for Plaintiff's Wellbeing**

Despite now insisting that it acted to remedy the situation for Plaintiff's benefit and listing a bevy of actions it professes to have taken, the undeniable fact is that no USF official acted to ensure that the educational environment was not sexually harassing for Plaintiff in the aftermath of rape.  All knew that she would not be able to avoid the trauma of facing her rapist and knew that it was devastating her and damaging her academic performance, but did nothing about it.

Ms. Coombes admits that there is a difference between "sanctions" and "remedial action."  ECF No. 80 at 16.  She admits that further remedial action could be taken after sanctions are imposed by OSRR.  Id. at 16 – 18.  However, she claims she could only pursue "voluntary" measures that would either require the assailant's consent or require that the victim forego access to educational opportunities and facilities.  Id.; and ECF No. 81 at 15 – 16.

Ms. Coombes maintains that various remedies that might have addressed Plaintiff's mental health needs were ones that could have been addressed through the OSRR sanctioning process, but she presumed that they were not found to be necessary in that process.  ECF No. 81 at 22.  As discussed above, OSRR did no such thing; Ms Zale Cutsinger did not even consider Plaintiff's needs and did not see it as a goal that the "sanctions" imposed on Thurston were remedial at all.

Plaintiff did complain to Ms. Coombes about having to come face-to-face repeatedly with the man who raped her.  ECF No. 80 at 11.  Coombes asserted that the process for determining the "sanctions" against Thurston ended at OSRR, so she could only ask Thurston to voluntarily agree to restrictions through "interim measure or remedy."  ECF No. 80 at 11 - 12.  At that time, Coombes personally observed that Plaintiff's level of upset caused her to need a 15 minute break to "gather

herself." Id.  Coombes otherwise offered only options that would require Plaintiff herself to leave campus, while Thurston got to stay, such as with a leave of absence or attending on-line only.  Id. at 13.  In the face of Plaintiff's complaints, Coombes made no effort to determine the extent to which Thurston's presence was depriving Plaintiff of access to educational opportunities.  Id. Likewise, she made no effort to consult with OSSR.  Id.  (In fact, Coombes maintained she did not even know what a "deferred suspension" entailed.  Id. at 14).  She would not consider acting to have Thurston to take a leave of absence because he had already been "sanctioned" by OSRR.  Id. When she spoke to him about cooperating to accommodate Plaintiff's needs, he refused.  Id. at 14.

Notably, Ms. Coombes could not rule out that Mr. Thurston might sexually assault Plaintiff again.  ECF No. 81 at 34.

Despite the fact that Coombes' job duties included stopping, remedying and preventing sexual harassment, she did nothing in response to Plaintiff's complaints of feeling intimidated by Thurston's ongoing presence in her program; likewise, she made no assessment of the on-campus impact of the off-campus sexual violence committed by Thurston.  ECF No 80 at 26.  (Coombes explained that Title IX student-on-student offenses are was handled by OSRR; she is only contacted otherwise once the case reaches a conclusion and sanctions are imposed by OSRR.  ECF No. 80 at 6.)  She claimed that it was the victim advocate's job to make such an assessment.  Id. However, Ms. Deremiah's testified that she had no authority to determine or impose sanctions on an offender and OSRR never consults with her about that.  Deremiah Depo. at 56 - 57.

The "sanctions" against Thurston were determined by Ms. Zale Cutsinger; Ms. Coombes maintains that it was not her job to be involved in that determination, nor is she consulted.  ECF No. 80 at 8.  Coombes was not aware of any guidelines for OSRR as to what sanctions to impose for a particular offense.  Id.  She had no opinion on whether the "sanctions" against Thurston were

sufficient. Id. at 15.   She had no knowledge as to whether Plaintiff was consulted in advance about the "sanctions" offered to Mr. Thuston, nor does she have an opinion as to whether she should have been. Id. at 16.  Notwithstanding, she admits that it was her job to make sure that the disciplinary process would "stop, remedy, and prevent" sexual harassment at USF.  Id.

Jonathan Monti also said the Title IX office is responsible to address a sexually harassing atmosphere, not OSRR.  ECF No. 84 at 5, 15.  Ms. Coombes, for her part, could not even identify any form that is used to ask a victim what remedial measures they might need.  ECF No. 81 at 9.

Despite being the direct subordinate of Ms. Zale Cutsinger, and despite having conducted the investigation, Ms. Ellwood was not consulted on what Plaintiff's needs might be in the aftermath of being raped and she was not involved in determining sanctions.  ECF No. 83 at 8.  However, she did indicate to Ms. Deremiah that, for safety and wellbeing reasons, Plaintiff and Thurston should not attend the same events.  Deremiah Depo. at 70.  Deremiah confirmed that when Plaintiff and Thurston did end up in the same academic room, Plaintiff was emotionally overwhelmed and had to leave, abandoning her academic duties.  Deremiah Depo. at 74 – 76.

**The Facts Regarding Plaintiff's Relationship With Mr. Thurston Highlighted by USF Are Not Relevant and Disregard Known Sex Crime Victim Trauma Behaviors**

USF's recitation of details of Plaintiff's relationship with Thurston before he raped her is a disingenuous effort to call into question her veracity in saying that she was raped.   The facts are that Mr. Thurston accepted responsibility for what he did and all involved agree that Plaintiff was honest about her claims.  See, e.g, ECF No. 80 at 14; ECF No. 79 at 9 (Professor Braun stating that he never doubted Plaintiff.); ECF No. 83 at 7 (Investigator Joanna Ellwood stating she found Plaintiff to be credible.)  Nobody attested otherwise.  There is no evidence that USF took the actions that it did or omitted any actions based on a belief that Plaintiff was dishonest.

Likewise, it is disingenuous for USF to try to cast the impression that Plaintiff's continued contact with Thurston during the approximate three weeks after the attack is anything less than known victim maladaptive behavior, a clinical reality for many survivors. USF knows this is common victim behavior, as they publish that very information. Ms. Zale Cutsinger identified USF sexual assault "victims guide" that states the initial reaction to victimization can be "shock, disbelief, or denial," and she admits that the manner of reaction varies from person to person. ECF No. 82 at 18. Ms. Coombes explains, for example, that sex trauma victims might "freeze" and not resist the attacker. ECF No. 81 at 5. Similarly, Ms. Ellwood acknowledges that victims might even blame themselves initially for their own rape. ECF No. 83 at 8. Ms. Deremiah testified that a "most" sex crime victims delay reporting the crime to police. Deremiah Depo. at 67.

The record is clear that USF's failures to comply with its Title IX obligations to Plaintiff were not due to any skeptical view of the prior relationship between Plaintiff and Mr. Thurston, despite its attorneys' attempt to insinuate that now.

**Facts Pertinent to the Retaliation Claim**

The subject recording was made during a discussion where Plaintiff was complaining about USF's failure to uphold her rights under Title IX. ECF No. 81 at 26. The timing and circumstances are significant. Ms. Coombes had gone so far in disregarding Plaintiff's rights under Title IX, that she told Plaintiff she should withdraw and transfer to another school. ECF No. 73-4 at 3. There could be few acts that more favored the rapist than that.

Ms. Coombes too had reason to believe in May 2017 that Plaintiff "was still within a trauma response" to having been raped. ECF No. 80 at 22. She recognized that she was still going through stages of trauma recovery. ECF No. 81 at 26. Plaintiff's mental stability had been questioned by a professor and she was no longer attending any department events. Id. at 18. Nonetheless,

14

Coombes closed Plaintiff's complaint file on June 18, 2017, following the disciplinary charges being leveled against Plaintiff, even though her concerns had not been resolved, other than to offer her options that would deprive her of access to educational opportunities. ECF No. 80 at 19.

In this context, Coombes seized the opportunity to find an excuse to silence Plaintiff. The assertion that the process of prosecuting Plaintiff was legitimate is belied by the known facts. Ms. Zale Cutsinger denies that there was any finding that Plaintiff violated state or federal law in making the recording, even though she was charged with and convicted of doing just that. ECF No. 82 at 9. Further, there was no legal analysis obtained to determine whether Plaintiff even violated the law. ECF No. 84 at 20, 26. No effort was made to determine if there were exceptions to any law that Plaintiff allegedly violated in making the recording. Id. at 22.

It is not disputed that the entire prosecution of Plaintiff arose from an attack against her confidential relationship with the victim advocate who had advocated alongside Plaintiff in repeated petitions to Coombes. Ms. Zale Cutsinger acknowledges that the relationship between Ms. Deremiah and Plaintiff was, under published university policies, supposed to be maintained as a confidential relationship under which confidentiality would be breached only if the client became suicidal or homicidal, to address suspected child or elder abuse, or based on a court order. ECF No. 82 at 26. See also, Deremiah Depo. at 30 – 31. Ms. Deremiah confirms that none of the exceptions ever arose while Plaintiff was her client. Id. at 31 – 32.

When the recording was made, Ms. Coombes was engaged in her job duties, as was Ms. Deremiah. The recording was in Ms. Coombes office on campus, a public building. ECF No. 84 at 23. The recording was of a discussion about Plaintiff's objections to not being properly protected from Thurston. Id. The recording was motivated by Plaintiff's problems with

concentration due to post-traumatic stress disorder developed when attacked by Thurston. Id. at 24 - 25. The conversation related to university business. Deremiah Depo. at 112 – 113.

The breach of Plaintiff's confidential relationship with Deremiah was conscious, knowing and purposeful. Deremiah depo at 105. The decision was made by a USF in-house attorney, Jodi Adamchak. Id. at 106, 114. It was known and expected that breaching the confidential relationship would destroy Plaintiff's supportive relationship with the victim advocate program. Id. at 110.

## PERTINENT LEGAL AUTHORITIES AND ANALYSIS

### Title IX Claim Generally

Despite USF's effort to mischaracterize this case as one in which Plaintiff is simply second-guessing its disciplinary process, "quibbling" over the sanctions and trying vindictively to get Thurston expelled, that is not the case. The facts make clear that Plaintiff is now, and has persistently, objected that remedial measures necessary to restore the educational environment to one that is not harassing and discriminatory to her were not put into place. She is objecting to the fact that USF sought to, and did, exclude her from educational facilities and opportunities, rather than excluding her assailant. She is objecting to the fact that USF took no action to evaluate and accommodate her medically-based needs in the aftermath of rape, a second-degree felony.

Liability attaches under Title IX if the university reacts to student-on-student sexual violence in a manner that subjects the plaintiff to discrimination, and that the discrimination is "'so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.'" *Williams v. Board of Regents*, 477 F. 3d 1282, 1293 (11th Cir. 2007), citing *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) at 633. A university is deliberately indifferent to discrimination where the university's action either "'cause[s] [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Williams,*

*supra.*, at 1296, citing *Davis* at 644 -645. (emphasis added). Here, that is exactly what USF did. USF knowingly and purposefully insisted that Plaintiff's access to educational opportunities and facilities was conditioned on her willingness to aggravate and endanger her mental health by exposure to her rapist. USF did so knowing that such exposure, given the extreme violation Plaintiff had suffered, was intimidating to her in a sexually harassing manner. USF knew she was suffering and failing academically and refused to rectify that. In fact, when Plaintiff was unexpectedly confronted with her rapist in a classroom, this is exactly what happened; she was forced to abandon her academic duties and flee.

It is instructive that the Title IX Plaintiff in *Williams* left the university altogether shortly after being sexually assaulted. *Williams, supra* at 1289. The fact that the plaintiff withdrew shortly after "the harrowing ordeal" of being sexually assaulted was held not to be a basis to deny her Title IX claim, reasoning that her decision was "reasonable and expected", including based on the university's failure "to take any precautions that would prevent future attacks" if she opted to return to the university, such as removing the assailants from university housing or suspending them, a decision the Court noted was "inexplicable and discriminatory." *Williams* at 1297.

While Title IX does not permit, *per se*, a "second guessing" of disciplinary decisions made by school administrators, the university still answers for any response to harassment that is "clearly unreasonable in light of the known circumstances." *Davis, supra* at 648. This can certainly occur where the university's response subjects the plaintiff to discrimination. Id. at 649. Consistent with the language on the face of Title IX, "discrimination," the Court has held, includes denying a student access to "participat[e] in" or receive "the benefits of" an educational program or activity. Davis at 650. This includes physical access to facilities due to the presence of an offending student, including deliberately refusing requests for aid in accessing those facilities. Id. at 650 – 651. That

is precisely what happened here. USF chose to impose sanctions on Thurston that had no remedial benefit to Plaintiff and then refused to implement any remedial measures when Plaintiff objected.

Moreover, "[t]he Title IX inquiry is contextual; it does not require school districts to simply do something in response to sexual harassment; rather, they must respond in a manner that is not 'clearly unreasonable in light of the known circumstances.'" *Doe v. School Board of Broward County*, 604 F. 3d 1248, 1263 (11th Cir. 2010), quoting *Davis, supra* at 648. Here, USF seeks to avoid the full context and the circumstances that its officials plainly knew, including that the Plaintiff was, based on a medical reality caused by the sexual assault, incapable of being able to attend to her studies and participate in educational opportunities if her rapist was present. USF's response was clearly unreasonable, at a minimum because it did nothing to remedy the problem other than put an ineffective "no communication" order in place that disregarded what they knew – that a severe sexual assault victim could well be intimidated by the immediate presence of her rapist – and empowered the rapist to decide what remedies could or could not be put into place. It was equally unreasonable for all of the decision-makers not to consider Plaintiff's needs before carving "sanctions" into stone and then hiding behind "due process" claims to refuse to take further remedial action. It was equally unreasonable to reject, disregard and dissuade the views of the professors who knew Plaintiff's needs the best and objected to the lack of proper remedies.

In this context, at least two other district courts have noted that the failure to make an effort to separate a Title IX plaintiff from an abuser after notice can amount to deliberate indifference. See, discussion in *Doe v. Seagull Industries for the Disabled, Inc.*, 2016 U.S. Dist. LEXIS 110772 *15; 2016 WL 4417684, citing *Kinsman v. Florida State University Board of Trustees*, 4:15CV235-MW/CAS, 2015 WL 11110848 (N.D. Fla. Aug. 12, 2015). In *Kinsman, supra*, the Court further noted that the "effect of [sexual harassment] on a victim does not necessarily end

with a cessation of abusive conduct, particularly if the victim and abuser retain the same or similar roles in an educational institution."

Similarly, in *Takla v. Regents of the University of California*, 2015 U.S. Dist. LEXIS 150587; 2015 WL 6755190 (C.D. Calif. Nov. 2, 2015), the Court addressed a Title IX plaintiff's fear of running into her sexual harasser and being subjected to further harassment. Citing *Davis, supra*, the Court emphasized that Title IX liability for deliberate indifference can arise from either the school causing the plaintiff "to undergo" or "'make liable or vulnerable' to harassment", and under that standard, rejected defense claims that its conduct must have resulted in actual further harassment. Id. at *13 - 14. The Court reasoned that a university's inadequate response could well create vulnerability to further harassment, even in the absence of "'actual'" harassment, including where the university fails to comply with the victim's demands for academic accommodations to "separate her from her assailant." Id., citing, *inter alia*, *Kelly v. Yale University*, 2003 U.S. Dist. LEXIS 4543, 2003 WL 1563424, at *4 (D. Conn. Mar. 26, 2003) (Defendant's motion for summary judgment denied where the plaintiff "'related to administrators her discomfort and fear that she would feel if she encountered [the assailant]", noting that the lack of further harassment was the result of the plaintiff leaving her classes and dormitory, not action taken by the university). In a particularly pertinent analysis to the issues raised here, and in reliance in part on the 11th Circuit's reasoning in *Williams, supra*, the Court held:

> The Court agrees with plaintiffs that placing undue emphasis on whether further harassment actually occurred to gauge the responsiveness of an educational institution would penalize a sexual harassment victim who takes steps to avoid the offending environment in which she may again encounter the harasser.

Id. at *16, citing *Kelly* and *Williams, supra*.

**Title IX Retaliation Claim**

"To establish a prima facie case of retaliation [under Title IX, Plaintiff] must show (1) he engaged in statutorily protected expression; (2) the [Defendant] took action that would have been materially adverse to a reasonable person; and (3) there was a causal link between the two events." *McCullough v. Bd. of Regents of the Univ. Sys. of Georgia*, 623 Fed. Appx. 980, 982 (11th Cir. 2015) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). "To establish a causal connection in a retaliation case, 'a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" Id. (quoting *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

Here, the facts show that Plaintiff was engaged in the protected expression of objecting to violation of her rights under federal law, at the time the recording was made.[3] Objectively speaking, a reasonable person would find it materially adverse to have a confidential relationship breached (and knowingly destroying that relationship in the process) and to have that breach used as the basis for being charged with violation of the student code of conduct and threatened with more severe sanctions than were ever threatened against her rapist. Finally, there was clearly a causal link between the Plaintiff's complaints of her rights being violated under federal law, the use of a disciplinary process for an alleged violation of law that was never even researched, and the expected destruction of her supportive and confidential relationship that was being used to advance her complaints against USF.

WHEREFORE, Plaintiff respectfully submits that Defendant's motion should be denied.

---

[3]     The failure and refusal of USF officials to consider the law itself is significant.  At a minimum, Plaintiff was arguably exercising her First Amendment Free Speech Rights when she recorded the conversation.  See, *Smith v. City of Cumming*, 212 F. 3d 1332 (11th Circ. 2000).

Respectfully submitted,

MICHAEL DOLCE, ESQ.
Florida Bar No.: 48445
mdolce@cohenmilstein.com
Cohen Milstein Sellers & Toll, PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL  33410
(561) 515-1400

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November 2018, I electronically filed a true and correct copy of the foregoing via EC/CME and served upon those listed below via the Portal:

Thomas M. Gonzalez
tgonzalez@tsghlaw.com;  sknox@tsghlaw.com;  kharris@tsghlaw.com;  MMcLeod@tsghlaw.com;
awhiteside@tsghlaw.com
Sacha Dyson
sdyson@tsghlaw.com
Thompson, Sizemore, Gonzalez & Hearing, P.A.
201 North Franklin Street, Ste. 1600
Tampa, FL  33602
Phone: (813)-273-0050

Cohen Milstein Sellers & Toll, PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL  33410
(561) 515-1400
(561) 515-1401 (facsimile)

By: _____
MICHAEL DOLCE, ESQ.
Florida Bar No.: 48445
mdolce@cohenmilstein.com