**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

SAMANTHA L. GARRETT,

     **Plaintiff,**

v.                                 **Case No. 8:17-cv-2874-T-23AAS**

UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES,

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

The University of South Florida Board (USF Board) moves for summary judgment on Samantha Garrett's claims brought under Title IX: Garrett's deliberate-indifference claim (Count I) and her retaliation claim (Count III). (Doc. 73). Garrett opposes the USF Board's motion. (Doc. 89).

A genuine dispute of material fact exists about whether USF's disciplining decision for Andrew Thurston made Garrett vulnerable to sexual harassment. And a genuine dispute of material fact exists about whether USF retaliated against Garrett because she filed a Title IX complaint. The USF Board is therefore not entitled to judgment as a matter of law, and its motion for summary judgment should be **DENIED**.

# I. BACKGROUND[1]

## A. The Alleged Assault on November 12, 2016

Samantha Garrett and Andrew Thurston were doctoral students in USF's Industrial & Organizational Psychology program. (Doc. 82, p. 12).[2] Garrett and Thurston had been good friends since 2015. (Doc. 74, p. 43; Doc. 76-1, pp. 1–458). That friendship, however, changed on November 12, 2016. (Doc. 82-1, pp. 51–60). According to Garrett, Thurston sexually assaulted her that night. (*Id.*). The alleged assault occurred in Thurston's apartment, which is not located on USF's campus. (*Id.* at 52).

## B. Interactions After the Alleged Assault

Garrett did not immediately report the alleged assault to USF, the police, or any other authority. (75, p. 6). Instead, Garrett and Thurston exchanged text

---

[1] The amount of exhibits the USF Board and Garrett filed in connection with the USF Board's motion for summary judgment demonstrates this case's fact-intensive nature. When ruling on a motion for summary judgment, reasonable inferences are drawn in the nonmoving party's favor and evidence favorable to the moving party that the jury need not believe is disregarded. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004) (discussing judgment as a matter of law); *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986) (stating that the standard for summary judgment mirrors the standard for directed verdict). As a result, this report's "Background" includes reasonable inferences in Garrett's favor and disregards evidence favorable to the USF Board that a jury need not believe.

[2] Only evidence that can be reduced to an admissible form may be considered when ruling on a motion for summary judgment. *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (citation omitted). This report therefore cites evidence produced by the parties that can be reduced to an admissible form at trial.

messages daily during the following ten days. (Doc. 76-1, pp. 367–453). The day after the alleged assault, Garrett and Thurston exchanged text messages that discussed their love for each other, exchanging gifts, and how the previous evening affected their friendship. (*Id.* at 367–79). When Thurston expressed concern about whether his actions ruined their friendship, Garrett responded: "We made out. It's not a big deal. Everything's still the exact same." (*Id.* at 374). Garrett also discussed how she felt about Thurston's actions from the previous night, including how "forceful" Thurston was and "the fact that [Thurston] wouldn't listen to no." (*Id.* at 376).

In addition to exchanging text messages with Thurston daily, Garrett slept two nights at Thurston's apartment with him. (Doc. 74, p. 44). Thurston did nothing untoward either of those nights, and Garrett never feared Thurston those nights. (*Id.*; Doc. 75, p. 6). At some point during her sleepovers with Thurston, Garrett sat on the same couch or bed with Thurston, but she had no fear of imminent bodily harm "other than him just being near [her]." (Doc. 74, p. 44; Doc. 75, p. 6).

On November 23, 2016, Garrett and Thurston continued exchanging text messages. (Doc. 76-1, pp. 446–53). That morning, in one of her text messages to Thurston, Garrett said, "If you don't want me to come to thanksgiving [sic] I'd totally understand." (*Id.* at 448). Thurston assured Garrett: "No not at all, why would I want that?" (*Id.*). Garrett responded: "Oh ok my bad. It's probably just in my head. Guess I shouldn't have taken those Xanax." (*Id.*).

Later that day, Garrett and Thurston discussed "hanging out." (*Id.* at 448–

49). After Thurston told Garrett he was going to a party, Garrett told him, "You're welcome to come here" and "Just let me know if you'd want to so I can at least not have my place look super gross." (Doc. 76-1, p. 449). Garrett then confirmed with Thurston that they would spend Thanksgiving together the next day with Thurston's mother. (*Id.* at 450). Thurston later sent a text message to Garrett and said, "I'll see you later tonight! We can cuddle and watch Westworld." (*Id.* at 451).

### C.    Garrett Arrested under Florida's Baker Act

Between 5:42 p.m. and 8:19 p.m. on November 23rd, Garrett sent Thurston fourteen text messages without reply. (*Id.* at 451–52). In one of those text messages, Garrett told Thurston, "Just do me a favor and if I don't answer I [sic]. The mornin f [sic] come Check [sic] on Riley" and "Last time I did this I ended up throwing up in my sleep and I'm not trying to leave her under." (*Id.* at 452).[3] At 8:21 p.m., Thurston asked Garrett, "What did you do? I'm on my way." (*Id.*). Garrett then sent multiple text messages to Thurston, including one, in which she said, "I'm taking two more Sleeping [sic] pills and another Xanax in CD-R [sic] you need to kno [sic]." (*Id.* at 453). In the following messages, Garrett said, "In all honesty, all of this would be a lot easier for me if you just shot me," "And I'm being 100% serious," and "At [sic] I wouldn't have to do [sic] through this shit alone." (*Id.*). The last text message Garrett sent to Thurston that evening said, "That's it. If you're going to blow my hair up and tell other people, I'm going the same." (*Id.*).

---

[3] Riley is Garrett's dog. (Doc. 75, p. 16).

Thurston eventually arrived at Garrett's apartment with another man. (Doc. 75, p. 15). Although Garrett yelled at Thurston to leave, Thurston eventually entered Garrett's apartment because she previously gave him a key. (*Id.* at 15–16). Garrett felt unsafe with Thurston at her apartment, especially after she told him to not enter. (*Id.* at 16). Thurston eventually called the police. (*Id.* at 17). When they arrived at her apartment, the police asked to see the text messages on Garrett's phone. (*Id.*). After reviewing her text messages, the police arrested Garrett under Florida's Baker Act. (*Id.* at 18; Doc. 90-1, p. 4).

Garrett was admitted into Gracepoint, where she completed medical examinations and tests, including bloodwork. (Doc. 75, p. 18; 74-1, pp. 175–84). While at Gracepoint, Garrett sent text messages to her friend, Maryana Arvan, and asked Arvan to pick her up from the hospital. (Doc. 75, pp. 22–23; Doc. 75-1, pp. 137–38). The same night she was admitted to Gracepoint, Garrett sent a text message to Arvan that said, "AJ will be dropping out of the program this semester." (Doc. 75-1, p. 137).[4] After Arvan expressed remorse over Garrett's situation, Garrett responded: "Oh he isn't the one who told me." (Doc. 75, p. 23; Doc. 75-1, p. 138). Garrett added: "But after this there's no way I'm ok with him staying in the program." (Doc. 75, p. 23; Doc. 75-1, p. 138).

### D. Garrett Tells Tammy Allen about the Assault

Eleven days later, on December 5th, Garrett told Tammy Allen, a psychology

---

[4] Andrew Thurston also goes by "A.J." (Doc. 84-1, p. 13).

professor and the director of USF's Industrial & Organizational Doctoral Program, about the alleged November 12th assault. (Doc. 78-1, pp. 1–5). That same day, Allen submitted a completed Title IX Incident Report to Crystal Coombes, the senior deputy Title IX coordinator at USF. (*Id.*; Doc. 80, p. 4). In her incident report, Allen stated Garrett experienced "a high degree of stress," texts between Garrett and Thurston "corroborate [Garrett's] story," Garrett "would like the perp removed from the program," and Garrett was concerned "she will be re-victimized by investigators." (Doc. 78-1, p. 4).

### E.    Garrett Decides to File Formal Complaint

The next day, Coombes determined Allen's incident report provided "enough information to certify this to move forward to an inquiry." (Doc. 84-1, p. 1). That same day, Jonathan Monti, the interim associate director of USF's Office of Student Rights and Responsibilities (OSRR), sent a letter to Garrett notifying her that OSRR and the Office of Diversity, Inclusion and Equal Opportunity (DIEO) were notified about her sexual-assault claim. (*Id.* at 26–28). In his letter to Garrett, Monti discussed how USF's students have a right to file a complaint and the various resources available to students, including the Center for Victim and Advocacy and the Counseling Center. (*Id.* at 26). Monti advised Garrett that students may also report incidents to the local police or the USF police department. (*Id.*).

In his letter, Monti explained USF has two offices that provide formal processes for students to address issues like Garrett's assault: the DIEO and the

OSRR. (Doc. 84-1, p. 27). Monti outlined how Garrett may follow the process in the DIEO and OSRR. (*Id.*). Monti then provided general information about how Garrett could submit a formal complaint with OSRR and how her complaint would be investigated. (*Id.*). Monti attached policies and guides to his letter, including USF's "Policy 004 Sexual Misconduct/Sexual Harassment." (*Id.* at 28).

That evening, Garrett emailed Monti and advised him that she wanted to file a formal complaint. (*Id.* at 2). Monti replied to Garrett's email the next morning and advised her to call his office to schedule an informational session to discuss Title IX policies and process. (*Id.* at 1).

After Garrett told her about the alleged assault, Allen referred Garrett to the Center for Victim Advocacy, and Garrett called the center and scheduled an appointment. (Doc. 74-1, p. 16). On December 8th, Garrett met with her assigned advocate from the center: Megan Deremiah. (*Id.* at 19). At that meeting, Deremiah explained the Title IX process, the timeline Garrett could expect, and possible outcomes to the investigation. (*Id.*). Garrett expressed an interest in obtaining an injunction against Thurston; so, Deremiah provided her the necessary paperwork for an injunction and explained the possible outcomes. (*Id.*). Garrett continued to contact Deremiah throughout the investigation. (*Id.* at 16–41).

The next day, Garrett met with Monti for an informational session. (Doc. 84-1, pp. 29–30). Monti and Garrett discussed USF's policies and regulations, the Title IX process, and general principles and rights. (*Id.* at 29). Monti also discussed

interim measures that could be entered while the Title IX investigation proceeded, but Garrett requested no interim measures. (Doc. 84-1, p. 30). In her meeting with Monti, Garrett described the alleged assault Thurston committed as "non-consensual digital penetration." (*Id.* at 30).

Monti also held a separate informational session with Thurston to discuss the Title IX process. (*Id.* at 13, 31–32). In his letter to Thurston, Monti strongly encouraged Thurston to "refrain from any contact" with Garrett even though no interim measures, like a no-contact order, had been enacted. (*Id.* at 31).

### F.    USF Begins the Investigation

On the same day Monti met with Garrett for an informational session, Joanna Elwood, the interim assistant director at OSRR, was assigned to investigate Garrett's complaint. (Doc. 75-1, p. 88; Doc. 83, p. 3). On December 21st, Elwood interviewed Garrett, reviewed Garrett's complaint, and discussed the investigative process. (Doc. 83-1, p. 8). Deremiah was also present at Garrett's meeting with Elwood. (*Id.* at 9). At the interview, Elwood explained the investigators' role; the investigation process; the standard of evidence used; Garrett's right to have an advisor with her at informational meetings; Garrett's right to provide evidence and names of witnesses; Garrett's right to report the incident to the police; the difference between USF's Title IX investigative process and a police investigation; retaliation;[5] and the privacy of the

_____

[5] The investigative report states Elwood discussed Garrett's "right to be retaliated against." (Doc. 83-1, p. 9).

investigation. (Doc. 83-1, p. 9).

During the Title IX investigative process, the investigator obtains a statement, evidence, and list of witnesses from the student filing the complaint (the complainant). (Doc. 83, p. 4). The investigator then meets with the accused student (responding party) to obtain the same information. (*Id.*). The goal of the Title IX investigation is to determine that facts of the case (i.e., what happened) so the OSRR can determine whether the responding party violated the Student Code of Conduct. (*Id.*).

The investigator's role (Elwood in Garrett's case) is to obtain as much information and facts as possible to determine whether enough evidence exists to proceed with the Code of Conduct process. (*Id.*). The investigator uses a preponderance-of-the-evidence standard in determining whether enough evidence exists. (*Id.* at 4).

During her investigation of Garrett's complaint, Elwood interviewed Garrett and Thurston. (*Id.* at 5; Doc. 83-1, p. 12). Neither Garrett nor Thurston provided other witnesses relevant to Garrett's complaint. (Doc. 83-1, p. 12). Elwood also reviewed text messages and notes between Garrett and Thurston and text messages between Garrett and another student. (*Id.* at 11). After her investigation, Elwood concluded enough evidence existed to "substantiate the presence of non-consensual sexual intercourse and non-consensual sexual contact." (*Id.* at 13). Elwood specifically found enough evidence—using a preponderance-of-the-evidence

standard—to support concluding Thurston violated two provisions of the Student Code of Conduct: 4.04(b) (which governs non-consensual sexual intercourse) and 4.14(c) (which governs non-consensual sexual contact). (Doc. 83-1, p. 13). Elwood also found enough evidence to support concluding Thurston violated USF Policy 0-004, which prohibits sexual misconduct and sexual harassment. (*Id.*).

Elwood submitted her report (which was completed on February 14, 2017) to Maria Zale Cutsinger, the interim director of OSRR and Elwood's immediate supervisor. (*Id.* at 8; Doc. 82-1, p. 45). At this point, Cutsinger had to determine the level of responsibility and appropriate sanctions. (Doc. 82, p. 6).

## G.    Cutsinger Determines Responsibility and Sanctions

Less than one month later, Cutsinger emailed Thurston her conclusions. (Doc. 80-1, pp. 30–33). Cutsinger determined the investigation established Thurston violated the Student Code of Conduct on November 12, 2016. (*Id.* at 30). Cutsinger notified Thurston he was formally charged with violating sections 4.14(b) (non-consensual sexual intercourse) and 4.14(c) (non-consensual sexual contact). (*Id.*). Cutsinger then provided Thurston two options on how he could proceed. (*Id.*).

First, Thurston could accept responsibility and Cutsinger's proposed sanctions. (*Id.* at 30). The proposed sanctions included deferred suspension with review, which would defer suspension to a certain date and require Thurston to meet and discuss his academic and personal achievements with staff members. (*Id.*; Doc. 82, p. 8). The proposed sanctions also included a no-contact order, which would prohibit Thurston

from contacting Garrett "by telephone, in writing, electronically, by third party, or in person both on and off campus." (Doc. 80-1, p. 31).

Second, Thurston could choose to not accept responsibility and Cutsinger's sanctions. (*Id.*). Thurston could instead choose to have a formal hearing before an administrative officer or a University Conduct Board (Conduct Board). (*Id.*). Choosing the second option could have resulted in more severe sanctions against Thurston. (*Id.*). Thurston had five days to respond to Cutsinger's letter; his failure to respond in time would have resulted in Thurston accepting responsibility and the sanctions. (*Id.*).

On March 9, 2017—the same day Cutsinger issued her conclusions—Garrett proctored an exam. (Doc. 74, p. 18). At some point, Thurston entered the classroom and walked toward Garrett. (*Id.*). Garrett ran straight out the classroom while Thurston walked in, and Garrett did not proctor the exam. (*Id.* at 19). Thurston never communicated with Garrett. (*Id.*). Thurston's presence in the classroom resulted from a miscommunication between a third doctoral student, who inadvertently asked both Garrett and Thurston to cover her in proctoring the exam. (*Id.*). The no-contact order OSRR later issued against Thurston was not yet in place when Garrett encountered Thurston while proctoring the exam. (*Id.*).

Garrett was notified of Cutsinger's letter to Thurston, and Garrett expressed frustration at the OSRR's decision. (Doc. 74-1, p. 57). However, Garrett wanted to avoid a hearing and to not appeal the decision. (*Id.*).

11

Thurston accepted responsibility and OSRR's sanctions. (Doc. 80, p. 11). In addition to the meetings he had to attend as part of his deferred suspension, the no-contact order prohibited Thurston from contacting Garrett "by any means." (Doc. 85-1, p. 1).

## H. Cutsinger Notifies Garrett about Thurston's Decision

Cutsinger then sent a letter to Garrett explaining the sanctions USF imposed on Thurston and Garrett's options. (Doc. 85-3). Cutsinger's letter stated the following:

> As the complainant in this case, as provided in the regulation, you may appeal in writing the Final Decision of the Conduct Officer within five business days of the date of the letter describing the decision. The Dean for Students may adopt, modify, or reject the recommended decisions and/or sanctions from the case. The record of the formal hearing may be considered on appeal as well as any new information that comes to the attention of the Dean for Students. (There was no formal hearing in this case, as the student did not request one). The Dean for Students is authorized to contact any participants from the case for clarification and the student is entitled access to the record when appealing. <u>Your basis of appeal must meet one or more of the following criteria to be considered for an appeal</u>:

(Doc. 85-3, p. 2). The letter listed and explained "due process," "sanctioning," and "new information" as the criteria to be considered. (*Id.* at 2–3). The "sanctioning" criterion determined "whether the sanction(s) imposed was extraordinarily disproportionate for the violation of the Student Code." (*Id.* at 3). The letter again stated the following:

> Should you disagree with this decision, you may appeal by visiting the following website https://usf-advocate.symplicity.com/u/gxubYtvE a [sic] within five (5) days of the date of this Outcome Letter by 5:00 p.m.

12

Danielle McDonald, Assistant Vice President and Dean for Students, is the appellate for all appeals for the University related to student conduct.

(Doc. 85-3, p. 3).

## I. Garrett Appeals Thurston's Sanctions

Garrett decided to appeal the OSRR's sanctions, and, on March 22, 2017, Garrett notified Cutsinger about her decision. (Doc. 84-1, p. 15). Less than two weeks later, McDonald (dean of students) emailed Garrett to schedule a meeting to discuss the appeal process. (*Id.* at 17). The next day, Garrett met with McDonald; Monti and Deremiah were also present. (Doc. 74-1, p. 81).

At the meeting, McDonald notified Garrett that USF had no specific procedure in place for an appeal in Garrett's situation—that is, when the responding party decides to not have a formal hearing but accepts responsibility and sanctions instead. (*Id.* at 84). McDonald therefore created a procedure after Garrett notified OSRR of her appeal. (*Id.*). McDonald's newly created procedure would govern Garrett's appeal of Thurston's sanctions. (*Id.*).

The appeals process for Garrett's case had six steps. (*Id.* at 146). First, after Thurston accepted responsibility and the sanctions, Garrett could request a hearing. (*Id.*). Second, Thurston could (a) request an administrative or board hearing or (b) "leave the initial review determination in place with the appeal of sanction process moved forward which may include a respondent appeal process." (*Id.*). Third, McDonald would notify Garrett of Thurston's decision (i.e., whether he requested a

hearing or left the initial determination in place while moving forward with Garrett's appeal of his sanctions). (Doc. 74-1, p. 146). Fourth, if Thurston requested a hearing, the OSRR would follow "the established process for hearings," including Garrett's ability to appeal the hearing's outcome. (*Id.*). Fifth, if Thurston decided to leave the initial determine in place while moving forward with Garrett's appeal of his sanctions, Thurston would have a chance to respond to Garrett's appeal. (*Id.*). McDonald would then consider Garrett's and Thurston's statements and issue a decision on Garrett's appeal. (*Id.*). Sixth, if Thurston failed to respond to Garrett's appeal, McDonald would consider Garrett's appeal and issue a final decision. (*Id.*).

After McDonald explained the appeals process, Garrett expressed concern that the newly created process differed from the process previously explained to Garrett. (*Id.* at 84). Garrett was told earlier she could appeal the sanctions directly to McDonald, who would then issue a final decision about Thurston's sanctions. (*Id.*). Garrett requested information about the psychology program's ability to remove Thurston from her program. (*Id.*). McDonald and Monti advised Garrett that they were unsure about removing Thurston and encouraged Garrett to meet with Coombes to discuss possible interim measures while the appeal continued. (*Id.*).

After the meeting with McDonald, Garrett told Deremiah she was furious with the situation because Thurston "held all the power" in the appeal process even though he accepted responsibility. (*Id.*). Garrett asked Deremiah to schedule a meeting with Coombes. (*Id.*). Garrett also told Deremiah she wanted to avoid a hearing at all costs

14

but, if a hearing occurred, she wanted to participate. (Doc. 74-1, p. 84).

**J.    Garrett Meets with Coombes to Discuss Appeal**

The next day, Garrett and Deremiah met with Coombes. (*Id.* at 87). At this meeting, Coombes and Garrett discussed the appeal process McDonald explained the day before. (*Id.*). Coombes advised that McDonald's newly created procedure differed from Coombes's understanding of the appeal process. (*Id.*). Coombes explained "equal process" to Garrett; that is, how Thurston and Garrett have the same due-process rights, which USF must respect during the appeal process. (*Id.*). Garrett told Coombes she wanted Thurston to have no access to the psychology department's building. (*Id.*). Garrett also wanted Thurston to not attend events Garrett attended, and Garrett wanted Thurston to have no access to the parking lot, in which Garrett also parked. (*Id.*). Coombes advised Garrett she would look into Garrett's requests, but Deremiah expressed concern about timing because Garrett had to decide by Monday whether she wanted to rescind her appeal. (*Id.*).

After meeting with Coombes, Garrett told Deremiah she was skeptical about whether she would obtain her requested sanctions. (*Id.*). Garrett also told Deremiah she leaned toward rescinding her appeal because she wanted to keep the option of expelling Thurston. (*Id.*).

Later that day, Deremiah spoke to Cutsinger and Joanne Adamchack (senior associate general counsel at USF). (*Id.* at 89; Doc. 77-1, p. 1). Deremiah asked about Garrett's request that Thurston be removed from the psychology program. (Doc. 74-

15

1, p. 89). Cutsinger expressed doubt about whether USF could remove Thurston because OSRR already sanctioned him. (Doc. 74-1, p. 89).

### K.    Garrett Retracts Her Appeal

On April 10, 2017, Garrett retracted her appeal of OSRR's sanctions on Thurston. (*Id.* at 15). She retracted her appeal because of differences between the information she first received in the Title IX complaint process and the newly created appeal process. (*Id.*). Garrett instead wanted to pursue other remedies through interim measures. (*Id.*). McDonald waited until Garrett confirmed her retraction before accepting it. (*Id.* at 98). McDonald notified Thurston about Garrett's decision after Garrett confirmed her retraction. (*Id.* at 15).

The day after she emailed her retraction to McDonald, Garrett and Deremiah met with Coombes again to discuss possible remedies. (*Id.* at 98). Coombes explained she could not limit Thurston's parking options but could only suggest he park in a different lot than Garrett. (Doc. 74-1, p. 98). Coombes also explained she could not ban Thurston from the psychology department's building, but she could limit his access to ensure he was not on the same floor with Coombes. (*Id.*). Coombes told Garrett that she and Thurston would have to split brown-bag events to ensure they attended different ones and that a faculty member would attend each event Garrett and Thurston attended. (*Id.*). Coombes also stated Garrett and Thurston would have different class schedules. (*Id.*).

Garrett was extremely upset with Coombes's proposed solutions. (*Id.*).

Coombes then explained she would look into finding Garrett a remote research-assistant position or off-campus internship. (Doc. 74-1, p. 98). Garrett asked that USF consider allowing her to perform a year-long internship so she could take a leave of absence. (*Id.*).

The day after Garrett's meeting with Coombes, Toru Shimizu, chair of USF's psychology department, forwarded Garrett an email from Allison Cleveland-Roberts, associate dean for academics at USF's College of Arts and Sciences. (Doc. 78-1, p. 6). In the forwarded email, Cleveland-Roberts stated the psychology department has no authority to remove a student for violating the Student Code of Conduct. (*Id.* at 7). Cleveland-Roberts stated OSRR is the office with power to sanction a student for violating the Student Code of Conduct and the psychology department could remove a student for academic reasons only. (*Id.*).

### L.     Garrett Records a Meeting with Coombes

On May 18, 2017, Garrett and Deremiah met with Coombes to discuss possible interim, voluntary measures available for Garrett. (Doc. 74, p. 46). Coombes explained that nothing required Thurston to agree to voluntary measures. (Doc. 74-1, p. 125). Garrett discussed how she believed OSRR failed to properly handle the Title IX process, especially the appeal process. (*Id.*).

Coombes provided three options to Garrett. (*Id.*). First, Garrett could take no action and leave everything in place, including the no-contact order. (*Id.*). Second, Garrett could file a complaint about an error in USF's Title IX process. (*Id.*). Third,

Garrett could possibly reinstate her now-retracted appeal.  (Doc. 74-1, p. 125).

After the meeting with Coombes, Garrett told Deremiah she recorded the meeting with Coombes.  (*Id.*).  Garrett said she had trouble remembering what is said during the meetings, but she was glad she recorded this meeting even though Garrett knew she could not use it for anything.  (*Id.*).  At that moment, Deremiah expressed no concern to Garrett about the recording.  (*Id.*).

### M.    Deremiah Reports Garrett's Actions

The morning after the meeting with Coombes, Garrett emailed Deremiah a transcript of the meeting with Coombes and asked Deremiah to confirm the transcript's accuracy.  (Doc. 81-1, p. 163).  Later that day, Deremiah reported Garrett for possibly violating the Student Code of Conduct when she recorded the meeting with Coombes.  (*Id.* at 181–87).

### N.    USF Investigates Deremiah's Report

On June 8, 2017, Monti, the initial review officer assigned to investigate Deremiah's report concerning Garrett's recording, sent a letter to Garrett notifying her about Deremiah's report.  (Doc. 84, p. 19; Doc. 84-1, p. 126).  Monti stated the investigation involved Garrett possibly violating USF Student Code of Conduct 4.21, which prohibits violations of state and local laws.  (*Id.*).  Monti asked Garrett to call his office so they could schedule an initial-review meeting to discuss this investigation.  (*Id.*).

On June 12th, Monti met with Garrett.  (Doc. 84-1, p. 127).  In her initial-

review meeting, Garrett admitted she recorded the May 18th meeting with Coombes. (Doc. 81-1, p. 182).

The next day, Monti met with Deremiah to discuss her report. (*Id.* at 186). Deremiah informed Monti she did not know Garrett was recording the May 18th meeting with Coombes. (*Id.*). Deremiah told Monti neither she nor Garrett previously addressed Garrett's difficulty remembering what is said in meetings. (*Id.*). Deremiah also said she could not recall Garrett taking notes at meetings before May 18th. (*Id.*). Deremiah knew not why Garrett recorded the meeting but speculated Garrett did so because information changed from meeting to meeting. (*Id.*). Deremiah told Monti she suspected no malintent by Garrett in recording the meeting. (*Id.*).

On June 15th, Monti sent Garrett a letter, in which he stated enough evidence existed to charge Garrett for violating the Student Code of Conduct. (Doc. 84-1, p. 127). Monti provided Garrett two options. (*Id.*). First, Garrett could accept responsibility and the OSRR's proposed sanctions. (Doc. 84-1, p. 127). The proposed sanctions required Garrett to complete two "Ethics and Community Standards Workshops." (*Id.*). Second, Garrett could have a formal hearing. (*Id.* at 128).

### O.    Garrett has Hearing Before the Conduct Board

Garrett decided to have a formal hearing. (*Id.* at 133). Monti provided Garrett an agenda for the hearing, the list of witnesses, and the names of the four individuals who would compose the Conduct Board. (*Id.*). The Conduct Board included students,

faculty, and staff. (Doc. 84-1, p. 133). Monti notified Garrett she could prepare questions for the hearing and have an advisor present during the hearing. (*Id.*). Monti also told Garrett she could review her file before the hearing. (*Id.*).

On August 18, 2017, Garrett had her hearing. (Doc. 85-4). Garrett had her advisor Valentina Villalobos with her during the hearing. (*Id.* at 2). The Conduct Board found Garrett responsible for violating USF Student Code of Conduct 4.21. (Doc. 82-1, pp. 170–71). The Conduct Board concluded Garrett more likely than not violated 4.21 based on the board's interpretation of Chapter 934, Florida Statutes, which prohibits an individual from recording another person without that person's consent. (*Id.* at 170).

The Conduct Board's sanction against Garrett for her violation was a "Letter of Warning." (Doc. 82-1, p. 170). The warning stated the following:

> The letter serves as a warning to you that any future disciplinary referrals to this office may result in formal disciplinary action being taken against you. Any such action could seriously impact your student status at the University.

(Doc. 82-1, p. 170). Garrett had five days to appeal the Conduct Board's decision. (*Id.*). McDonald would review the board's decision if Garrett appealed. (*Id.* at 171). If Garrett appealed, McDonald could adopt, modify, or reject the Conduct Board's decision and sanction. (*Id.*). Garrett decided not to appeal the Conduct Board's decision.

### P.    Garrett Sues the USF Board

On November 30, 2017, Garrett brought this cause of action against the USF

Board.  She claims the USF Board violated Title IX.[6]  (Doc. 1).  Specifically, Garrett

claims USF's response to Garrett's Title IX investigation into the alleged November

12th assault, including Thurston's sanctions, fostered and endorsed a sexually

harassing and hostile atmosphere.  (*Id.*).

Garrett's complaint includes three counts: hostile educational environment

under Title IX (Count I); clearly unreasonable response to sexual violence under Title

IX (Count II); and retaliation under Title IX (Count III).  (*Id.*).  The April 18, 2018

order dismissed Count II from Garrett's complaint because it was redundant.  (Doc.

35).  As a result, only Counts I and III remain.

The USF Board now moves for summary judgment on Counts I and III.  (Doc.

73).  Garrett opposes the USF Board's motion.  (Doc. 89).[7]

## II.   STANDARD

An order granting summary judgment is appropriate if no genuine dispute of

material fact exists and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit under

governing law.  *Liberty Lobby*, 477 U.S. 242 at 248.

A moving party is entitled to summary judgment when the nonmoving party

---

[6]  20 U.S.C. § 1681 (the Education Amendments).

[7]  While the USF Board's motion remained pending, the parties were allowed to submit supplemental memorandum about a recent Title IX case—decided after the USF Board moved for summary judgment—from the Northern District of Florida. (Docs. 98, 100, 101).  Those memoranda have been considered, and that case will be addressed in this report.

fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 316, 323 (1986). The nonmoving party must "go beyond the pleadings and her own affidavits," and she must point to evidence in the record that demonstrate the existence of a genuine issue for trial. *Id.*

If evidence requires credibility determinations or deciding factual inferences in the moving party's favor, summary judgment is inappropriate because the duty to weigh credibility and evidence belongs to the jury when the judge is not the factfinder. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (quotation and citation omitted). Further, all record evidence is reviewed with inferences construed in the nonmoving party's favor. *Id.* at 1192–93 (citation omitted).

## III. ANALYSIS

After the April 18, 2018 order, Garrett has a deliberate-indifference claim (Count I)[8] and retaliation claim remaining (Count III). (Doc. 35). This report will analyze whether the USF Board is entitled to summary judgment on each of Garrett's claims.

---

[8] With respect to Count I, Garrett alleges a "hostile education environment" in her complaint. (Doc. 1 p. 25). The April 18, 2018 order explains, however, that a "hostile educational environment" claim requires Garrett to prove the USF Board demonstrated a "clearly unreasonable response to sexual violence." (Doc. 35, p. 12). As a result, this report—consistent with the April 18, 2018 order—refers to Count I as a "deliberate-indifference claim."

### A.    Deliberate-Indifference Claim

A university that receives federal funding may not exclude a student from the benefits of an educational program "on the basis of sex." 20 U.S.C. § 1681(a). Student-on-student sexual harassment can constitute discrimination "on the basis of sex" under Title IX. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (citation omitted).

To recover damages for student-on-student sexual harassment under Title IX, the plaintiff must prove four elements. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007). First, the plaintiff must prove the defendant is a Title IX funding recipient. *Id.* (citation omitted). Second, the plaintiff must prove an "appropriate person" had actual knowledge about the alleged student-on-student harassment. *Id.* (citation omitted). Third, the plaintiff must prove the defendant acted with "deliberate indifference to known acts of harassment in its programs or activities." *Williams*, 477 F.3d at 1293 (quoting *Davis*). Fourth, the student-on-student harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* (quoting *Davis*).

The parties do not dispute USF is a Title IX funding recipient. (Docs. 73, 89). Nor do the parties dispute whether USF had actual knowledge about the alleged sexual harassment Garrett experienced after the alleged November 12th assault. (*Id.*). As a result, whether summary judgment is appropriate hinges on (1) whether

the USF Board was deliberately indifferent to Garrett's alleged sexual harassment after the alleged assault and (2) whether Garrett's alleged sexual harassment after the alleged assault was so severe, pervasive, and objectively offensive that it effectively barred Garrett's access to an educational opportunity or benefit.

      1.    <u>Whether the USF Board was deliberately indifferent to the alleged sexual harassment and discrimination Garrett experienced.</u>

A university is deliberately indifferent to a student's sexual harassment when its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. A clearly unreasonable response results in a student's continued harassment or "makes them more vulnerable to it." *Hill v. Cundiff*, 797 F.3d 948, 973 (11th Cir. 2015) (citation omitted). To survive summary judgment, a Title IX plaintiff must provide evidence that would allow a reasonable jury to conclude the university's "deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination." *Hill*, 797 F.3d at 973 (quoting *Williams*). The premise of a deliberate-indifference claim is an official decision by the university to not remedy a Title IX violation. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998).

The standard for demonstrating deliberate indifference is "rigorous and hard to meet." *Id.* at 975. Title IX gives no right to students to request particular remedies from a university. *Davis*, 526 U.S. at 648 (citation omitted). Courts should not second guess a university's disciplinary measures because university administrators must

enjoy flexibility in their decision-making. *Davis*, 526 U.S. at 648.

To be liable for deliberate indifference, the university must have substantial control over the circumstances under which the sexual harassment occurred. *Id.* at 646. Garrett argues not that the USF Board's deliberate indifference resulted in the alleged November 12th sexual assault. (Docs. 1, 89). Instead, she argues the USF Board exhibited deliberate indifference in its response to her Title IX complaint filed after the alleged assault. (Doc. 89). At issue here, therefore, is whether the USF Board demonstrated deliberate indifference when it investigated and responded to Garrett's Title IX complaint about the alleged November 12th assault.

The USF Board argues Garrett cannot, as a matter of law, demonstrate USF responded to her Title IX complaint with deliberate indifference. (Doc. 73, pp. 23–30). The USF Board cites the steps it took when investigating Garrett's complaint in an effort to establish that it was not deliberately indifferent. (Doc. 73, pp. 26–28). According to the USF Board, Garrett "merely disagrees" with the decision to not expel Thurston, and, as a result, she instituted this lawsuit. (*Id.* at 28).

Garrett disagrees with the USF Board's characterization of her allegations and instead argues USF attempted to exclude her from educational facilities and opportunities. (Doc. 89, p. 16). According to Garrett, USF insisted on conditioning her access to educational facilities and opportunities "on her willingness to aggravate and endanger her mental health by exposure to her rapist." (*Id.* at 17). Garrett argues she could not study or participate in educational opportunities at USF "if her

rapist was present." (Doc. 89, p. 18). Garrett characterizes USF's no-contact order as "ineffective" and argues USF's process "empowered the rapist to decide what remedies could or could not be put in place." (*Id.*).

This report's "Background" section illustrates how USF took many steps to ensure Garrett experienced no more sexual harassment from Thurston. On December 5, 2017, Garrett told Tammy Allen about the alleged November 12th assault. USF then provided Garrett a victim advocate to accompany her through the investigation process. Less than three weeks later, the OSRR (through Monti) encouraged Thurston to refrain from any contact with Garrett, and USF began its investigation. By February 14th—just over two months after Garrett first told Allen about the assault—Elwood found enough evidence to support concluding Thurston violated USF's Student Code of Conduct.

On March 9th—less than one month after Elwood concluded her investigation and less than three months after Garrett first disclosed the alleged assault— Cutsinger determined that Thurston violated the USF Student Code of Conduct. Thurston accepted Cutsinger's proposed sanctions, which included deferred suspension and a no-contact order. The OSRR then allowed Garrett the opportunity to appeal Thurston's sanctions, which she did before later retracting her appeal. The appeal process—had Garrett followed through with it—could have resulted in Garrett's desired sanction: Thurston's expulsion from USF.

Responses like USF's actions have been determined to not constitute deliberate

indifference. For example, in *Oden v. Northern Marianas College*, a college student reported sexual harassment by her professor in February. 440 F.3d 1085, 1087 (9th Cir. 2006). The student filed a formal complaint in March, the college quickly assigned two counselors to the student for psychological and practical support, the college instructed the professor to have no contact with the student, and a formal hearing was held, after which the professor was "significantly disciplined." *Id.* at 1087, 1089. The student argued the college demonstrated deliberate indifference because of a nine-month delay in holding the hearing and because the college decided to not fire the professor even though the student encountered the professor twice on campus after filing her complaint. *Id.* at 1087, 1089. *Oden*, however, held that the college was not deliberately indifferent in its response to the student's complaint and affirmed summary judgment in the college's favor. *Id.* at 1090.

Other circuits have issued decisions like *Oden. See Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014) (affirming summary judgment in university's favor after it took immediate action to inform the student about her options and resources and investigated her sexual-assault complaint); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751–53 (2d Cir. 2003) (Calabresi, J.) (same); *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823–25 (7th Cir. 2003) (same).

Garrett argues that the sanctions imposed on Thurston, including deferred suspension and the no-contact order, were inadequate because Garrett encountered Thurston twice after the no-contact order issued. (Doc. 89, p. 8).

The first interaction between Garrett and Thurston—or, more accurately, a series of brief interactions over two days—occurred at a conference the Society for Industrial and Organizational Psychology (SIOP) organized from April 26 to April 29, 2017. (Doc. 73-2, p. 4). The conference took place in Orlando—not on USF's Tampa campus. (Doc. 74, p. 7). Students, professionals, and academics from different schools—not just USF—attended the conference. (*Id.*). The psychology program at USF requires its doctoral students to attend these conferences. (*Id.* at 8).

While Garrett was in line to register for the conference, Thurston stood in a line next to Garrett even though he could choose from four other lines. (*Id.* at 7). Thurston never tried to talk to Garrett while in line, and they stood in line next to each other for about three minutes. (*Id.* at 8).

Garrett also encountered Thurston while attending receptions at the SIOP conference. (Doc. 74, p. 8). Garrett saw Thurston at a reception, but Thurston never tried to speak with Garrett, and the closest Thurston stood to Garrett was within one foot. (*Id.* at 9). Thurston also regularly walked in the same hallways Garrett walked in, and Thurston waited in common areas Garrett needed to pass. (*Id.* at 10).

The second interaction between Garrett and Thurston occurred at a brown-bag event. (*Id.* at 42). A brown-bag event is a lunchtime meeting, attended by doctoral students, in which a speaker gives a one-hour presentation. (*Id.* at 10). After the no-contact order issued, Thurston attended a brown-bag event Garrett also attended. (*Id.* at 42). Thurston never spoke or communicated with Garrett during the brown-

bag event.  (Doc. 74, p. 42).

Garrett argues these two interactions demonstrate that the no-contact order was an ineffective remedy.  Garrett also argues USF failed to issue adequate measures to ensure she experienced no additional distress resulting from the possibility of encountering Thurston.  (Doc. 89, p. 8).

The question is not whether a university's response to student-on-student sexual harassment is effective but whether the university's action amounted to deliberate indifference.  *See Sauls v. Pierce Cty. Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir. 2005) (citation omitted) (affirming summary judgment for a school that promptly investigated each complaint of misconduct by a teacher); *see also Ostrander v. Duggan*, 341 F.3d 745, 751 (8th Cir. 2003) (affirming summary judgment for university that promptly investigated claim that fraternity member sexually assaulted student but decided to impose no sanctions on the fraternity).

That said, a university's response to a Title IX complaint is clearly unreasonable when it causes students to experience harassment or "makes them more vulnerable to it."  *Hill*, 797 F.3d at 973; *see also Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1104–05 (10th Cir. 2019) (Ebel, J.) (concluding that plaintiffs sufficiently pleaded university's deliberate indifference made them "vulnerable to" sexual harassment).  When a student repeatedly requests academic separation from her assailant and the university decides to not accommodate those requests, a reasonable jury may conclude the university's actions made the student more vulnerable to

harassment. *Kelly v. Yale Univ.*, No. Civ. A. 3:01-CV-1591, 2003 WL 1563424, at *4 (D. Conn. Mar. 26, 2003) (Hall, J.); *Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 448 (D. Conn. 2006) (Arterton, J.) (noting school board made no effort to reduce student's vulnerability to traumatic interactions with her attacker).[9]

The USF Board cites cases holding that a school is not deliberately indifferent to sexual harassment because it decides to not remove an assailant student from campus. (Doc. 73, p. 29) (citing one circuit decision and four district-court decisions). For example in *Gabrielle M. v. Park Forest-Chicago Heights*, a kindergarten student, who was a victim of sexually inappropriate behavior by another student, argued the school's response to her complaint was clearly unreasonable because the school failed to ensure the assaulting student had no more interactions with her. 315 F.3d 817, 824 (7th Cir. 2003) (Kanne, J.). But the school was not deliberately indifferent to the victim student's complaint because it investigated each complaint against the assaulting student and disciplined him. *Id.*

*Gabrielle M.* holds that a school need not end all interactions between two

---

[9] Courts have also analyzed a university's failure to expel a student assailant at the motion-to-dismiss stage. *See Takla v. Regents of the Univ. of Calif.*, No. 2:15-CV-04418-CAS(SHx), 2015 WL 5755190, at *4–5 (C.D. Calif. Nov. 2, 2015) (Snyder, J.) (denying motion to dismiss because student sufficiently pleaded that the university's decision to not remove her assailant from campus made her vulnerable to further harassment); *Doe v. Seagull Indus. for the Disabled, Inc.*, No. 15-CV-81403-MARRA, 2016 WL 4417684, at *5 (S.D. Fla. Aug. 19, 2016) (denying motion to dismiss because school made no effort to separate student from her abuser); *Kinsman v. Fla. State Univ. Bd. of Tr.*, No. 4:15CV235-MW/CAS, 2015 WL 11110848, at *4–5 (N.D. Fla. Aug. 12, 2015) (Walker, J.) (denying motion to dismiss because student sufficiently pleaded that her attacker's presence on campus forced her to leave school).

students "to prevent conclusively any further harassment." 315 F.3d at 825. Instead, Title IX only requires a school's response to not be clearly unreasonable. *Id.*; *see also Clark v. Bibb Cty. Bd. of Educ.*, 174 F. Supp. 2d 1369, 1374 (M.D. Ga. 2001) (Fitzpatrick, J.) (noting that a school's disciplinary measures under Title IX should not be second-guessed).

While the USF Board's cited cases support its argument, none of those cases discuss whether the school's response made the victim student vulnerable to further harassment. In contrast, *Farmer* emphasizes how, under Title IX, a victim student may show she either experienced further harassment or was made vulnerable to further harassment. 918 F.3d at 1103 (citations omitted).

Whether a university responded to a Title IX complaint with deliberate indifference is a fact-intensive question. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 n.12 (5th Cir. 1994) (en banc) (Davis and Jolly, JJ.) (discussing deliberate indifference in a Section 1983 context); *Derby Bd. of Educ.*, 451 F. Supp. 2d at 447 (citation omitted) (stating deliberate indifference under Title IX is a fact-based question).

A reasonable jury could conclude that USF's decision to not issue more severe sanctions against Thurston—despite Garrett's requests for USF to expel him from campus because of fear of encountering her assailant—constitutes deliberate indifference because USF's decision made Garrett vulnerable to further sexual harassment. Garrett repeatedly requested that USF remove Thurston from the

psychology program because she feared further encounters with him. Garrett's concern proved justifiable when she encountered Thurston twice after the no-contact order issued. In both instances, Garrett felt uncomfortable while in her assailant's presence. (Doc. 74, pp. 7–10, 42–43).

The USF Board points out the first interaction at the SIOP conference occurred off USF's campus. (Doc. 73, p. 15). And the USF Board points out USF had no power to prevent Thurston from attending the SIOP conference because it was not limited to USF students. (*Id.* at 15–16). But doctoral students had to attend the conference as part of USF's psychology program. (Doc. 74, pp. 7–8). A reasonable jury could therefore conclude that USF's decision to not remove Thurston from the psychology program resulted in Thurston attending the SIOP conference and encountering Garrett. *See also Hill*, 797 F.3d at 974 (concluding that a reasonable jury could find that school's decision to allow suspected sexual harassers to roam school halls unsupervised was clearly unreasonable).

The USF Board also argues Garrett could have obtained more severe sanctions against Thurston, including his removal from the psychology program, if Garrett appealed Thurston's sanctions, but Garrett decided to not do so. (Doc. 73, p. 18). Under Title IX, however, a student need not exhaust administrative remedies before suing a university for deliberate indifference. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009); *see also Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1357 (M.D. Ga. 2007) (Lawson, J.) (rejecting argument that university's failure to

initiate formal proceedings against assailant was due to the plaintiff's failure to complete additional paperwork).[10] USF ultimately decided to not remove Thurston from the psychology program. The USF Board's argument that Garrett could have appealed that decision is unavailing.

*   *   *

A reasonable jury could conclude USF's response to Garrett's Title IX complaint was clearly unreasonable because USF decided to not issue more severe sanctions against Thurston, including removal from the psychology program, and that decision made Garrett vulnerable to further sexual harassment. Reviewing the evidence with inferences in Garrett's favor, a genuine dispute of material fact exists about whether USF was deliberately indifferent to Garrett's sexual harassment.

2. <u>Whether alleged sexual harassment Garrett experienced was severe, pervasive, and objectively offensive that it effectively barred Garrett's access to an educational opportunity or benefit.</u>

The sexual harassment a student experiences must effectively bar her access to an educational opportunity or benefit. *Davis*, 526 U.S. at 633; *Hill*, 797 F.3d at 975. "Whether gender oriented conduct rises to the level of actionable harassment often depends on a constellation of surrounding circumstances, expectations, and relationships, including . . . the ages of the harasser and victim, and the number of individuals involved." *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1288 (11th

---

[10] *See also Tubbs v. Stony Brook Univ.*, 343 F. Supp. 3d 292, 318 (S.D.N.Y. 2018) (Roman, J.) (noting that Title IX does not require schools to have an appeals process).

Cir. 2003) (citations omitted). Generally, "gender discrimination must be more widespread than a single instance of one-on-one peer harassment and . . . the effects of the harassment [must] touch the whole or entirety of an educational program or activity." *Hawkins*, 322 F.3d at 1289 (footnote omitted).

Garrett points to two interactions that demonstrate the sexual harassment she encountered: the interaction with Thurston at the SIOP conference and the interaction with Thurston at a brown-bag event. Thurston never communicated with Garrett during either interaction. But Garrett argues that just Thurston's proximity to her in those situations and Garrett's vulnerability to encountering Thurston in similar situations constitute severe and pervasive sexual harassment.

Courts are split on whether an assailant's mere presence on campus constitutes severe and pervasive sexual harassment under Title IX. *Compare Kinsman*, 2015 WL 11110848, at *4–5 (denying motion to dismiss a complaint that alleged assailant's presence on campus impacted the plaintiff's educational opportunities) *with O'Hara v. Colonial Sch. Dist.*, No. 99 CV 399, 2002 U.S. Dist. LEXIS 12153, at *19–20 (E.D. Pa. Mar. 25, 2002) (Surrick, J.) (rejecting student's claim that assailant's presence on campus constituted severe, pervasive sexual harassment).

In some circumstances, a student may have an objectively reasonable fear of encountering her assailant on campus. *Farmer*, 918 F.3d at 1105 (citation omitted); *see also Williams*, 477 F.3d at 1297 (stating that student's decision to withdraw from

university was reasonable and expected in light of her sexual assault and rape). In other circumstances, a university's decision to not expel an assailant is not clearly unreasonable. *M.D. v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 777–78 (6th Cir. 2017) (Thapar, J.); *Clifford v. Regents of Univ. of Calif.*, No. 2:11-CV-02935-JAM-GGH, 2012 WL 1565702, at *7 (E.D. Calif. Apr. 30, 2012) (Mendez, J.).

Garrett provides a recent decision that denied summary judgment on a Title IX deliberate-indifference claim: *S.B. v. Florida Agricultural and Mechanical Board of Trustees*, No. 4:16cv613-MW/CAS (N.D. Fla. Mar. 1, 2019) (Walker, J.). (Doc. 101-1). In that case, the victim student claimed she could not "do many things on campus" because she feared encountering her assailant, who attended the same university with her. (*Id.* at 30). *S.B.* inferred testimony in the victim student's favor[11] and concluded that a reasonable jury could conclude that the university's response to the student victim's complaint (i.e., not preventing encounters between the victim and her assailant) made her vulnerable to severe, pervasive harassment that deprived the student victim of educational opportunities. (*Id.* at 27–30).

In the absence of clear, binding precedent squarely addressing facts like Garrett's case, the USF Board is not entitled to summary judgment. Instead, a reasonable jury could conclude that Thurston continued presence on USF's campus after the alleged November 12th sexual assault constituted severe and pervasive sexual harassment.

---

[11] The defendant university moved for summary judgment. (Doc. 101-1, p. 2).

A reasonable jury could also conclude Thurston's presence on USF's campus effectively barred Garrett's access to an educational opportunity or benefit. According to Garrett, Thurston's presence on USF's campus affected her schoolwork and mental health. (Doc. 75, p. 26). Garrett required accommodations in her classes, including deadline extensions for papers, because of how the alleged assault and Title IX investigation affected her. (Doc. 90-1, p. 13). Garrett also withdrew from classes and accepted "incomplete" grades. (Doc. 73-4, p. 2). And Garrett asked about the possibility of a remote research-assistant position or year-long off-campus internship because she could not be on USF's campus at the same time as Thurston. (Doc. 74-1, p. 98).

Harassment effectively bars a victim's access to an educational opportunity or benefit if the victim is denied equal access to a university's resources and opportunities. *Davis*, 526 U.S. at 650–51. A genuine dispute of material fact exists about whether Thurston's continued presence on USF's campus denied Garrett equal access to USF's resources and opportunities.

*   *   *

Depending on credibility determinations and how competing evidence is weighed, a reasonable jury could conclude that USF's decision to not issue more severe sanctions against Thurston, like removal from USF's psychology program, made Garrett vulnerable to further sexual harassment. A reasonable jury could also conclude Thurston's presence on USF's campus constitutes severe, pervasive sexual

harassment. And a reasonable jury could conclude Thurston's presence on campus effectively barred Garrett's access to an educational benefit or opportunity. As a result, genuine disputes of material fact exist with respect to Garrett's deliberate-indifference claim under Title IX. The USF Board's motion for summary judgment on that claim should be denied.

## B. Retaliation Claim

Garrett argues USF retaliated against Garrett for her Title IX complaint against Thurston when the OSRR charged Garrett for violating the Student Code of Conduct when she recorded the May 18, 2017 meeting with Coombes. (Doc. 89, pp. 14–16). That charge resulted in Garrett attending a formal hearing and the Conduct Board sanctioning Garrett with a "letter of warning." (Doc. 85-4; Doc. 82-1, pp. 170–71).

Under Title IX, a funding recipient may not retaliate against an individual who complains about sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 169 (2005). To succeed on a retaliation claim under Title IX, the student must demonstrate (1) she engaged in statutorily protected activity; (2) the university took actions that would be considered materially adverse to a reasonable person; and (3) a causal link exists between the student's protected activity and the university's adverse action. *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911

(11th Cir. 2013) (citations omitted).[12]

### 1. Whether Garrett engaged in protected activity.

Title IX prohibits a university from retaliating against a student "who speaks out against sex discrimination." *Jackson*, 544 U.S. at 178. Reporting sexual harassment to a professor constitutes statutorily protected activity under Title IX. *See Sanchez v. Brawley Elementary Sch. Dist.*, 719 F. App'x 723 (9th Cir. 2018) (determining that a student reporting harassment to a teacher is protected activity under Title IX).

When Garrett filed her formal Title IX complaint, she "spoke out" against sex discrimination. She therefore engaged in statutorily protected activity.

The USF Board argues Garrett cannot prove she engaged in statutorily protected activity because she cannot demonstrate she had a good-faith belief USF acted with deliberate indifference. (Doc. 73, p. 34). For support, the USF Board cites *Knott v. DeKalb County School System*, 624 F. App'x 996 (11th Cir. 2015). *Knott*, however, discussed the plaintiff's good-faith belief about her statutorily protected

---

[12] *Bowers* is one of two Title IX retaliation-claim cases the Eleventh Circuit decided after *Jackson*. *See also Saphir v. Broward Cty. Pub. Sch.*, 744 F. App'x 634 (11th Cir. 2018) (affirming summary judgment in favor of school against student's retaliation claim). This report uses the analysis from *Bowers* when determining whether summary judgment is appropriate with respect to Garrett's retaliation claim. However, it is worth noting that other courts in this circuit analyze additional elements taken from Title VII. *See Ross*, 506 F. Supp. 2d at 1360 (applying the *McDonnell Douglas* framework to a Title IX retaliation claim); *see also Kocsis v. Fla. State Univ. Bd. of Tr.*, No. 4:16-CV-529-RH/MJF, 2019 WL 1232866, at *8–14 (N.D. Fla. Feb. 27, 2019) (Frank, Mag. J.) (same), *adopted in* 2019 WL 1227711. *Kocsis*, however, is currently on appeal.

activity in the context of Title VII—not Tile IX. 624 F. App'x at 997–98. The Eleventh Circuit's two decisions addressing retaliation under Title IX do not address whether the plaintiff must have a good-faith belief that the university engaged in unlawful conduct. *Bowers*, 509 F. App'x 806; *Saphir*, 744 F. App'x 634.

But even if Title IX required good-faith belief to succeed in her retaliation claim, Section III(A)(1) of this report explains how a reasonable jury could conclude USF's decision to not issue more severe sanctions against Thurston constitutes deliberate indifference because that decision made Garrett vulnerable to future harassment. A reasonable jury could therefore find Garrett had a good-faith belief that the decision to not issue severe sanctions against Thurston, including removal from USF's psychology program, constituted deliberate indifference.

2.      <u>Whether USF took action that would be considered materially adverse to a reasonable person.</u>

A university's action is materially adverse under Title IX if the action would dissuade a reasonable person from filing a discrimination complaint. *Bowers*, F. App'x at 911–12 (quotation and citation omitted).

Garrett argues a reasonable person would consider Deremiah's decision to breach her confidential relationship with Garrett a materially adverse action. (Doc. 89, p. 20). Further, considering how Deremiah's breach of confidentiality resulted in a charge against Garrett for violating the Student Code of Conduct, Garrett argues a reasonable would find those actions materially adverse. (*Id.*).

The USF Board argues Garrett cannot show that USF took any adverse action

against her. (Doc. 73, p. 35). According to the USF Board, the letter issued to Garrett following the investigation of her recording the May 18, 2017 meeting with Coombes was only a warning. (*Id.*). The USF Board argues the letter's purpose was to inform Garrett about Florida's law against recording an individual without her consent and to inform Garrett about USF's policy. (*Id.*). Therefore, the USF Board concludes that the letter cannot constitute adverse action under Title IX because it had no impact on Garrett's education or transcript. (*Id.*) (citations omitted).

Requiring a student to use a university's formal proceedings may constitute an adverse material action under Title IX. *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011); *see also Emeldi v. Univ. of Or.*, 698 F.3d 715, 726 (9th Cir. 2012) (noting, in a Title IX case, that forcing an employee to use a grievance procedure constitutes adverse action under Title VII).

In this case, USF investigated Deremiah's report that Garrett recorded the May 18, 2017 meeting between Garrett, Deremiah and Coombes. At the time the meeting took place, Garrett was still exploring possible solutions to her Title IX complaint against Thurston. After meeting with Deremiah and Garrett to discuss the recording incident, Monti found enough evidence existed to charge Garrett with violating the Student Code of Conduct. Monti gave Garrett two options: accept the proposed sanctions or have a formal hearing. Garrett decided to challenge OSRR's findings and have a hearing. She attended the hearing, and the Conduct Board found Garrett more likely than not violated the Student Code of Conduct. The Conduct

Board then issued its sanction against Garrett: a letter of warning.

A reasonable jury could conclude that USF's decision to require Garrett to undergo a separate investigation, which included attending a formal hearing, and issue a sanction (letter of warning) constitutes a materially adverse action under Title IX. Stated differently, a reasonable jury could conclude that a reasonable person would be dissuaded from filing a Title IX complaint if she knew that she may need to undergo a separate investigation and hearing for an incident that may arise while USF investigated her original complaint. A genuine dispute of material fact therefore exists about whether USF's decision to require Garrett to undergo formal proceedings concerning her recording of the May 18, 2017 meeting constitutes a materially adverse action.

To support its argument that Garrett's warning letter is not an adverse action under Title IX, the USF Board cites three cases holding that reprimand letters alone do not constitute adverse actions under Title VII: *Clark v. Potter*, 232 F. App'x 895 (11th Cir. 2007); *Hawkins v. Potter*, 316 F. App'x 957 (11th Cir. 2009); and *Barnett v. Athens Regional Medical Center, Inc.*, 550 F. App'x 711 (11th Cir. 2013). But in each of those cases, a reprimand, warning letter, and performance evaluation constituted the extent of the plaintiff's claimed adverse employment action. *Clark*, 232 F. App'x at 897; *Hawkins*, 316 F. App'x at 961; *Barnett*, 550 F. App'x at 712. In this case, USF required Garrett to undergo a separate investigation, including a formal hearing, which resulted in her warning letter. *Papelino*, a Title IX case, holds that requiring

students to use formal proceedings may constitute a material adverse action. 633 F.3d at 92. The USF Board's cited cases are inapplicable.

###   3.   Whether causal link exists between Garrett's activity and USF's materially adverse action.

To establish a causal link, the student must show that university decision-makers knew about her protected conduct and that her protected conduct was not wholly unrelated to the university's adverse action. *Bowers*, 509 F. App'x at 911 (quoting *Shannon v. BellSouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

A reasonable jury could conclude USF decision-makers knew about Garrett's protected activity because her protected activity was the filing of her Title IX complaint with USF. The USF Board argues, however, that Garrett can present no evidence that shows her complaint related to USF's decision "to discipline her under the student conduct process." (Doc. 73, p. 4).

Contrary to the USF Board's assertion, evidence exists for a reasonable jury to conclude that USF's decision to require Garrett to undergo a separate investigation for the recording was not wholly unrelated to Garrett's original Title IX complaint. Coombes testified that Garrett created problems during the Title IX investigation because Garrett told undergraduate students USF was investigating Thurston for sexual assault. (Doc. 81, p. 32). Coombes also discussed how students in the psychology department aligned themselves with "Team Garrett" or "Team Thurston." (*Id.*). Coombes also discussed with USF's Title IX coordinator about how Garrett's actions "impacted the department." (*Id.* at 31).

42

In Garrett's transcript of the May 18, 2017 meeting, Coombes allegedly discussed the possibility that Garrett could have a complaint against USF because its Title IX process was inadequate. (Doc. 81-1, p. 175). Once she became aware Garrett recorded the meeting without consent, Coombes requested that the Conduct Board address Garrett's actions in the "strongest possible manner" and that Garrett's sanctions be "hard felt." (Doc. 80, pp. 30–31; Doc. 81-1, pp. 191–93).

Reviewing the evidence with inferences in Garrett's favor, a reasonable jury could conclude—considering Coombes's statements and testimony—that USF's decision to require Garrett to undergo a separate investigation was not wholly unrelated to her original Title IX complaint. A genuine dispute of material fact therefore exists concerning whether a causal link exists between Garrett's protected activity and USF's adverse action.

\*   \*   \*

A reasonable jury could conclude Garrett engaged in statutorily protected activity when she filed her Title IX complaint concerning Thurston's alleged sexual assault. A reasonable jury could conclude USF's decision to require Garrett to undergo a separate investigation into her recording the May 18, 2017 meeting with Coombes, which resulted in sanctions (a warning letter) against Garrett, constituted a materially adverse action. And a reasonable jury could conclude USF's decision to require Garrett to undergo a separate investigation was not wholly unrelated to Garrett's original Title IX complaint. The USF Board's motion for summary

43

judgment on Garrett's retaliation claim should be denied.

## IV. CONCLUSION

A genuine dispute of material fact exists about whether USF demonstrated deliberate indifference when it decided not to issue more severe sanctions against Thurston, like removal from USF's campus and psychology program. And a genuine dispute of material fact exists about whether USF retaliated against Garrett because she complained about sexual harassment under Title IX. The USF Board's motion for summary judgment (Doc. 73) should therefore be **DENIED**.

**RECOMMENDED** in Tampa, Florida, on June 7, 2019.

*Amanda Arnold Sansone*
AMANDA ARNOLD SANSONE
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of this service bars an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).