# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**SAMANTHA L. GARRETT,**

       **Plaintiff,**

**v.**                                   **CASE NO: 8:17-cv-2874-T-23AAS**

**UNIVERSITY OF SOUTH FLORIDA**
**BOARD OF TRUSTEES,**

       **Defendant.**

_____/

## DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION

The Defendant, University of South Florida Board of Trustees ("USF"), pursuant to Rule 72 and Local Rule 6.02, files its written objections to the Report and Recommendation (Dkt. No. 105; R&R). The magistrate judge reached two conclusions in the R&R. First, the R&R states "[a] genuine dispute of material facts exists about whether USF's disciplining decision for Andrew Thurston made Garrett vulnerable to sexual harassment." (R&R at 1). Second, "a genuine dispute of material fact exists about whether USF retaliated against Garrett because she filed a Title IX complaint." (Id.). As a result of these conclusions, the R&R recommends that USF's Motion for Summary Judgment (Dkt. No. 73; MSJ) be denied. USF objects to both of these conclusions as well as the recommendation that the MSJ should be denied.

Garrett asserts two claims in this case – a deliberate-indifference claim under Title IX and a retaliation claim under Title IX. The R&R applies an incorrect analysis to both claims. With respect to the deliberate-indifference claim, the R&R fails to analyze USF's actions in light of the known circumstances. (R&R at 29-33). Instead, the R&R looks at the outcome and concludes that, because Garrett was "uncomfortable" when she was in the same proximity as

Thurston on two isolated occasions after USF disciplined him, that establishes that she was more vulnerable to sexual harassment and therefore USF was deliberately indifferent. (R&R at 32).   It allows Title IX to be used to demand a specific remedy from USF. It does not find that there is any evidence that USF knew or should have known that its discipline decision would make Garrett more vulnerable to harassment or that Garrett reported these encounters.   (Id.). Additionally, there is no evidence that Garrett was more vulnerable to harassment because of USF's actions, as opposed to her decision not to appeal, and the R&R fails to consider the undisputed surrounding circumstances in concluding that the two encounters could establish actionable sexual harassment. (Id. at 33-37).  The R&R conclusions must be rejected.

Next, the R&R fails to apply the correct legal standard to the retaliation claim.   It erroneously evaluates only whether Garrett can establish a prima facie case of retaliation instead of determining whether Garrett can establish that USF engaged in intentional retaliation.  Further the conclusion that Garrett can meet a prima facie case is flawed.  Garrett cannot establish that she engaged in protected activity or that a letter of warning for secretly recording a meeting with a USF administrator is a materially adverse action.  For all of these reasons, the R&R must be rejected and summary judgment should be entered in favor of USF.

## I.      The Undisputed Facts Establish USF Was Not Deliberately Indifferent.

### A.  This Court Set Forth the Framework For Analyzing This Claim.

On April 18, 2018, this Court entered an order on USF's motion to dismiss where it set forth the framework for analyzing the Title IX claim.  (See Order (Dkt. No. 35)).  Specifically, the Court held that "success on a 'hostile educational environment' claim – that is, a claim of university's deliberate indifference to severe, pervasive, and objectively offensive harassment known to the university – requires providing a 'clearly unreasonable response to sexual

violence.'" (Order at 12). It recognized that "[t]o succeed on a Title IX claim, the plaintiff must show the university's 'deliberate indifference to known acts of harassment' so 'severe, pervasive, and objectively offensive' that the harassment 'effectively bars the victim's access to an educational opportunity or benefit.'" (Id. at 8). It explained that "[d]eliberate indifference' means the university's response to the harassment 'is clearly unreasonable in light of the known circumstances.'" (Id.). This Court recognized that "Title IX affords a plaintiff no 'right to make particular remedial demands' and that a school need not suspend or expel an alleged assailant in order to avoid liability under Title IX." (Id. at 9). The R&R, however, fails to apply this law.

### B. The R&R Improperly Focuses on the Outcome.

As this Court recognized, a school is not deliberately indifferent because the measures taken are ineffective at ending harassment. Sauls v. Pierce Cty. Sch. Dist., 399 F.3d 1279, 1285 (11th Cir. 2005); see also Snethen v. Bd. of Pub. Educ. for City of Savannah, No. 406CV259, 2008 WL 766569, at *3 (S.D. Ga. Mar. 24, 2008). A Title IX claim requires an intentional act of discrimination by the university. Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 642 (1999).

The R&R itself recognizes this standard,[1] but it fails to apply it. (R&R at 29). Instead, it concludes "a university's response to a Title IX complaint is clearly unreasonable when it causes students to experience harassment or 'makes them more vulnerable to it.'" (R&R at 29). Thus, despite recognizing that the analysis does not turn on the outcome of USF's actions, it goes on to conclude that this claim turns on the outcome of USF's actions because, after it disciplined Thurston, Garrett was uncomfortable on two occasions when she saw Thurston. (R&R at 32).

The R&R also recognizes that "[t]he premise of a deliberate-indifference claim is an

---

[1] It states: "The question is not whether a university's response to student-on-student sexual harassment is effective but whether the university's action amounted to deliberate indifference." (R&R at 29).

official decision by the university to not remedy a Title IX violation." (R&R at 24 (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 291 (1998)). Specifically, the Supreme Court in Gebser explained:

> We think, moreover, that the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference. Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions.

Id. at 290-91. Thus, the standard is the decision not to remedy. Title IX is not violated because the remedy was unsuccessful.

In this case, there is no evidence that USF made an official decision not to remedy a Title IX violation. It did impose a remedy and it undisputedly took many other actions to remedy or minimize any impact from the alleged sexual misconduct. In addition, it offered Garrett the opportunity for an appeal to increase the sanctions as well as seek judicial review of USF's decision. Garrett declined these opportunities. The sanctions against Thurston became final because of Garrett's decision to withdraw her appeal and her request that USF finalize the sanctions. Garrett has not identified any official decision by USF not to remedy an alleged Title IX violation. USF merely refused to expel Thurston without due process.

The cases cited in the R&R, which allow a deliberate-indifference claim to proceed, differ significantly and importantly from the undisputed facts of this case. For example, in Williams v. Board of Regents of University System of Georgia, where the Eleventh Circuit reversed the district court's dismissal of a Title IX claim, the plaintiff alleged that several men repeatedly sexually assaulted her in an on-campus dormitory; the men were indicted by a grand jury; the university had knowledge that, prior to the assaults, at least one of the men had previous

4

discipline at other schools for sexual assault and harassment; and the university waited eight months after the investigation to conduct a disciplinary hearing.  477 F.3d 1282, 1295-97 (11th Cir. 2007).  Despite the alleged facts, characterized as a "harrowing ordeal," the Eleventh Circuit did not find deliberate indifference because the university failed to expel the students after the assault, but in the school's failure to take any precautions to prevent future attacks.  Id. at 1297.[2]

In Hill v. Cundiff, the case involved the rape of a 14-year old girl who was in the eighth grade at a public middle school.  797 F.3d 948, 956 (11th Cir. 2015).  The alleged assailant was a 15-year old boy who also was in the eighth grade.  Id.  Prior to the rape, the boy had a disciplinary history of violence and sexual misconduct, including five infractions for sexual misconduct as well as four infractions for violence.  Id.  He also had repeatedly propositioned the victim for sex over a two-week period prior to the rape.  Id. at 959.  Shortly before the rape, the victim told a teacher's aide that the boy was propositioning her and the aide suggested that the victim help set up the boy to catch him in the act.  Id. at 962-63.  The administrators, however, did not catch the boy in the act, and he raped the victim.  Id.  The boy was assigned to an alternative school for two months before he returned to the middle school.  Id. at 964-65.  The court concluded that there was a genuine dispute of material fact regarding the school's deliberate indifference based on the knowledge of the boy's prior sexual harassment; its policies, including assigning suspected sexual harassers to unsupervised janitorial duty; its sting operation and use of the victim as bait; its failure to assist the victim after the rape; its failure to change its policies and record-keeping system; and "continuing to allow suspected sexual harassers to roam a middle school's halls unsupervised."  Id. at 973-74.  Specifically, the Eleventh Circuit held:

[2] Specifically, the court in Williams concluded that "[v]iewing the evidence in the light most favorable to Williams, UGA failed to take any precautions that would prevent future attacks from Cole, Thomas, Brandon Williams, or like-minded hooligans should Williams have decided to return to UGA, either by, for example, removing from student housing or suspending the alleged assailants, or implementing a more protective sexual harassment policy to deal with future incidents."  477 F.3d at 1297.

> Given all of these events and circumstances considered cumulatively, there is a genuine issue of fact as to whether the Board's action and inaction were deliberately indifferent.  We do not say that any one action or inaction suffices.  The deliberate indifference standard is rigorous and hard to meet.  But the cumulative events and circumstances here, viewed in the light more favorable to Doe, are enough to establish deliberate indifference under Title IX.

Id. at 975.  The Eleventh Circuit noted "[t]hese are highly unique and extreme facts that will hopefully never again be repeated."[3]  Id. at 973.

Likewise, the Supreme Court decision in Davis presents different facts.  526 U.S. at 654-55.  In that case, the complaint alleged that a fifth-grade student was subjected to verbal and physical sexual harassment over a five-month period, the accused student plead guilty to criminal misconduct, and the school made no attempt to investigate the complaints of harassment or put an end to it.  Id.  Additionally, in Farmer v. Kansas State University, the plaintiffs alleged that they were raped,[4] they repeatedly reported the rapes, and that the university refused to investigate the rapes or take any other action.  918 F.3d 1094, 1099-1101 (10th Cir. 2019).  Given the procedural posture of the case, the Tenth Circuit assumed, without deciding, that these allegations were sufficient to establish the university acted with deliberate indifference.[5]

In Kelly v. Yale University, the plaintiff alleged that she was sexually assaulted and filed a formal complaint one week later.  No. CIV.A. 3:01-CV-1591, 2003 WL 1563424, at *1 (D. Conn. Mar. 26, 2003).  She attended classes with the alleged assailant, and she requested

---

[3] The R&R suggests that Thurston's attendance at a trade conference where he did not speak or attempt to communicate with Garrett was akin to the conclusion in Hill that there was a jury question because, among other things, the school allowed middle school children to "roam school halls unsupervised" after alleged sexual misconduct.  (R&R at 32).  In addition to the stark difference between these two cases, the Eleventh Circuit did not conclude that "roaming the halls" alone was sufficient to establish deliberate indifference.  Hill, 797 F.3d at 975.

[4] The plaintiff alleged that one rape occurred at a fraternity house when the assailant jumped out of the closet and rape her and the other occurred at an off-campus fraternity event where the plaintiff was rape in front of 15 students.  Farmer, 918 F.3d at 1099-1101.

[5] The Tenth Circuit affirmed the court's denial of a motion to dismiss.  Farmer, 918 F.3d at 1099-1101.  The R&R cites to cases resolving motions to dismiss.  However, whether the plaintiff has pled sufficient facts to meet the pleading standard is different from whether the plaintiff has provided evidence to create an issue of fact for the jury.  Indeed, the Court in its Order recognized this distinction in denying USF's motion to dismiss because "the resolution of Garrett's deliberate-indifference claim requires a more developed record."  (Order at 12).

academic accommodations, including academic planning assistance, but the university did not respond to the requests. Id. The plaintiff also requested an alternative housing arrangement because the plaintiff and the assailant lived in the same dormitory, and it took several weeks to respond to this request. Id. The court concluded that there was a question of fact regarding deliberate indifference based on the plaintiff's requests for accommodation and the university's lack of any response. Id. at *4-5. However, it concluded that the university's failure to grant the plaintiff's request to remove the alleged assailant from classes was not clearly unreasonable. Id. Thus, this case fails to support the conclusion of deliberate indifference in this case.[6]

Further, in Doe ex rel. Doe v. Derby Board of Education, the court concluded that there was an issue of fact regarding deliberate indifference because the middle school delayed in taking any disciplinary action after the rape of a middle school student, the school did not offer her any protection, the assailant was allowed to interact with and attend classes in the same area as the plaintiff, the school did not even consider expulsion, and the assailant's father served as a member of the school board. 451 F. Supp. 2d 438, 447-48 (D. Conn. 2006). The court found that the circumstances of this case, including the assault, the plaintiff's youth, and her proximity to the alleged assailant all supported a conclusion of deliberate indifference, but the school's failure to expel the student was "not necessarily indicative of defendant's inaction or deliberate indifference." Id. The facts supporting deliberate indifference in Derby Board are not presented in the instant matter before this Court.[7]

None of these cases looked at the outcome, as the R&R does, to determine deliberate indifference. These decisions demonstrate that the undisputed facts of this case fail to satisfy the

---

[6] The facts in Yale differs from those in the instant case. Garrett and Thurston did not attend class together nor live in the same dormitory. USF also responded to every request made by Garrett. Garrett did not report the assault a week after it happened. Instead, as that time, Garrett did not want to stop seeing Thurston "24/7." (MSJ at 6).

[7] Indeed, USF offered to consider a greater sanction, such as expulsion, on appeal, but Garrett withdrew her appeal and requested that USF finalize the current sanctions, which did not include expulsion. (MSJ at 19).

exacting standard of deliberate indifference.  Indeed, the R&R recognizes that "[r]esponses like USF's actions have been determined to not constitute deliberate indifference."  (R&R at 26-27).  However, after recognizing the correct law, the R&R then fails to apply it to this claim.

**C.  The R&R Ignores Numerous Undisputed Facts.**

In USF's MSJ, it set forth the known and undisputed circumstances surrounding USF's actions.  However, in a footnote, the R&R generally asserts that it has "disregard[ed] evidence favorable to the USF Board that a jury need not believe."  (R&R at 2 n.1).  It is unclear what standard the R&R is applying or even which facts the R&R is disregarding under this standard.[8] (Id.).  Upon review of the R&R, it appears that the magistrate judge had rejected numerous undisputed facts without any basis to do so.  Below is a non-exhaustive list of the omitted facts:

- The undisputed facts regarding the events that led up to the night of November 12, 2016.  (Compare MSJ at 2-4 with R&R at 2).

- Garrett's description of the assault, which Garrett does not dispute and was included in USF's report.  (Compare MSJ at 4 with R&R at 2).

- Garrett's admission, that after the alleged assault, she did not have any obligation to see or speak to Thurston again, but she did.  (Compare MSJ at 5 with R&R at 2-3).

- Many of the extensive interactions between Garrett and Thurston after the alleged assault, which Thurston provided to USF. (Compare MSJ at 5-7 with R&R at 2-4).

- After the alleged assault, Garrett sent a picture of her clothed chest to Thurston and her girlfriends where she obviously was not wearing a bra and the outline of her nipples was evident.  (Compare MSJ at 5 with R&R at 2-3). In response to this message, Thurston expressed his concern that he had ruined their friendship by coming on to her.  (Id.).  Garrett assured him

---

[8] Likewise, the R&R also notes that it "cites evidence produced by the parties that can be reduced to an admissible form at trial." (R&R at 2 n.2).  It is unclear whether the R&R is rejecting any facts set forth in the MSJ based on the contention that it could not be reduced to an admissible form at trial.  The facts are simply missing from the R&R.

nothing had changed.  (Id.).  Thurston then said that he thought that Garrett was into him now.  (Id.).  Garrett denied it and said that she "[l]ove[s] getting turned down by someone [she] wasn't even interested in." (Id.).  She then said that she did not feel like talking to him anymore.  (Id.).  Garrett then told Thurston that he had assaulted her.  (Id.).  Thurston said that he did not remember the assault, and Garrett did not dispute this statement.  (Id.).

- After this exchange with Thurston, Garrett admits that she initiated at least one sleepover with Thurston.  (See MSJ at 5-6 with R&R at 2-4).  Garrett's initiation of this sleepover is not included in the R&R.[9]  (Id.).  In addition, the R&R states that "Garrett sat on the same couch or bed with Thurston" during these sleepovers." (R&R at 3).  However, Garrett testified that, in one of the sleepovers, they were studying together, Thurston convinced her to stay the night, and she "went upstairs and got in the bed." (MSJ at 6; Pl. Dep. (Dkt. No. 74) at 168-69).  They also texted about cuddling.  (PX19:000145, 000153).

- A week after the alleged assault, Garrett and Thurston were texting about Garrett's ability to have an orgasm.  (Compare MSJ at 6 with R&R at 2-4).  Garrett texted Thurston: "But like last weekend I got really close but it just didn't happen, which is why I think the meds aren't going to let me." (MSJ at 6).  Thurston provided this text message to USF during the investigation.  (Id.).  This text message was sent on Saturday, November 19, 2016, and the alleged assault occurred on Saturday, November 12, 2016.  (Id.).  There is no dispute that this text message was sent and Thurston provided it to USF during the investigation.  (Id.).

- Garrett exchanged text messages with a friend where she reported she was seeing Thurston every day and did not want to stop.  (Compare MSJ at 6-7 with R&R at 2-5).  Garrett

---

[9] The R&R finds, "[a]t some point during her sleepovers with Thurston, Garrett sat on the same couch or bed with Thurston, but she had no fear of imminent bodily harm 'other than him just being near [her]." (R&R at 3).  However, the undisputed evidence is that Garrett did not have any fear during these sleepovers. (See Pl. Dep. 170 ("Q. Okay.  Did he do anything that night to put you in fear?  A. No.").

asked her friend about a woman Thurston was interested in and replied: "So if he goes from seeing me (at his request) every day and telling me he loves me 24/7 to completely different if he starts dating someone I'm 100% going to be extremely pissed." (MSJ at 6).

- On the morning of November 23, 2016, Garrett told Thurston that she wanted to stop by his office at USF to give him a hug, but Thurston said that he was working from home. (Compare MSJ at 7 with R&R at 4-5). In addition, that evening, she specifically asked Thurston to come to her apartment. (Compare MSJ at 8 with R&R at 4-5). While the R&R notes that Thurston used a key to enter Garrett's apartment the second time after she sent text messages threatening harm to herself, the R&R does not note that Garrett gave Thurston the key and refused to take it back when Thurston tried to return it before this incident. (Id.). Garrett's admitted that the police determined she was a danger to herself. (Compare MSJ at 9 with R&R at 5). In addition, the facility determined that Garrett was an imminent danger to herself.[10] (Id.).

- Megan Deremiah, USF victim advocate, specifically warned Garrett that expulsion is a rare outcome and that she should re-think whether this is the right process if she was only going through the process to obtain expulsion. (Compare MSJ at 10 with R&R at 7).

- Garrett knew that she could request a no-contact order and she told USF that she did not need one. (Compare MSJ at 11 with R&R at 7-8). The investigator, Joanna Ellwood, reminded Garrett that USF could provide interim measures, including a no-contact order, and Garrett again did not request a no-contact order. (Compare MSJ at 12 with R&R at 7-8).

- In the investigative report, Ellwood noted both undisputed and disputed information, including that Thurston asserted that he had consent for the sexual contact. (Compare MSJ at 12 with R&R at 9-10). While the R&R notes that Ellwood determined that

---

[10] Only some of the undisputed text messages and admissions by Garrett that led to her arrest under the Baker Act are included in the R&R. (Compare MSJ at 7-9 with R&R at 4-5).

there was sufficient evidence of the violation, it fails to recognize that the undisputed fact she merely concluded that there was sufficient evidence to move forward with the process. (Compare MSJ at 12-13 & n.21 with R&R at 10). The investigation did not determine responsibility. (Id.). In fact, Cutsinger specifically advised Thurston and Garrett that sanctions would only be entered if Thurston was found responsible or accepted responsibility for the formal charges, which the R&R does not acknowledge. (Compare MSJ at 13 with R&R at 10).[11]

- Ellwood issued the no-contact order to Thurston upon Garrett's request on March 9, 2017. (Compare MSJ at 14 with R&R at 11). Garrett confirmed Thurston has not violated the no-contact order since it was entered. (Compare MSJ at 16 with R&R at 11).

- Upon satisfying certain conditions, the deferred suspension could be converted to conduct probation for the remainder of the time that Thurston was enrolled at USF and Thurston was expressly cautioned that any violation of the code of conduct, including any contact with Garrett, could result in immediate suspension. (Compare MSJ at 14 & n.26 with R&R at 12).

- Any final decision of USF may be reviewed by filing a petition for certiorari with the circuit court, and it is undisputed that Garrett never filed any such petition. (Compare MSJ at 15 & n.27 with R&R at 13-14).

- Dean McDonald told Garrett that sanctions could not be increased against Thurston without an appeal and giving Thurston an opportunity for a hearing. (Compare MSJ at 17 with R&R at 13-14). Additionally, after the meeting with Dean McDonald, Garrett understood that, regardless of whether Thurston elected a hearing, she could appeal the sanctions under this process. (Compare MSJ at 18 with R&R at 13-14).

---

[11] The R&R also states that "Cutsinger determined the investigation established Thurston violated the Student Code of Conduct on November 12, 2016." (R&R at 10). However, that is not accurate. Instead, the undisputed evidence is that the investigation does not determine responsibility, but whether there is sufficient evidence to move forward with formal charges. (See MSJ at 12-13). The R&R incorrectly states that there was a determination that Thurston had violated USF's policies through the investigation. (R&R at 10).

- On April 10, 2017, Garrett requested that Dean McDonald formally close her case and finalize the sanctions. (Compare MSJ at 19 with R&R at 16). Before accepting her retraction, Dean McDonald undisputedly gave Garrett additional time to speak to Crystal Coombes and the department about potential remedies. (Id.). In addition, during this time, Garrett admits that she was receiving legal advice. (See MSJ at 19 n.35 with R&R at 16). Pursuant to Garrett's request, USF granted several of her academic requests, including providing her with a remote research position and an incomplete. (Compare MSJ at 19 n.36 with R&R at 16-17). The faculty also offered to consider any other academic accommodations she might need. (Id.). USF did not accept Garrett's retraction of her appeal until April 12, 2017, after the department informed her that it could not remove Thurston and Coombes told her that some of her other requests could not be granted. (Compare MSJ at 20 with R&R at 16-17).

- The R&R fails to acknowledge the undisputed circumstances of the recording that Garrett made of Coombes on May 18, 2017.[12] (Compare MSJ at 20-21 with R&R at 17-18). Specifically, this was a closed-door meeting with Coombes and Deremiah and that Garrett had secretly recorded the meeting on her phone. (Id.). Thereafter, Garrett told Deremiah that she made a transcript of the recording and deleted it. (Id.). Garrett, however, produced a copy of the recording on the last day of discovery. (Id.).

- Before the conclusion of the meeting with Coombes, Coombes requested an

---

[12] The R&R finds, citing to Deremiah's notes, that, "Garrett said she had trouble remembering what is said during the meetings, but she was glad she recorded this meeting even though Garrett knew she could not use it for anything." (R&R at 18). However, the statement reflected in these notes is: "She went on to explain that she always has a hard time remembering what is said in these meetings. She also said that she knows she can't use it for anything, but when her lawyer asks what was said, she wants to be able to remember." (Id.). In addition, the R&R finds that, "[a]t that moment, Deremiah expressed no concern to Garrett about the recording." (R&R at 18). However, the statement in these notes is: "At that time, the advocate was unaware of the limits of her confidentiality and chose to not address the concern until she spoke to her director." (Id.). Furthermore, in these notes, Deremiah recounts, in a discussion prior to the meeting with Coombes, "Advocate wanted to debrief the client that it may not be in her favor. The client stated that it doesn't even matter anymore because she is suing the university. She stated that she had a list of questions from her lawyer that she wanted to ask about." (Id.).

opportunity to, once again, explain the no-contact order to Garrett and encourage her to report any violations.  (<u>Compare</u> MSJ at 21 <u>with</u> R&R at 17-18).  While Garrett declined, Coombes proceed to explain the order anyway, providing that the order prohibits directed, specific, targeted contact with her.  (<u>Id.</u>).  Garrett responded, "I got it."  (<u>Id.</u>).  Coombes also told Garrett that, if it is happening, then Garrett needs to report it immediately.  (<u>Compare</u> MSJ at 22 <u>with</u> R&R at 17-18).  Garrett denied that there had been any violation.  (<u>Id.</u>).

The R&R erroneously fails to acknowledge or rejects these undisputed facts, which are part of the known circumstances for USF's decision.

### D.  The R&R Failed to View USF's Actions in Light of the Known Circumstances.

The fact that Garrett encountered Thurston on two occasions does not establish that USF acted clearly unreasonably when the known and undisputed circumstances are considered.[13] Because the R&R merely looked at the outcome to conclude that Garrett could establish that USF acted clearly unreasonably, the R&R failed to consider the circumstances known to USF when it made its decision in this case.  As a result, the R&R must be rejected.

It is undisputed that the alleged sexual assault was committed off-campus in circumstances that were not within the control of, or known to, USF.[14]  Three weeks after the event, Garrett disclosed the assault to Dr. Allen, but did not report it to the police.  (MSJ at 14 & n.24).  Garrett argues that she needs "separation" from Thurston based solely on the alleged assault.  (MSJ at 32).  However, the undisputed facts known to USF established that, prior to the assault, Thurston and Garrett were good friends who frequently declared their love for each other.  (<u>Id.</u>).  Garrett and Thurston also engaged in consensual touching and cuddling.  (<u>Id.</u>).  After

---

[13] Notably, while Garrett now complains about these two incidents, it is undisputed that Coombes asked Garrett on May 18, 2017, whether Thurston has violated the no-contact order.  (MSJ at 16).  Garrett confirmed that there has been no violations of the no-contact order.  (<u>Id.</u>).  Thus, USF lacked knowledge of these encounters.
[14] USF summarized the undisputed facts of USF's actions taken in response to Garrett's complaint in its MSJ.  (MSJ at 26-28).  The R&R does not find that these facts are disputed.

the alleged assault, Garrett did not seek separation, but sought to be in his presence almost every day and she communicated with him every day until she was arrested under the Baker Act. (Id.). She sent him a picture of her clothed chest with an outline of her nipples; she continued to profess her love for him as he did for her; she told another student that she completely forgives him; she sought to attend Thanksgiving dinner with Thurston at his parents' house; she spent two nights in his bed in his apartment, she initiated one of those sleepovers, and she did not fear for her safety; she insisted that Thurston retain a key to her apartment; and she told another student that she was going to be "extremely pissed" if Thurston stopped spending time with her. (Id.).

Garrett did not want "separation" and Thurston to leave the program until after he called the police and Garrett was arrested and held under the Baker Act. (Id.). Garrett does not dispute that she threatened to harm herself and told this to Thurston before he called the police, the police decided to take her to the hospital after reviewing her text messages, and the facility decided to hold Garrett for treatment and stabilization under the Baker Act. (Id. at 32-33).

Garrett does not dispute that USF followed its procedures by immediately accepting her complaint, conducting an investigation, filing charges, and proposing sanctions. (MSJ at 26). After Thurston accepted responsibility and the proposed sanctions, USF imposed the sanctions on Thurston. (Id.). It imposed the sanction of deferred suspension under its code of conduct, but it did not expel or remove Thurston from campus. (Id.). These sanctions did not preclude Thurston from being present on campus or at USF events. When Garrett complained about the sanctions, it offered her the opportunity to obtain increased sanctions through a hearing and appeal, which she declined. (Id.). Garrett also had the opportunity to seek judicial review of USF's final order, which she also did not do. The R&R expressly recognizes "[t]he appeal process – had Garrett followed through with it – could have resulted in Garrett's desired

sanction:  Thurston's expulsion from USF."  (R&R at 26).  It refused to consider this undisputed fact when evaluating Garrett's Title IX claim.

In light of the known facts and circumstances, USF's response was not clearly unreasonable.  Based on Garrett's actions where she waited three weeks to report the assault, she sought repeatedly to be in Thurston's presence after the assault, she sought to hug, touch, and cuddle with Thurston after the assault, she had two sleepovers (one of which she initiated) in his bed with Thurston after the assault, and she did not request a no-contact order when it was offered by USF after she disclosed the assault, it is not clearly unreasonable, as a matter of law, that USF would enter a sanction that would allow Thurston, as a graduate student who was not enrolled in the same classes as Garrett and had an office on a different floor, to be present on USF's campus but prohibit him from communicating or contacting Garrett in any way, especially because it gave Garrett the opportunity to seek a greater sanction, which she declined.

In addition, there also is no dispute that, after the sanctions were imposed on Thurston, Thurston did not engage in any other instances of non-consensual sexual contact or any inappropriate touching or sexual conduct of any kind.  (MSJ at 30).  Indeed, Garrett admits that she is not aware of any conduct or interaction with anyone else where Thurston posed a danger to any other woman on campus.  (Id.).  In addition, Thurston did not make any attempt to talk to Garrett or have any communication with her.  He did not make any remarks to her.  He did not touch her or engage in any attempt to make purposeful contact her.  Garrett never reported any such attempt to USF and specifically denied it when Coombes inquired.  It is undisputed that Thurston has complied with all of the sanctions imposed by USF.  Thus, it is undisputed that USF took action to remedy the non-consensual sexual contact and prevent future violations of sexual misconduct.  Garrett cannot establish that USF's response to her complaint was clearly

unreasonable in light of the known circumstances.

**E.  The R&R Erroneously Confuses Causation with Deliberate Indifference.**

In order to establish a Title IX claim, the plaintiff must prove deliberate indifference and

causation – two separate elements.   The Eleventh Circuit explained the applicable analysis in

Williams, 477 F.3d at 1295-96:

> First, Title IX requires that the plaintiff prove that the deliberate indifference
> occurred in response to discrimination she faced. Davis, 526 U.S. at 633, 119 S.
> Ct. 1661. Second, as Davis requires, a Title IX recipient "may not be liable for
> damages unless its deliberate indifference 'subject[s]' its students to harassment.
> That is, the deliberate indifference must, at a minimum, 'cause [students] to
> undergo' harassment or 'make them liable or vulnerable' to it."

In recognizing these two separate requirements, the Eleventh Circuit explained that "Title IX has

important requirements for establishing deliberate indifference that cannot be scuttled simply

because the plaintiff can meet the standard applicable to municipal liability cases."   Id. at 1295.

The R&R confuses these separate elements and finds that causation (i.e. whether Garrett was

more vulnerable to harassment) establishes deliberate indifference.  (R&R at 29).  As the express

language from Williams establishes, this is not correct.[15]  See 477 F.3d at 1295 (recognizing "the

Davis Court held that funding recipients are deliberately indifferent "only where the recipient's

response to the harassment or lack thereof is clearly unreasonable in light of the known

circumstances"). The R&R fails to conduct the proper analysis in evaluating this Title IX claim.

The R&R recognizes that USF cited several cases where courts repeatedly have held that

the university was not deliberately indifferent because it did not remove the accused student.

(R&R at 30-31).   However, the R&R rejected these cases because the courts did not discuss

---

[15] The R&R cites two decisions in support of this contention – Farmer and Hill, which are both discussed supra.
(R&R at 29).  However, in both of these decisions, the courts analyzed and determined that there was sufficient
evidence that the schools acted with deliberate indifference based on the specific circumstances presented in those
cases.  See Farmer, 918 F.3d at 1097 ("Accepting, then, that KSU was deliberately indifferent, the narrow legal
question presented here involves the element of causation: what harm must Plaintiffs allege that KSU's deliberate
indifference caused them?"); see also Hill, 797 F.3d at 948 (observing that, "[a] clearly unreasonable response
causes students to undergo harassment or makes them more vulnerable to it.").

whether the school's response made the victim more vulnerable to harassment.   (R&R at 31).

However, the reason that the cases cited by USF did not discuss whether the response made the

student more vulnerable to harassment was because they did not conflate deliberate indifference

and causation.  (MSJ at 29).  The courts never reached the issue of causation.[16]  (Id.).

### F.   The R&R Allows Title IX to be Used to Demand Specific Remedy.

Although the R&R correctly recognizes that "Title IX gives no right to students to

request particular remedies from a university," it fails to apply this well-established principle to

this case.   (R&R at 24).   Instead, it concludes that "[w]hen a student repeatedly requests

academic separation from her assailant and the university decides to not accommodate those

requests, a reasonable jury may conclude the university's actions made the student more

vulnerable to harassment."[17]   (R&R at 29-30).   The R&R is allowing a claim for a specific

remedial demand to proceed, which is contrary to this Court's Order and Davis.   The R&R

specifically invites the jury to second-guess USF's disciplinary decision, despite recognizing that

"[c]ourts should not second guess a university's disciplinary measures because university

administrators must enjoy flexibility in their decision-making."  (R&R at 24-25).  In fact, based

on the R&R and Garrett's argument, the only way in which USF could have avoided liability

was to impose a particular remedial sanction – expulsion – and without affording due process to

the accused student.  This conclusion is untenable and unsupported by the well-established law.

The R&R again recognizes the correct standard, but fails to apply it.  It provides that

---

[16] It cites Farmer in contrast, even though it was undisputed in Farmer that the university acted with deliberate indifference when it refused to investigate the complaints of rape.  No such concession has been made here.

[17] It further asserts that "[a] reasonable jury could conclude that USF's decision to not issue more severe sanctions against Thurston – despite Garrett's requests for USF to expel him from campus because of fear of encountering her assailant – constitutes deliberate indifference because USF's decision made Garrett vulnerable to further sexual harassment."  (R&R at 31).  Likewise, it finds: "A reasonable jury could conclude USF's response to Garrett's Title IX complaint was clearly unreasonable because USF decided to not issue more severe sanctions against Thurston, including removal from the psychology program, and that decision made Garrett vulnerable to further sexual harassment."  (R&R at 33).  All of these statements are different ways of saying the same thing – USF is liable under Title IX because it did not concede to Garrett's particular demand.  This conclusion is not supported by law.

"[t]he standard for demonstrating deliberate indifference is 'rigorous and hard to meet." (R&R at 24). In fact, the Eleventh Circuit has recognized that rigorous standard is necessary in order "to guard against the imposition of 'sweeping liability.'" Hill, 797 F.3d at 968-69. The standard, however, employed in the R&R is not the "exacting standard" required by the Eleventh Circuit. See Doe v. Sch. Bd. of Broward County, Fla., 604 F.3d 1248, 1259 (11th Cir. 2010). The R&R employs a lenient standard that allows a claim to proceed merely because the school does not impose the sanction Garrett demanded. (See R&R at 31). Indeed, this standard would impose "sweeping liability" in every case where the university did not impose the ultimate sanction.

USF also provided Garrett with an opportunity to seek a greater sanctions, including expulsion, through an appeal, if due process was afforded to Thurston. Garrett declined. The R&R concluded that affording Garrett an opportunity for an appeal and judicial review to obtain greater sanctions was "unavailing" because there is no administrative exhaustion requirement under Title IX. (R&R at 32). This conclusion confuses administrative exhaustion and deliberate indifference. USF never argued that Garrett had to exhaust her administrative remedies. However, the fact that Garrett declined to appeal establishes why she cannot prove deliberate indifference. In other words, Garrett cannot complain that USF was deliberately indifferent or turned a blind eye to alleged harassment when it sanctioned the accused student, provided Garrett with a process to challenge the sanctions decision, allowed her the opportunity to obtain a greater sanction if due process was afforded to the accused student, and Garrett elected not to participate in the process. Garrett's contention that USF should have imposed expulsion without due process is not supported by this Court's previous order. (Order at 9).[18] The R&R, however, refused to consider this process in evaluating whether USF acted with deliberate indifference.

---

[18] "[T]he decisions consistently recognize that the hasty suspension or expulsion of a student who allegedly harassed another student might violate the former's rights and might subject a university to suit from the suspended or expelled student." (Order at 9).

### G.  Garrett Was Not More Vulnerable to Harassment from Two Encounters.

The R&R concludes that, because Garrett encountered Thurston twice since March 9, 2017, and she felt uncomfortable, there is a genuine dispute of material fact as to whether USF's actions caused her to be more vulnerable to sexual harassment.  (R&R at 32-33).  It finds that "a reasonable jury could conclude that Thurston['s] continued presence on USF's campus after the alleged November 12th sexual assault constituted severe and pervasive sexual harassment."[19] (R&R at 35).  This conclusion is flawed in two respects.  First, two encounters where there was no attempt to make contact and Garrett was simply "uncomfortable" do not establish severe, pervasive, and objectively offensive sexual harassment or that Garrett was more vulnerable to such actionable harassment, particularly when the surrounding circumstances, expectations, and relationships are considered.  Second, even viewing the facts most favorably to her, Garrett cannot establish that these two encounters were the result of USF's actions.

### 1.  Two Encounters Do Not Establish Actionable Sexual Harassment.

The R&R asserts the courts are split on whether an individual's mere presence on campus constitutes severe and pervasive sexual harassment.  (R&R at 34).  However, the cases cited in the R&R do not establish that presence alone is sufficient to constitute actionable harassment.

First, in Kinsman, the plaintiff's claim was not based on mere presence.  Kinsman v. Fla. State Univ. Bd. of Trustees, No. 4:15CV235-MW/CAS, 2015 WL 11110848, at *4 (N.D. Fla. Aug. 12, 2015).  Instead, in denying a motion to dismiss, the court noted that the plaintiff alleged

---

[19] The R&R finds that "[i]n the absence of clear, binding precedent squarely addressing facts like Garrett's case, the USF Board is not entitled to summary judgment."  (R&R at 35).  This standard is not the correct legal standard for evaluating the MSJ.  There must be a genuine dispute of material fact for the jury to decide, which does not exist here. As set forth in the MSJ, after considering the undisputed facts regarding the surrounding circumstances, the only conclusion that can be drawn is that Thurston's mere presence on two occasions is not sufficiently severe, pervasive, and objectively offensive to constitute sexual harassment.  (MSJ at 30-33).  In the R&R, there is no discussion of the surrounding circumstances, expectations, and relationship as required to consider a claim of actionable harassment.  (R&R at 33-35).  Because the R&R uses the incorrect legal standard, it must be rejected.

that the university failed to investigate her complaint for a ten months, and, during that time, she shared a class with the accused student. (Id.). Second, in Farmer, the court specifically held that it was not finding actionable harassment based on mere presence. 918 F.3d at 1105. Instead, in denying a motion to dismiss, the court explained that its decision was based on the "horrific circumstances," including the university's refusal to investigate claims of rape. (Id.).

Third, in Williams, the court did not find actionable harassment based on mere presence. 477 F.3d at 1298. Instead, it found "[t]he incident involved a ringleader who lured the victim to his territory and then conspired with two friends to commit two separate acts of sexual assault." Id. In addition, it noted the school had knowledge that one assailant had engaged in sexual misconduct prior to this "harrowing ordeal" as the court characterized it. Id. at 1301. Fourth, in S.B. v. Fla. Agr. & Mech. Bd.,[20] it likewise does not find mere presence is actionable. In S.B., the university had not issued a no-contact order, the accused individuals did not have any restrictions on their access to campus, the college did not investigate one incident, and there was a six-month delay in conducting the administrative hearing for the other incident. (Id.). The court in S.B. concluded that, having taken no action to prevent contact and providing evidence of multiple instances of contact after the complaint, there was an issue of fact for the jury's determination as to whether there was actionable harassment. (Id.).

USF's argument did not rely on solely case law. (MSJ at 30-33). Instead, it explained that "[i]n the context of the undisputed facts regarding the surrounding circumstances, expectations, and relationship, Thurston's mere presence, as a matter of law, is not sufficiently severe, pervasive, and objectively offensive to constitute actionable harassment." (MSJ at 33). Although the R&R observes that actionable harassment "depends on a constellation of

---

[20] This is an unpublished decision, which has not been reported on Westlaw. USF explained in its memorandum (Dkt. No. 101) why this decision does not support a finding of actionable harassment in this case.

surrounding circumstances, expectations, and relationship, including . . . the ages of the harasser and victim, and the number of individuals involved," it does not apply this standard. (R&R at 33).  There is no discussion of the surrounding circumstances.  (R&R at 33-35).

Specifically, the undisputed facts establish that there were only two instances where Thurston was in the same proximity as Garrett and he did not attempt to contact or communicate with her in either instance.  With respect to Thurston's presence at the SIOP conference, the R&R does not acknowledge Garrett admitted that she is not aware of any authority of USF to prevent Thurston from attending the conference, and, even if USF had expelled Thurston, he still would have legally been able to come to her apartment or make any contact that he wanted with her.  (MSJ at 16; R&R at 28).  In fact, Garrett did not report the alleged sexual assault to the police until March 2017 after USF proposed sanctions to Thurston and she did not seek an injunction or court order until October 2017.  No criminal charges were filed and the judge twice denied her request for an injunction.  After the alleged assault and before she reported it three weeks later, Garrett undisputedly sought to have contact with Thurston on a daily basis.  She and Thurston exchanged thousands of text messages and she had two sleepovers with him.  The text messages were very intimate and personal.  Garrett said that she was going to be "extremely pissed" if Thurston stopped having "24/7" contact with her.  Even after Garrett made the complaint, she did not request a no-contact order, despite her knowledge that USF would enter this order if she wanted it.  Garrett had no interactions with Thurston until March 9, 2017.

On March 9, 2017, without a no-contact order in  place, Thurston entered a classroom where Garrett was proctoring an exam as a result of a miscommunication with another doctoral student.  Thurston made no attempt to try to talk to Garrett.  After that incident, Garrett requested a no-contact order, which was immediately entered.  Garrett admitted to Coombes that there had

been no violation of the no-contact order after it was entered on March 9, 2017.  USF disciplined Thurston by imposing a deferred suspension, two required meetings, and a no-contact order.  It warned Thurston that any violation of the code of conduct or the no-contact order could result in result in immediate suspension.  It provided Garrett with the opportunity to appeal to seek greater sanctions, including expulsion, providing only that Thurston be afforded due process.  Garrett also had the opportunity to seek judicial review of the final order of USF.  Garrett withdrew her appeal and did not seek judicial review.

As a result, the undisputed facts and circumstances in this case do not establish that Garrett's two encounters with Thurston after he was disciplined are severe, pervasive, and objectively offensive sexual harassment.

### 2. Garrett Cannot Establish USF Caused Her to Be Vulnerable to Harassment.

Even under the R&R's erroneous analysis of actionable harassment, Garrett cannot prevail as she cannot show that she was more vulnerable to harassment because of USF's actions as opposed to her own decision.

The R&R recognizes that, if Garrett had not withdrawn her appeal, the appeal process could have resulted in Garrett's desired sanction of expulsion.  (R&R at 26).  Yet, the R&R concludes that Garrett was more vulnerable to harassment because Thurston was not expelled.  (R&R at 29-30).  However, it is undisputed that Garrett requested to withdraw her appeal and asked USF to finalize its sanctions.  After giving Garrett additional time to reconsider this decision, USF ultimately accepted Garrett's retraction and entered the final order as requested by Garrett.  If the entry of a final order not imposing the sanction of expulsion caused Garrett to be more vulnerable to harassment, this decision was undisputedly caused by Garrett's own action in refusing to proceed with the appeal and requesting entry of the final order.

## II.     Garrett Cannot Establish a Retaliation Claim

The R&R is erroneous when it concludes that "a genuine dispute of material facts exists about whether USF retaliated against Garrett because she filed a Title IX complaint." (R&R at 1).  Based on the undisputed facts, Garrett cannot establish that she engaged in protected activity, pretext for retaliation, or that USF took a materially adverse action against her.

### A.  The R&R Incorrectly Concludes that Garrett Engaged in Protected Activity.

As set forth in the MSJ, Garrett cannot establish an objectively reasonable good faith belief that USF acted with deliberate indifference or that Thurston's mere presence was actionable sexual harassment.  At first, the R&R concludes that Garrett's protected activity was her Title IX complaint against Thurston.  (R&R at 38, 42).  However, there is no dispute that this complaint does not allege any discrimination under Title IX.  Title IX prohibits actions by certain universities, not sexual assault by individuals.  Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173–74 (2005) ("The text of Title IX . . . broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'").  The implied cause of action for retaliation requires a person to "complain[] of sex discrimination."  Id.  Garrett's Title IX complaint, however, did not complain of sex discrimination under Title IX.  (R&R at 25).  As a result, the Title IX complaint cannot be protected activity. The R&R also concludes that Garrett engaged in protected activity based on its erroneous findings in the discrimination claim. (R&R at 39). Thus, Garrett cannot establish she engaged in protected activity.[21]

### B.  The R&R Uses the Incorrect Legal Standard for Pretext.

In the MSJ, USF argued that Garrett cannot establish pretext for her retaliation claim. (MSJ at 34).  The R&R, however, does not address pretext.  Instead, it confuses Garrett's prima

---

[21] The R&R suggests that, under a Title IX retaliation claim, the plaintiff need not have a good faith belief to engage in protected activity.  (R&R at 39).  However, it does not cite any case law to support the suggestion that a Title IX retaliation claim can be based on Garrett's subjective belief alone.

facie case with pretext.  (R&R at 42).  The R&R concludes that, "[t]o establish a causal link, the student must show that university decision-makers knew about her protected conduct and that her protected conduct was not wholly unrelated to the university's adverse action."  (R&R at 42).  However, the "wholly unrelated" standard is the requirement to establish a prime facie case, not a claim of retaliation.  Jones v. Gulf Coast Health Care of Delaware, LLC, 854 F.3d 1261, 1271 (11th Cir. 2017).  A retaliation claim under Title IX requires intentional discrimination.  Jackson, 544 U.S. at 173–74 ("Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment.").  Indeed, despite the conclusion in the R&R, the Eleventh Circuit recognizes that the analysis of a retaliation claim does not end with the "wholly unrelated" standard.[22]  Jones, 854 F.3d at 1271.

As the Eleventh Circuit has recognized, "[t]o show pretext, [the plaintiff] must 'come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'"  Jones, 854 F.3d at 1274.  As set forth in the MSJ, there is no evidence of pretext for retaliation.

Garrett does not deny that she surreptitiously recorded Coombes without her knowledge.  A board of four individuals, including two students, who were not involved in the investigation of Garrett's Title IX complaint, concluded that Garrett was responsible for violating USF's policy.  Coombes did not play any role in the hearing and her written statement was not considered. There is no evidence that the board had any other interpretation than the one set forth

---

[22] The R&R's conclusion that a reasonable jury could find the disciplinary process was not "wholly unrelated" to Garrett's Title IX complaint is flawed.  (R&R at 42).  First, Garrett's Title IX complaint is not protected activity.  Second, the R&R relies on Coombes's testimony regarding events that occurred on October 17, 2017, after the conclusion of the conduct process. (R&R at 42; (Coombes Dep. Ex. 23 (Dkt. No. 81) at 31-32)).  There is no evidence that this testimony related to any period of time prior to the initiation of the conduct process or the decision.  (Id.).  Moreover, there is no evidence that the conduct board, found Garrett responsible and imposed discipline, had any knowledge of the information conveyed in Coombes's testimony.  (Id.).  The R&R also relies on Coombes's statement that the conduct board should address Garrett's actions "in the strongest manner possible" and that "Garrett's sanctions must be 'hard felt.'"  (R&R at 43).  However, these statements, from Coombes's letter, were never considered by the conduct board.  (MSJ at 23 n.44).

in the letter.  Likewise, there is no evidence of any disparate treatment or of any weakness, implausibility, inconsistency, incoherency, or contradiction in the legitimate reasons for USF's disciplinary process for a jury to find these reasons unworthy of credence and Garrett cannot establish an issue of fact regarding pretext to warrant a jury trial on this claim.

### C.  USF Did Not Take Any Materially Adverse Action.

The R&R erroneously concludes that Garrett can establish a materially adverse action based on the initiation of the conduct proceedings.  (R&R at 39-42).  In order words, the R&R finds that, because USF, a public university, gave Garrett due process, including the opportunity for a hearing, instead of imposing discipline against her, it is a materially adverse action.  The decisions cited in the R&R, however, do not support this conclusion.  (R&R at 40-41); see also Papelino v. Albany Coll. of Pharm. of Union Univ., 633 F.3d 81, 92 (2d Cir. 2011) (addressing only the knowledge and causation elements of the retaliation claim); Emeldi v. Univ. of Or., 698 F.3d 715, 726 (9th Cir. 2012) (concluding a resignation was an adverse action).[23]

The R&R concludes that an adverse action can be established in this case because Garrett was required to go through a formal process, including a hearing.  However, it is undisputed that Garrett elected to go to a hearing.  Additionally, the formal process exists in order to give Garrett, a student at public university, notice and an opportunity to be heard.  Providing due process to a student cannot be considered a materially adverse action.  Indeed, the Eleventh Circuit has concluded that an investigation, which results in no harm, is not an adverse action. Entrekin v. City of Panama City Fla., 376 F. App'x 987, 995 (11th Cir. 2010).  It is undisputed that the letter of warning simply cautioned Garrett that she could be disciplined in the future if she engaged in the conduct again.  (MSJ at 35).  The letter is not a materially adverse action.

---

[23] The court concluded:  "We will not establish a different rule on adverse action for Title IX than for Title VII."  Id.

DATED this <u>21st</u> day of June, 2019.

Respectfully submitted,

<u>**/s/ Thomas M. Gonzalez**</u>
Thomas M. Gonzalez
Florida Bar No. 192341
Sacha Dyson
Florida Bar No. 509191
Thompson, Sizemore, Gonzalez
& Hearing, P.A.
Street: 201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Mail: Post Office Box 639
Tampa, Florida 33601
Telephone: 813-273-0050
tgonzalez@tsghlaw.com
sdyson@tsghlaw.com

and

Joanne M. Adamchak
Florida Bar No. 943037
Associate General Counsel
Office of the General Counsel
University of South Florida
4202 E. Fowler Avenue, CGS 301
Tampa, FL  33620-4301
Telephone: 813-974-2131
jadamcha@usf.edu
Attorneys for the Defendant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

this <u>21st</u> day of June, 2019, by CM/ECF electronic filing to the Clerk of Court and to the

following:  Michael T. Dolce and Takisha Richardson, counsel for Plaintiff.

<u>**/s/ Thomas M. Gonzalez**</u>
Attorney

26