UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SAMANTHA GARRETT,

      Plaintiff,

v.                                   CASE NO. 8:17-cv-2874-T-23AAS

UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES,

      Defendant.

_____/

## ORDER

      Samantha Garrett, a female student at USF, accused Andrew Thurston, a male student and her intimate friend at the time, of violating USF's student conduct code by exceeding the bound of her consent to sexual contact. In response to a formal complaint against him and despite denying the accusation, Thurston accepted USF's proposed disposition, including a prohibition against "directed, specific, targeted contact" with Garrett. USF imposed the agreed restriction, but Garrett wanted a more severe restriction. In response, USF offered her an appeal that might have resulted in her achieving a more severe restriction. But, because USF's permitting the appeal unilaterally abandoned the agreed disposition, the prospective appeal would relieve Thurston of his acceptance of USF's proposed disposition and would re-open the unadjudicated question of the validity of Garrett's accusation. Because she was unwilling to participate in a hearing to test the validity of the

accusation (insisting, instead, on a proceeding that could result only in more severe punishment for Thurston), Garrett withdrew her appeal. In this action under Title IX, Garrett alleges that — by imposing only the agreed restrictions and by the prospective appeal's resulting in Thurston's receiving a hearing — USF was clearly unreasonable and deliberately indifferent to a hostile educational environment. But imposing a proportionate penalty and offering due process to an accused is neither "clearly unreasonable" nor "deliberately indifferent."

Also, after withdrawing her appeal, Garrett illicitly recorded a conversation with USF's senior Title IX coordinator. After Garrett admitted recording the coordinator without permission, a deception prohibited by Florida law, USF charged Garrett under the student conduct code, which incorporates Florida law. Garrett alleges that USF charged her as an indirect means to retaliate for her criticizing USF's disposition of her formal complaint against Thurston. But USF charged Garrett only because of her admitted misconduct.

## THE REPORT AND RECOMMENDATION

A report by the magistrate judge recommends denying summary judgment. The report determines that, because Garrett at an off-campus conference "felt uncomfortable" in Thurston's presence after issuance of the contact prohibition, "a reasonable jury could find" that the possibility of Thurston's entering Garrett's range of perception subjects Garrett to a hostile educational environment actionable under Title IX. The report concludes that USF's affording Garrett an opportunity for an

appeal is "unavailing" because Title IX contains no administrative exhaustion requirement. Also, the report finds that USF's decision to discipline Garrett for illicitly recording was not "wholly unrelated" to Garrett's criticizing the disposition of her formal complaint against Thurston. Consequently, the report recommends denying summary judgment on the retaliation claim.

Although the report aids in distilling the record and identifying certain conceptual confusion, a careful review of USF's objections confirms that the report has erred. First, Title IX imposes no obligation to eliminate conclusively every trace of discomfort resulting from student-on-student sexual misconduct. Rather, Title IX requires a university to respond in a manner not "clearly unreasonable." As a matter of law, USF's choosing not to eliminate — by expulsion or the equivalent — every occasion on which Thurston might appear inadvertently in Garrett's range of perception was not — to say the least — clearly unreasonable. Second, although USF cannot raise administrative exhaustion as an affirmative defense to a Title IX claim, the availability of a reasonable appellate remedy argues persuasively for the reasonableness of the response. The report erroneously fails to consider correctly both the availability of an appeal and Garrett's considered refusal to pursue an appeal. Third, the report's analysis of retaliation errs by concluding that the filing of a formal complaint against Thurston constitutes "protected activity," errs by applying the wrong standard of causation, and errs by failing to consider USF's non-discriminatory reason for charging Garrett under the student conduct code.

**BACKGROUND**

1.  <u>The November 12, 2016 incident</u>

Samantha Garrett and Andrew Thurston, each a doctoral candidate in USF's Industrial & Organizational Psychology Program, became friends in 2015. Although enrolled in the same program, Garrett and Thurston — at all pertinent times — attended different classes, pursued different research projects, and maintained an office on different floors of the psychology building. (Doc. 74-1 at 98) From 2015 to 2017, Garrett and Thurston exchanged thousands of text-messages in which Garrett and Thurston routinely called each other "best friends" and expressed "love" for each other. (Doc. 76-1)

Three weeks after the alleged November 12, 2016 incident, Garrett filed with USF's Title IX office a complaint, which alleges the following: after seeing a movie together on November 12, 2016, Garrett told Thurston that she felt "buzzed" from an alcoholic beverage and asked to sleep on a couch at Thurston's apartment. (Doc. 82-1 at 52) After arriving at Thurston's apartment, Thurston and Garrett sat on the couch together, and Thurston mixed an alcoholic beverage for Thurston and for Garrett. (Doc. 82-1 at 52) At Thurston's instance, Thurston and Garrett moved to Thurston's bedroom and began watching television. (Doc. 82-1 at 52) About thirty minutes later, Thurston — with Garrett's consent — began kissing Garrett and touching Garrett's breasts. (Doc. 82-1 at 52) However, after Thurston attempted to remove Garrett's shorts, Garrett instructed Thurston to stop. (Doc. 82-1 at 52)

Ignoring Garrett's instruction, Thurston removed Garrett's shorts and attempted —
despite Garrett's resistance — to remove Garrett's underwear. (Doc. 82-1 at 52)
Although Garrett said "no" and "this is not going to happen," Thurston engaged
in what a faculty member later described as "non-consensual digital penetration."
(Doc. 82-1 at 52; Doc. 84-1 at 30) After Thurston stopped, Garrett went to the
bathroom for twenty minutes. Upon Garrett's return, Thurston asked Garrett to
lie in bed, and Garrett agreed. (Doc. 82-1 at 52) Later that night, Garrett began
dressing and told Thurston that she intended to leave Thurston's apartment.
Thurston asked Garrett to return to bed, and Garrett returned. (Doc. 82-1 at 53)
Thurston and Garrett slept without further issue. The following morning, Garrett
and Thurston agreed to "never cross the 'friend line' again." (Doc. 82-1 at 53)

2.    <u>Thurston and Garrett's conduct after the incident</u>

In cellular text-messages exchanged the following day, Thurston expressed
dismay about possibly having ruined Thurston and Garrett's friendship. Garrett
responded, "We made out. It's not a big deal. Everything's still the exact same."
(Doc. 76-1 at 374) However, Garrett wrote that Thurston had acted "forceful[ly]"
and "wouldn't listen to no." (Doc. 76-1 at 376) Thurston responded by describing
himself as a "monster." (Doc. 76-1 at 377)

Twice within a few days after the incident and once at Garrett's instance,
Garrett slept at Thurston's apartment after studying with Thurston. (Doc. 74 at 44)
No sexual activity occurred either night. On November 23, 2016 — eleven days after

the incident — Thurston accepted an invitation from Garrett to watch a television show at Garrett's apartment, and Garrett accepted an invitation from Thurston to celebrate Thanksgiving two days later with Thurston's family.  (Doc. 76-1 at 449)

Later that evening Thurston attended a party, and between 5:30 p.m. and 6:30 p.m. Garrett sent Thurston nine text-messages.  (Doc. 76-1 at 451–52)  After receiving no response by 8:00 p.m., Garrett wrote, "Ok so since you haven't told me anything about [Thanksgiving] I'm going to assume that's your way of making sure I don't come . . . I tried . . . Just do me a favor and if I don't answer [in] [t]he mornin[g] come Check on [my dog]."  Garrett wrote that the "[l]ast time I did this I ended up throwing up in my sleep and I'm not trying to leave [my dog] . . . un[fed]." (Doc. 76-1 at 452)  In an 8:21 p.m. text-message, Thurston responded, "What did you do?  I'm on my way."  (Doc. 76-1 at 452)  Garrett replied that she was "taking two more Sleeping pills and another Xanax in [case] you need to kno[w]" and that "[i]n all honesty, all of this would be a lot easier for me if you just shot me." (Doc. 76-1 at 453)  Garrett asked Thurston to "just come back, watch me drink, and make sure I sleep on my back."  (Doc. 76-1 at 453)

After Thurston arrived at Garrett's apartment, Garrett told Thurston to leave and locked the door.  (Doc. 75 at 15)  Thurston, to whom Garrett had given a key to the apartment, unlocked the door and called the police.  (Doc. 75 at 15–16)  After arriving, the police reviewed the text-messages on Garrett's cellular telephone and involuntarily committed Garrett under Florida's Baker Act.  (Doc. 75 at 17)  After

receiving "stabilization" at a wellness center, Garrett sent to another student a text-message stating that Thurston "will be dropping out" because "after this there's no way I'm ok with him staying in the program." (Doc. 75-1 at 138)

3.    <u>Garrett files a complaint against Thurston</u>.

Eleven days after her release from the wellness center, Garrett told the director of the psychology doctoral program about the incident. (Doc. 78-1 at 1–5) That same day, the director sent an incident report to Crystal Coombes, USF's senior Title IX coordinator. The director's report described briefly the incident and stated that Garrett "wanted the perp removed from the program" and that Garrett "is concerned that she will be re-victimized by investigators." (Doc. 78-1 at 4) The next day, Coombes determined that the incident report warranted an investigation. (Doc. 84-1 at 1) Jonathan Monti, the associate director of USF's Office of Student Rights and Responsibilities (OSRR), sent Garrett a letter stating that Garrett could file with OSRR a complaint against Thurston. (Doc. 84-1 at 26–27) Garrett responded by e-mail that she intended to file a complaint. (Doc. 84-1 at 2)

On December 8, 2016, Garrett met her victim's advocate, Megan Deremiah, whom OSRR had assigned to Garrett throughout the Title IX process. (Doc. 74-1 at 16) After Deremiah explained USF's Title IX process, Garrett told Deremiah that Garrett wanted Thurston removed from the psychology program. (Doc. 74-1 at 19) The next day, Monti explained to Garrett that she could request interim restrictions against Thurston during the investigation, but Garrett — remarkably — requested

that USF impose no interim restrictions against Thurston. (Docs. 82-1 at 52; Doc. 84-1 at 30)

The same day, OSRR assigned Joanna Elwood, the assistant director of OSRR, to investigate the incident. (Doc. 75-1 at 88) Elwood interviewed Garrett and Thurston, reviewed the text-messages between Garrett and Thurston, and interviewed two witnesses provided by Thurston. (Docs. 82-1 at 54; 83-1 at 11–12) During his interview with Elwood, Thurston stated that the sexual touching was consensual and that the day following the incident Garrett used a social media platform to send Thurston a sexually suggestive image. (Doc. 83-1) Thurston stated that he "then texted [Garrett that] he felt bad about engaging in contact because he wanted to keep things platonic and didn't want to ruin their friendship." (Doc. 83-1 at 10) Thurston told Elwood that "only after he rejected her advances did she say he was forceful the night before." (Doc. 83-1 at 10) Also, Thurston told Elwood that Garrett spent the night at Thurston's apartment on two occasions after the incident and that Garrett and Thurston "cuddled" together. (Doc. 83-1 at 11) Thurston stated that he told Garrett that he planned a date with another woman and that in response Garrett threatened to call the police and forced Thurston to cancel the date. (Doc. 83-1 at 11) Elwood interviewed a student witness who told Elwood that — after the alleged incident — the witness saw Thurston and Garrett together and that "Thurston appeared stiff/non-emotional and Garrett appeared to be physically leaning into him." (Doc. 83-1 at 13)

In her investigative report submitted two months after Garrett's complaint, Elwood found that Garrett and Thurston "were close, personal friends, who communicated their love for each other frequently" and that on November 12, 2016, "Garrett and Thurston were engaged in consensual kissing, removing of the bra and touching breasts." (Doc. 83-1 at 13) However, Elwood reported a dispute about whether Garrett had consented to the remainder of the sexual activity and about whether Thurston was intoxicated. Elwood concluded that "sufficient evidence" exists "to substantiate the presence of non-consensual sexual intercourse and non-consensual sexual contact."[1] (Doc. 83-1 at 13–14) Elwood recommended that OSRR charge Thurston under the Student Code of Conduct, which prohibits non-consensual sexual intercourse and non-consensual sexual contact.[2] Elwood submitted the investigative report to Maria Cutsinger, the interim director of OSRR. (Doc. 83-1 at 8)

---

[1] The meaning of "sufficient evidence . . . to substantiate" remains unclear. In her deposition, Elwood explained that she "determined if there was enough information to move forward to the conduct process; not anything beyond that." (Doc. 83 at 12:1–17) "Moving forward" and "substantiating" differ, if not conflict; Elwood apparently determined probable cause and nothing more.

[2] The Student Code of Conduct defines "non-consensual sexual intercourse" to include "vaginal penetration by a penis, object, tongue or finger, anal penetration by a penis, object, tongue, or finger, and oral copulation (mouth to genital contact or genital to mouth contact), no matter how slight the penetration or contact" and defines "non-consensual sexual contact" to include "intentional contact with the breasts, buttocks, groin, or genitals, or touching another with any of these body parts, or making another touch you or themselves with or on any of these body parts; any intentional bodily contact in a sexual manner, though not involving contact with/of/by breasts, buttocks, groin, genitals, mouth, or other orifice." (Doc. 82-1 at 15)

Cutsinger determined that the investigative report showed a "substantial likelihood" that Thurston had violated the Student Code of Conduct, and OSRR formally charged Thurston under the Student Code of Conduct. (Doc. 80-1 at 30–31) In a March 9, 2017 "disposition letter" to Thurston, Cutsinger explained the charges and stated that Thurston could either (1) accept responsibility for violating the Student Code of Conduct and accept USF's proposed restrictions or (2) deny responsibility, reject the proposed restrictions, and demand a formal hearing. The proposed restrictions were (1) a "no-contact order," which both prohibited Thurston's "making contact with Samantha Garrett by telephone, in writing, electronically, by third party, or in person both on and off campus," and (2) a deferred suspension, which required Thurston to meet periodically with OSRR staff and psychology-department faculty and subjected Thurston to an immediate suspension if Thurston again violated the Student Code of Conduct. The no-contact order prohibited "directed, specific, targeted contact" by Thurston and entitled Garrett to report a violation of the no-contact order. (Doc. 76 at 54:38–54:44) The disposition letter warned Thurston that denying responsibility and demanding a formal hearing might "result in determinations and measures that are more severe" than the no-contact order and the deferred suspension. (Doc. 80-1 at 30–31)

In response to the disposition letter, Thurston accepted responsibility for violating the Student Code of Conduct and, as a result, accepted imposition of both the no-contact order and the deferred suspension. (Doc. 80 at 11) In a March 20,

2017 letter to Garrett, Cutsinger stated that Thurston had accepted both responsibility and the proposed restrictions and that Garrett could appeal and request additional restrictions against Thurston. (Doc. 85-3 at 2)

4. <u>Garrett appeals to request more restrictions against Thurston</u>.

In a March 22, 2017 e-mail to Cutsinger, Garrett stated that she intended to appeal the restrictions imposed against Thurston. (Doc. 84-1 at 15) Two weeks later, Garrett met with Monti and Danielle McDonald, the dean of students, to discuss the appeal. (Doc. 84-1 at 17) McDonald explained that, because USF had not encountered a circumstance in which the respondent accepts responsibility and the proposed restrictions but the complainant appeals in pursuit of more punitive restrictions, McDonald had devised a new procedure to govern Garrett's appeal. (Doc. 84-1 at 17) USF created for Garrett a new appellate opportunity, unknown and undisclosed to Thurston when he accepted USF's proposed disposition.

Under USF's new procedure, if Garrett appealed, Thurston could either demand a hearing before the conduct board or "leave the initial review determination in place." If Thurston decided to "leave the initial review determination in place," Thurston could respond in writing to Garrett's appeal, and McDonald would resolve the appeal without a hearing before the conduct board. (Doc. 74-1 at 146) However, if Thurston demanded a hearing before the conduct board, OSRR would use "the established process for hearings," which would permit Thurston to contest the charges for which he had accepted responsibility and which

might result in punishment of greater or lesser severity. Both Garrett and Thurston could appeal the result of the hearing. (Doc. 74-1 at 146)

After hearing McDonald's explanation, Garrett protested (1) that her prospective appeal permitted Thurston to contest the charges despite Thurston's accepting responsibility, (2) that her appeal permitted Thurston to demand a hearing before the conduct board even if Garrett opposed a hearing, and (3) that Coombes (USF's Title IX coordinator) had stated earlier that Garrett could appeal to McDonald directly without permitting Thurston to demand a hearing. (Doc. 74-1 at 84)

Disappointed with the prospective appeal, Garrett asked whether — absent an appeal — the psychology department could unilaterally expel Thurston from the doctoral program because Thurston had accepted responsibility for violating the Student Code of Conduct. (Doc. 74-1 at 84) McDonald and Monti suggested that Garrett meet with Coombes to discuss the availability of "interim measures" pending resolution of Garrett's appeal. (Doc. 74-1 at 84) After the meeting, Garrett complained to Deremiah (the victim's advocate) that Thurston "held all the power" in the appeal despite Thurston's accepting responsibility. (Doc. 74-1 at 84) Garrett stated that she wanted to avoid a hearing "at all costs" but would attend a hearing if necessary "to defend herself." (Doc. 74-1 at 84)

The next day, April 6, 2017, Garrett met with Coombes to discuss the restrictions that USF could impose against Thurston in the absence of an appeal.

Coombes explained that Garrett could request — without appealing — certain "alternative measures" against Thurston. (Doc. 74-1 at 87) Garrett stated that these alternative measures must prohibit Thurston's accessing the psychology building, parking in the adjacent lot, and attending department-sponsored events and conferences. (Doc. 74-1 at 87) Coombes expressed uncertainty about whether Garrett could obtain those restrictions absent an appeal. (Doc. 74-1 at 87) Also, Garrett asked whether the psychology department could remove Thurston from the psychology program because Thurston had accepted responsibility for violating the Student Code of Conduct. (Doc. 74-1 at 87) Coombes stated that she would consult with the psychology department about the ability to remove Thurston based on Thurston's accepting responsibility. (Doc. 74-1 at 87) After the meeting, Coombes e-mailed Garrett and stated that Coombes would "be working diligently" to determine the restrictions that USF could impose absent an appeal and offered to schedule another meeting to occur within a week. (Doc. 74-1 at 90)

Later that day, Deremiah asked Cutsinger (OSRR's interim director) about the psychology department's ability — absent an appeal — to remove Thurston based on Thurston's accepting responsibility for violating the Student Code of Conduct. (Doc. 74-1 at 89) Citing "double jeopardy," Cutsinger expressed doubt about the department's ability to remove Thurston and stated that expelling Thurston despite his acceptance of the restrictions proposed in the disposition letter would subject USF to a Title IX claim from Thurston. (Doc. 74-1 at 89)

5.    <u>Garrett withdraws the appeal</u>.

On April 10, 2017, Garrett told Deremiah that Garrett had decided to retract her appeal because Thurston could demand a hearing even if Garrett opposed a hearing. (Doc. 74-1 at 91)  In an e-mail to McDonald sent the same day, Garrett stated that she was retracting her appeal "due to the differences between the initial information [she] was given regarding an appeal of the restrictions and the newly created procedure after [she] initiated the appeal." (Doc. 74-1 at 15)  Garrett stated that she intended to pursue "potential remedies through interim measures" and asked whether "there is anything else [she] need[s] to do for [her] case to be formally closed with the current charges and sanctions finalized." (Doc. 74-1 at 15)  At the instance of Coombes, McDonald waited to accept Garrett's retraction of the appeal until after Garrett met with Coombes to discuss the "alternative measures" that USF could impose absent an appeal. (Doc. 74-1 at 98)

During a meeting with Garrett the next day, Coombes stated that McDonald would defer accepting Garrett's retraction of the appeal until Coombes had explained the available "alternative measures." (Doc. 74-1 at 98)  Coombes explained that absent an appeal USF could not ban Thurston from the psychology building, from the adjacent parking lot, or from attending campus events. (Doc. 74-1 at 98) However, Coombes explained that USF could assign a faculty member to supervise any event that both Thurston and Garrett attended and that Coombes could assign a schedule to reduce Thurston's and Garrett's simultaneous presence on campus.

After hearing Coombes's explanation, Garrett "was extremely upset" but did not rescind her retraction of the appeal. (Doc. 74-1 at 98) Garrett requested a remote research assignment and a leave of absence, and Coombes stated that the psychology program could assist Garrett in obtaining both. (Doc. 74-1 at 98) In an e-mail to Garrett the next day, McDonald accepted Garrett's retraction of the appeal. (Doc. 74-1 at 96)

6.      Garrett and Thurston attend a psychology conference.

Two weeks after McDonald accepted Garrett's retraction of the appeal, a psychology organization hosted a three-day off-campus conference in Orlando, Florida. (Doc. 73-2 at 4; Doc. 74 at 7) The psychology department required doctoral students to attend the conference. (Doc. 74 at 8) While waiting to register at the conference, Thurston stood in a line adjacent to Garrett's line. (Doc. 74 at 7) For about three minutes, Thurston and Garrett stood within five feet of each other. (Doc. 74 at 7–8) During the conference, Garrett saw Thurston in hallways, in communal areas, and at several receptions. (Doc. 74 at 8) Thurston never attempted to communicate with Garrett during the conference, and Garrett never reported or otherwise complained to USF about Thurston's attending the conference. (Doc. 74 at 7–8) No party asserts that Thurston's conduct at the conference violated the no-contact order.

7.    <u>Garrett illicitly records a meeting with Coombes</u>.

On May 18, 2017, about two weeks after the psychology conference and a month after Garrett's retraction of the appeal, Coombes and Garrett again met to discuss the "alternative measures" that USF could impose against Thurston. (Doc. 74 at 46)  Coombes reminded Garrett that that USF could not — without Thurston's consent or an appeal from Garrett — ban Thurston from the psychology building or the adjacent parking lot.  (Doc. 74-1 at 125)  Further, Coombes explained that Thurston had refused to accept a schedule that restricted his presence on campus and that USF could not restrict his presence without consent.  Coombes explained (1) that Garrett could accept the no-contact order and the deferred suspension in place, (2) that Garrett could file a complaint about USF's Title IX management of the episode, or (3) that Garrett could request to renew the appeal of the restrictions imposed on Thurston.  Garrett chose to accept the no-contact order and the deferred suspension.

After the meeting, Garrett told Deremiah, "I am so glad I recorded that conversation" because "I [have] a hard time remembering what is said in these meetings."  (Doc 74-1 at 125)  Later that day, Deremiah reported to OSRR that Garrett might have violated the Student Code of Conduct by recording the conversation without Coombes's permission.  (Doc. 81-1 at 181–87)

On June 8, 2017, Monti began investigating Deremiah's report.  During a June 12, 2017 interview with Monti, Garrett admitted recording the conversation.

(Doc. 81-1 at 182) On June 15, 2017, Monti sent Garrett a letter stating that sufficient evidence existed to charge Garrett under the Student Code of Conduct, which prohibits a student's violating Florida law as determined by USF.[3] (Doc. 84-1 at 127) The letter states that Garrett could either (1) accept responsibility and complete two ethics workshops or (2) demand a hearing before the conduct board. (Doc. 84-1 at 128) Garrett demanded a hearing, which occurred on August 18, 2017. (Doc. 84-1 at 133) After the hearing, the conduct board found that — by recording the conversation with Coombes — Garrett likely violated both (1) Section 934.03, Florida Statutes, which prohibits a person's "intentionally intercept[ing] . . . any wire, oral, or electronic communication" unless "all parties to the communication have given prior consent . . . ." and (2) the Student Code of Conduct. The conduct board issued a "Letter of Warning," which states that "any future disciplinary referrals to this office may result in formal disciplinary action being taken against you . . . [and] could seriously impact your student status at the University." (Doc. 82-1 at 170) Garrett accepted the conduct board's decision.

---

[3] Entitled "Violation of University Policy and/or Local Ordinance, State, or Federal Law (as determined by the University)," Section 4.21, Student Code of Conduct, states that "[f]ailure to adhere or abide by policies including, but not limited to, local ordinance, state law or federal law. Adjudication by an outside entity is not a prerequisite to a determination of responsibility by the University."

**DISCUSSION**

**I.    Hostile Educational Environment**

Title IX creates a claim for relief against a university that receives federal money earmarked for education if the university responds with deliberate indifference to known acts of student-on-student sexual misconduct and if the misconduct is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Proving that a university responded with deliberate indifference to student-on-student sexual misconduct is "rigorous and hard." *Hill v. Cundiff*, 797 F.3d 948, 975 (11th Cir. 2015). A university responds with deliberate indifference only if the university's response to the misconduct is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. The clearly unreasonable response "must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 644–45.

However, a university is not "deliberately indifferent" solely because the university fails to "purge" all future misconduct or eliminate all sources of discomfort. *Davis*, 526 U.S. at 648. Title IX affords the victim no right "to make particular remedial demands" and imposes no obligation to "engage in particular disciplinary action." *Davis*, 526 U.S. at 648. Further, *Davis* instructs that "courts should refrain from second-guessing the disciplinary decisions of school administrators." *Davis*, 526 U.S. at 648.

Title IX requires that a university respond in a manner not clearly unreasonable in response to a credible complaint about sexual misconduct. Neither Title IX nor any other law requires the imposition of a punitive or draconian remedy, the establishment of a particular procedure to resolve an allegation of sexual misconduct, or the suspension of due process for either the accused or the accuser or both.

Like every other offense, sexual misconduct and the penalty for sexual misconduct range in severity from trivial to life-altering. Where in this range an incident and the remedy lie is a determination that requires neutral assessment and sober evaluation, which the law firmly commits to the university's discretion and in which the law requires, at least, the rudiments of due process. Neither the accuser nor the accused commands unilaterally either the validity of the accusation or the fashioning of the remedy. The accuser has a right to a remedy for a valid accusation and the accused has a right to vindication from an invalid accusation; the law and the university must ensure that the rights remain in equipoise.

In this instance, USF's creating an opportunity for Garrett to appeal and USF's consequent, prospective abandonment (if the appeal continued) of the agreed resolution required restoration of Thurston's opportunity to defend. After weighing the advantages and disadvantages, Thurston elected to relinquish the opportunity to defend only in exchange for the agreed conclusion to the student disciplinary proceeding and the opportunity to continue his doctoral program (although subject

to both the deferred suspension and the restriction against "directed, specific, targeted contact" with his accuser).  At the moment he "accepted responsibility," Thurston had no idea that USF would create a right for Garrett to appeal and offer her an opportunity to increase his restrictions or cause his expulsion.

USF argues that as a matter of law the restrictions imposed against Thurston were not "clearly unreasonable in light of the known circumstances" because the restrictions prohibited Thurston's direct, specific, and targeted contact with Garrett and because USF offered a reasonable appellate procedure — declined by Garrett — to request additional restrictions against Thurston.  Garrett responds that USF's failure to restrict Thurston's proximity to Garrett was "clearly unreasonable," that the appeal procedure created by USF unfairly required Garrett to attend a hearing and permitted Thurston to contest the charges for which he had accepted responsibility, and that USF misinformed Garrett about the restrictions available absent an appeal.

A.    The reasonableness of USF's response

Primarily, Garrett argues that USF's decision to impose a no-contact order, which prohibits directed, specific, targeted contact but permits him to enter the psychology building and to remain on campus as a student, constitutes a "clearly unreasonable" response to Garrett's complaint against Thurston.  Garrett claims that after the incident she became "intimidated" by the prospect of encountering Thurston in the psychology building and claims that this sensation compelled Garrett

to request and receive both "incompletes" in her classes and a remote-research assignment. (Doc. 78 at 8, 12) Garrett contends that USF's failure to expel Thurston from the psychology program or ban Thurston from the psychology building was "clearly unreasonable" because the response "made [Garrett] liable or vulnerable to harassment" in the form of Thurston's continued presence in the psychology building.

In other words, Garrett contends that the mere prospect of Thurston's entering Garrett's range of perception creates a hostile educational environment actionable under Title IX. However, two distinguishing principles emerge from the decisions on which Garrett relies for this contention. First, a university's response constitutes deliberate indifference if the university refuses to impose any protective restrictions after receiving a credible complaint about student-on-student sexual misconduct. Second, the mere prospect of the alleged assailant's entering the victim's range of perception "ma[kes] [the plaintiff] liable or vulnerable to harassment" only if the university fails to restrict the conduct of an alleged assailant after the sexual misconduct. That is, the distress a victim might reasonably suffer upon seeing an alleged assailant whose conduct remains wholly unrestricted is qualitatively different than the distress a victim might reasonably suffer upon seeing an alleged assailant against whom the university has imposed and enforced restrictions and against whom the university has retained the ability to investigate and punish for any violation of the restrictions.

Unlike the universities in Garrett's cited decisions, USF promptly restricted Thurston's conduct by issuing the no-contact order, which prohibits communication and "directed, specific, targeted contact." And, unlike the victims in Garrett's cited decisions, Garrett knew that, in the event of a chance sighting, Thurston's conduct was restricted by the university and that any violation of the restrictions would subject Thurston to further investigation and punishment, including possible suspension or expulsion. In other words, Garrett knew (and so did Thurston) that even if Thurston happened to appear in her range of perception, USF's restrictions precluded any directed, specific, or targeted contact.

Garrett cites *Kelly v. Yale University*, 2003 WL 1563424, (D. Conn. 2003), in which a student of the university's divinity school sexually assaulted another student, who shared a class with, and lived in the same dormitory as, the alleged assailant. During the investigation of the assault, the victim complained that the alleged assailant's presence in the dormitory and the shared class was "harassing" and requested that the university both assign the alleged assailant to another class and assign the victim to another dormitory. *Kelly*, 2003 WL 1563424 at *3. However, the university "never responded to the [victim's] entreaties" for residential and educational accommodations, and the victim withdrew from classes before the investigation concluded and before the university imposed any restrictions on the conduct of the alleged assailant. *Kelly*, 2003 WL 1563424, at *1–3. *Kelly* holds correctly that the university's failure to impose any restriction — failure to do

anything — constituted deliberate indifference. *Kelly*, 2003 WL 1563424, at *5 ("[T]he court does not find that [the university's] refusal to bar [the alleged assailant] from attending classes was clearly unreasonable. What is substantially less clear, however, is whether [the university's] particular course of action — in which minimal efforts were made to protect [the victim] from further harassment . . . violated Title IX.")

Garrett cites *Takla v. Regents of the University of California*, 2015 WL 6755190, (C.D. Cal. 2015), in which a faculty advisor sexually assaulted the plaintiff, and the university's Title IX coordinator convinced the plaintiff — in violation of the university's Title IX policy — to pursue an "Early Resolution" procedure. The university concluded the procedure "without making any formal findings," and the university informed the plaintiff neither about the outcome of the procedure nor whether the university had imposed a restriction on the advisor's conduct. Due to the "[f]ear of running into [the advisor] and being subjected to additional sexual harassment," the plaintiff stopped attending classes. *Takla*, 2015 WL 6755190, at *2. *Takla* finds plausible that the university's failure to impose any restriction constituted deliberate indifference. *Takla*, 2015 WL 6755190, at *4 (denying a motion to dismiss).

And Garrett cites *Kinsman v. Florida State University Board of Trustees*, 2015 WL 11110848, (N.D. Fla. 2015), in which a student-athlete sexually assaulted another student at an off-campus apartment. Although the victim, who shared a class with

the alleged assailant, reported the assault, the university neither assigned the alleged assailant to another class nor imposed a restriction against the alleged assailant's conduct. Further, the university delayed the investigation of the alleged assault until after completion of the student-athlete's competitive sports season. *Kinsman* finds "reasonable and expected" the victim's decision — absent any protective response from the university — to withdraw. *Kinsman*, 2015 WL 11110848, at *4 (denying a motion to dismiss).

In sum, *Kelly*, *Takla*, and *Kinsman* find deliberate indifference because each university failed to impose any restriction in the aftermath of the sexual misconduct and permitted the alleged assailants to remain on the campus without restriction. By contrast, USF promptly investigated the allegations of Garrett's Title IX complaint against Thurston; promptly charged Thurston under the Student Code of Conduct after concluding the investigation; imposed a no-contact order and a deferred suspension on the condition of Thurston's accepting responsibility; manufactured a new and entirely reasonable appellate remedy by which Garrett could obtain further restrictions against Thurston; and furnished educational accommodations — a remote research assignment — after Garrett withdrew her appeal. Unlike the universities in *Kelly*, *Takla*, and *Kinsman*, USF successfully and promptly eliminated "directed, specific, targeted contact" between Thurston and Garrett, which reasonably but aggressively eliminated or minimized the distress Garrett might suffer if the two randomly passed within the range of perception.

Although Garrett concedes that USF imposed restrictions against Thurston and that after issuance of the no-contact order Thurston neither communicated with Garrett nor subjected Garrett to directed, specific, or targeted contact, Garrett argues that the restrictions remain "clearly unreasonable" because Thurston's and Garrett's concurrent enrollment in the psychology doctoral program entailed a likelihood of the two frequently entering within each other's range of perception. Accordingly, Garrett contends that USF's refusal to ban Thurston from the psychology building or to expel Thurston from the psychology program constituted a clearly unreasonable response to the alleged student-on-student sexual misconduct.

Garrett cites no authority for the proposition that USF's remedial prohibition is clearly unreasonable. Although Garrett repeatedly reported to faculty and Title IX officials that Thurston's continued presence subjected her to distress and intimidation, Title IX affords a victim of student-on-student sexual misconduct no right "to demand a particular remedy" and affords the university "flexibility" and deference in deciding the appropriate response to student-on-student sexual misconduct. *Davis*, 526 at 648. If, as Garrett maintains, the prospect of future proximity between a victim and an alleged assailant creates an irreconcilably hostile educational environment, a university confronted with an allegation of non-consensual sexual contact has almost no choice — regardless of the severity of the contact — other than to expel the accused. In other words, Garrett argues that the only response not "clearly unreasonable in light of the known circumstances" is

expulsion from the psychology program or banishment from the psychology building — a punishment tantamount to expulsion. *Davis* condemns this result. *Davis*, 526 U.S. at 648 (rejecting the contention that a university can avoid Title IX liability only by expelling "'every student accused of misconduct involving sexual overtones.'")

However, the possibility remains that in an "extreme" circumstance a university might have no choice but to reasonably limit the occasions on which an assailant and a victim might enter the range of one another's perception. For example, in *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), a student-athlete with a record of sexual misconduct "orchestrated" a "gang rape" of the plaintiff, who withdrew from the university a few days later. Although promptly receiving a police report about the rape, the university imposed no restrictions against the alleged assailants and delayed by more than eight months before investigating.

*Williams* suggests that the university's failure to restrict the alleged assailants' presence on campus "effectively deni[ed] [the victim] an opportunity to continue to attend [the university]." *Williams*, 477 F.3d at 1297. Under the "extreme facts" alleged in the complaint, *Williams* holds that the university's inaction — the failure to restrict the alleged assailants and the protracted delay in investigating the rape — constitutes deliberate indifference. *Williams*, 477 F.3d at 1297 (finding "inexplicable and discriminatory" the university's failure "to take any precautions that would

prevent future attacks" by the alleged assailants). However, *Williams* limits the holding to the "extreme facts" alleged and declines to decide whether a cause of action would exist "if the facts alleged had been less severe." *Williams*, 477 F.3d at 1299.

USF's response contrasts dramatically and decisively with the "extreme facts" and the unreasonable delay in *Williams*. USF knew when imposing the no-contact order and deferring the suspension that Thurston had no record of sexual misconduct, knew that Garrett had consented to some of the sexual activity, and knew that Garrett and Thurston were friends who voluntarily saw each other after the alleged non-consensual contact. (Doc. 74-1 at 98) Although USF also knew that Thurston and Garrett were enrolled in the same doctoral program and occasionally attended the same academic events and conferences, USF knew when imposing the no-contact order that Thurston was "all but dissertation" and shared no classes with Garrett, knew that Thurston and Garrett maintained offices on different floors, and knew that Thurston and Garrett pursued different research projects. (Doc. 74-1 at 98) In other words, USF knew that Thurston's and Garrett's academic obligations seemed to suggest only, at most, *de minimis* opportunities for the two to pass within the range of perception.

Garrett wrongly insists that the no-contact order provides "no protection." As Coombes explained to Garrett, the no-contact order prohibits "directed, specific, targeted contact" by Thurston, and Garrett can report any violation of the order.

(Doc. 76 at 54:38–54:44)  Thurston never violated the no-contact order, and Garrett cites no instance after issuance of the no-contact order that Thurston intentionally appeared on campus within the range of Garrett's perception.

In the absence of a shared class schedule, shared living quarters, or an academic obligation necessitating recurrent and close proximity between Garrett and Thurston, USF's decision to prohibit directed, specific, and targeted contact indisputably was not unreasonable.  *Yoona Ha v. Northwestern Univ.*, 2014 WL 5893292, at *2 (N.D. Ill. 2014) (holding "not actionable under Title IX" the plaintiff's claim that the mere "knowledge of [the alleged assailant's] presence on the campus" continued — despite issuance of a no-contact order against the alleged assailant — to cause the plaintiff "considerable grief").  Garrett's contention that USF must "effectively end[] all interaction between the two students . . . misunderstands the law."  *Gabrielle M. v. Park Forest-Chicago Heights*, 315 F.3d 817, 825 (7th Cir. 2003).  Although the no-contact order "was not the punishment [Garrett] wanted, punishment was imposed."  *Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 762 (W.D. Va. 2016).  As a matter of law, USF's decision not to ban Thurston from the psychology building and, instead, to impose the no-contact order and the deferred suspension was clearly not unreasonable — or even close to unreasonable.

B.    The availability of an appeal

After issuance of the no-contact order and the deferred suspension, Garrett complained that the mere prospect of seeing Thurston in the psychology building — even without any directed, specific, targeted contact between the two — caused Garrett "extreme anxiety" and prevented Garrett's attending classes and completing assignments.  (Doc. 81 at 22)  Garrett argues that by rejecting her pleas to ban Thurston from the psychology building or to expel Thurston from the psychology program, USF responded with deliberate indifference to Garrett's distress.

Again, Title IX affords the victim no right "to make particular remedial demands," *Davis*, 526 at 648, and an educational institution need not — in every instance — banish someone from the perception of the victim to avoid Title IX liability, *Gabrielle M.*, 315 F.3d at 824.  As a matter of law, USF did not respond with deliberate indifference after issuance of the no-contact order.  As Coombes and McDonald explained, to ban Thurston from the psychology building required Garrett to appeal the punishment against Thurston and to permit Thurston an opportunity for a hearing.  This procedure comports with the rudiments of due process and fairly considers the rights of both Garrett and Thurston.  Electing to relinquish her opportunity to achieve the same remedy that she now sues USF for not imposing, Garrett both withdrew her appeal because of her reluctance to attend a hearing before the conduct board and requested "[her] case to be formally closed with the current charges and sanctions finalized."  (Doc. 74-1 at 15)

Although Title IX contains no requirement to exhaust the administrative remedy, Garrett's reluctance to attend a hearing cannot render "clearly unreasonable" USF's declining to impose unilaterally the punishment demanded by Garrett. And, although she reported to USF that Thurston's presence caused her distress, Garrett identifies no circumstance in which Thurston attempted to communicate with her; in which Thurston subjected her to targeted, specific, or directed contact; or in which Thurston intentionally appeared on campus within her range of perception. In the absence of targeted conduct by Thurston, USF's decision not to unilaterally impose the punishment demanded by Garrett falls comfortably within the "flexibility" and discretion that Title IX affords. *Davis*, 526 U.S. at 648. Further, Thurston already had accepted responsibility and accepted the proposed restrictions, and a decision to increase unilaterally Thurston's punishment without affording Thurston an opportunity for a hearing would violate USF's Title IX procedure, would contradict reasonable expectations about the finality of the punishment that Thurston had accepted, and might expose USF to an action by Thurston. *Davis*, 526 U.S. at 649 ("[I]t would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims.").

Garrett argues that requiring her to attend a hearing before imposing additional sanctions against Thurston was "clearly unreasonable" because an appeal would subject her to "additional trauma." (Doc. 107 at 9) Garrett cites no authority

suggesting that Title IX imposes liability on a university because the university affords the accused the rudiments of due process, that is, notice and an opportunity for a hearing. *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) (acknowledging that a university must respect the due process rights of the accused). Although Thurston — as part of an agreed disposition — already had accepted responsibility for violating the Student Code of Conduct, USF reasonably permitted Thurston to contest these charges if Garrett appealed. Title IX affords a university the opportunity to fashion a reasonable and effective procedure and remedy and does not require a university to impose any specific procedure or remedy to resolve a complaint about student-on-student sexual misconduct. Even if a "more victim-friendly" process exists in accord with due process (that question is not pertinent here), USF fairly balanced the due process rights of the accused and the accuser and was clearly not unreasonable. *Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 763 (W.D. Va. 2016) (finding not "clearly unreasonable" a process that required the plaintiff to "testify multiple times, at multiple hearings" and that "permitted several levels of appeals, which required additional testimony to appeal.")

Attempting to minimize her refusal to pursue an appeal, Garrett contends that she "was first assured that she could pursue the additional remedies she needed without appealing" but learned after withdrawing the appeal "that Thurston was given veto power over anything she requested . . . ." (Doc. 107 at 9) But McDonald, the Dean of Students, refused to accept Garrett's withdrawal of the appeal until after

Garrett met with Coombes to discuss the restrictions that USF could impose absent an appeal. (Doc. 74-1 at 98; Doc. 90-1 at 96:12–96:25) During the meeting, Coombes explained that — absent an appeal — USF could not ban Thurston from the psychology building, from the adjacent parking lot, or from department events. (Doc. 74-1 at 98) Nonetheless, Garrett persisted in her withdrawal of the appeal. (Doc. 74-1 at 96; Doc. 90-1 at 94:12–97:1) Although the parties dispute whether Coombes had erroneously assured Garrett that USF could assign a schedule that limited Thurston's and Garrett's simultaneous presence on campus in the absence of an appeal, Coombes's erroneous assurance constitutes — at most — an innocent mistake because Coombes suggested the possibility of an assigned schedule after Garrett had instructed USF to withdraw Garrett's appeal and "finalize" the restrictions imposed against Thurston.

USF had not before encountered the circumstance in which both the accused accepts USF's proposed disposition and the accuser demands punishment beyond the proposed disposition. Although USF might have better anticipated and prepared for this circumstance, the record confirms that USF met or exceeded any reasonable expectation in an attempt to accommodate Garrett's trepidation about pursuing the newly established procedure, that is, trepidation about attending a hearing and affording due process to Thurston. Also, Coombes suggested the possibility of imposing on Thurston an assigned schedule only after Garrett had instructed USF to withdraw Garrett's appeal and "finalize" the restrictions imposed against Thurston,

and Garrett had repeatedly informed USF's Title IX officials, including Coombes, that any restrictions shy of Thurston's expulsion from the psychology program or banishment from the psychology building was unacceptable.

In this circumstance, the claimed procedural error constitutes at most a trivial, and innocently benign, mistake and not deliberate indifference.  Further, Coombes informed Garrett that to remedy the claimed procedural error Garrett could file with USF a complaint about an error in USF's Title IX procedure or request a renewal of the appeal.  Garrett did neither.  The existence of a reasonable procedure to remedy an innocent procedural error precludes a finding of deliberate indifference.

In sum, USF imposed a reasonable punishment in response to Garrett's complaint and provided a reasonable appellate procedure by which Garrett might — after notice and an opportunity for a hearing — secure Thurston's expulsion from the psychology program or exile from the psychology building.  As a matter of law, USF's response to the alleged sexual misconduct was not "clearly unreasonable." *Davis*, 526 U.S. at 649 ("This is not a mere 'reasonableness' standard . . . [and therefore,] [i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a matter of law.")

## II.    Retaliation

Garrett claims that USF used the disciplinary action against Garrett as a means to retaliate against Garrett for criticizing USF's disposition of the complaint

against Thurston.  A claim for retaliation under Title IX is "analyzed under the framework for claims under Title VII." *Kocsis v. Fla. State Univ. Bd. of Tr.*, 788 F. App'x 680, 686 (11th Cir. 2019).  To prevail on the retaliation claim, Garrett must establish a *prima facie* case of retaliation by showing (1) that she engaged in a statutorily protected activity, (2) that USF subjected Garrett to a "materially adverse" action, and (3) that "a causal link" existed between the protected activity and the adverse action. *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911 (11th Cir. 2013).  If Garrett establishes a *prima facie* case of retaliation, USF must establish a "legitimate, non-discriminatory reason for the adverse action." *Kocsis*, 788 F. App'x at 686–67 (citing *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). If USF establishes a non-discriminatory reason, Garrett must demonstrate that the proffered reason serves as a "pretext to mask discriminatory actions." *Bryant*, 575 F.3d at 1308.

A.    <u>*Prima Facie* Case</u>

     1.    Protected activity

A person engages in statutorily protected activity under Title IX if the person opposes a practice that Title IX prohibits. *Kocsis*, 788 F. App'x at 686 (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999)).  The person's opposition "must be based upon a good faith belief that is objectively reasonable under existing substantive law." *Kocsis*, 788 F. App'x at 687.

The magistrate judge's report concludes that Garrett's complaint against Thurston constitutes protected activity because in the complaint Garrett purportedly "spoke out" against "sex discrimination." (Doc. 105 at 23)  The report errs.  Title IX prohibits a university's deliberate indifference to a hostile educational environment — Title IX does not prohibit student-on-student sexual misconduct.  But Garrett's complaint against Thurston complains about only Thurston's conduct — not about USF's.  That is, Garrett's complaint against Thurston does not "oppose practices made unlawful" by Title IX.  *Kocsis*, 788 F. App'x at 686.

Also, the report suggests that Garrett engaged in protected activity by criticizing USF's disposition of the complaint.  Even if Garrett sincerely perceived USF's response as inadequate, a Title IX retaliation claim requires that the plaintiff's opposition "be based upon a good faith belief that is objectively reasonable under existing substantive law."  *Kocsis*, 788 F. App'x at 686.  Because USF's response to the alleged non-consensual contact was not — as a matter of law — "clearly unreasonable," Garrett lacked an "objectively reasonable" belief that she had opposed a practice that Title IX prohibits.  That is, USF's decision not to banish Thurston from Garrett's range of perception was not clearly unreasonable, and USF was not clearly unreasonable or deliberately indifferent by declining to impose unilaterally the remedy that Garrett — after repeated warnings of the consequences — voluntarily relinquished her opportunity to achieve.  USF did not fail to offer the

remedy; Garrett failed to pursue the remedy. Accordingly, Garrett presents no genuine factual dispute about whether Garrett engaged in a protected activity.

> 2.      Materially adverse action

To constitute a materially adverse action, the action must "dissuade[] a reasonable [person] from making or supporting a charge of discrimination." *Kocsis*, 788 F. App'x at 686 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Garrett argues that USF's investigating the conduct that Garrett admitted, requiring Garrett to attend a hearing before the conduct board and issuing a warning letter each constitutes a materially adverse action. Although the magistrate judge's report acknowledges that a warning letter cannot constitute a materially adverse action,[4] the report concludes that by requiring "Garrett to undergo a separate investigation, including a formal hearing," USF subjected Garrett to a materially adverse action. (Doc. 105 at 42)

Relying on *Entrekin v. City of Panama City Fla.*, 376 F. App'x 987 (11th Cir. 2010), USF objects that "an investigation, which results in no harm, is not an adverse action" and that Garrett elected to attend the hearing. (Doc. 106 at 25) In *Entrekin*, the plaintiff, a police officer, claimed that the city retaliated against the plaintiff's complaint by investigating the complaints of other officers who alleged that the plaintiff repeatedly engaged in insubordinate behavior. *Entrekin* finds "likely"

---

[4] *See, e.g., Clark v. Potter*, 232 F. App'x 895 (11th Cir. 2007), *Hawkins v. Potter*, 316 F. App'x 957 (11th Cir. 2009), and *Barnett v. Athens Reg. Med. Ctr., Inc.*, 550 F. App'x 711 (11th Cir. 2013)).

that "the initiation of an internal investigation against an employee would dissuade a reasonable worker from making or supporting a charge of discrimination." *Entrekin*, 376 F. App'x at 995. Although the investigation of the plaintiff in *Entrekin* resulted in the plaintiff's termination, *Entrekin* suggests in a dictum that the initiation of an investigation constitutes a materially adverse action, even if no discipline results. *Entrekin*, 376 F. App'x at 995. However, this order need not resolve whether an investigation that results in trivial or no discipline constitutes a materially adverse action because, as discussed above, Garrett never engaged in activity protected by Title IX and, as discussed below, Garrett fails both to demonstrate causation and to rebut USF's non-discriminatory reason for charging Garrett under the Student Code of Conduct.

3.    Causation

To establish a *prima facie* case, the plaintiff must demonstrate a causal connection between the statutorily protected activity and the adverse employment action. Relying on *Bowers v. Board of Regents of University System of Georgia*, 509 F. App'x 906, 911 (11th Cir. 2013), the magistrate judge's report determines that to demonstrate a causal connection, the plaintiff "must show that university decision-makers knew about her protected conduct and that her protected conduct was not wholly unrelated to the university's adverse action." (Doc. 105 at 42) (citing *Bowers*, 509 F. App'x at 911). The report finds that the investigation of Garrett was not "wholly unrelated" to Garrett's criticizing USF's disposition of the complaint

because (1) during the recorded meeting Coombes suggested that Garrett could complain about an error in USF's Title IX process and (2) after Coombes learned about the recording Coombes requested that the conduct board respond to Garrett's conduct in the "strongest possible manner" and that the sanctions be "hard felt." (Doc. 105 at 43) The report finds that "a reasonable jury could conclude — considering Coombes's statements and testimony — that USF's decision to require Garrett to undergo a separate investigation was not wholly unrelated to her original Title IX complaint." (Doc. 105 at 43)

Decided four months after *Bowers*, which applied the "not wholly unrelated" standard of causation to a Title IX retaliation claim, *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 352 (2013), holds that unlike a Title VII discrimination claim, which requires proof that discriminatory intent served as a "motivating factor," a Title VII retaliation claim requires the plaintiff to adduce "proof that the desire to retaliate was the but-for cause of the challenged . . . action." And because "[r]etaliation claims under Title IX are analyzed under the framework for claims under Title VII," *Kocsis v. Florida State University Board of Trustees*, 788 F. App'x 680 (11th Cir. 2019), requires that a plaintiff claiming retaliation under Title IX establish causation "according to traditional principles of but-for causation, which requires 'proof that the desire to retaliate was the but-for cause of the challenged . . . action.'" *Kocsis*, 788 F. App'x at 686 (quoting *Nassar*, 570 U.S. at 352).

Although (1) Garrett's criticizing Coombes's handling of the complaint and (2) Coombes's suggesting during the recorded meeting that Garrett could complain about an error in USF's Title IX Procedure might have "motivated" Coombes to request that the conduct board respond "in the strongest possible manner" to Garrett's conduct, Garrett adduces no proof from which a reasonable jury could conclude that either Garrett's criticism or Coombes's suggestion served as the "but-for" cause of USF's decision to charge Garrett under the Student Code of Conduct. First, Garrett cites no material in the record suggesting that USF investigated Garrett at Coombes's instance. Rather, Monti scheduled a meeting with Garrett after Deremiah reported to OSRR that Garrett might have violated the Student Code of Conduct by recording the conversation without Coombes's permission. (Doc. 84 at 72:4–17) During the meeting, Garrett admitted to Monti that Garrett had recorded Coombes without permission. (Doc. 81-1 at 183) Second, Garrett cites nothing in the record suggesting that Coombes demanded that the conduct board sanction Garrett for a reason other than that Garrett had violated Coombes's rights under Florida law. Regardless, the conduct board never considered Coombes's written submission, and Coombes did not testify at the hearing. (Doc. 85-4 at 5) No reasonable jury could conclude that "but-for" Garrett's criticizing Coombes's handling of the complaint and "but-for" Coombes's suggesting during the conversation that Garrett could complain about an error in USF's Title IX process,

USF would not have charged Garrett for her admitted violation of the Student Code of Conduct.

Also, USF objects that the magistrate judge's report confuses causation, an element of the plaintiff's *prima facie* case, with pretext, which the plaintiff must demonstrate to rebut a non-discriminatory reason proffered by the defendant. Consequently, USF objects that the report errs by failing to consider whether USF articulates a legitimate, non-discriminatory reason to charge Garrett under the Student Code of Conduct.

USF is right.  The report relies on *Bowers v. Board of Regents of University System of Georgia*, 509 F. App'x 906  (11th Cir. 2013), to determine "whether summary judgment is appropriate with respect to Garrett's retaliation claim."  (Doc. 105 at 38 n.12)  But *Bowers* resolved an appeal from a motion to dismiss for failure to state a claim — not a motion for summary judgment.  To state a plausible retaliation claim, the plaintiff need only allege a plausible case of discrimination and need not allege facts demonstrating that the non-discriminatory reason proffered by the defendant was pretextual.  Accordingly, *Bowers* discusses the elements of a *prima facie* case only. But on summary judgment, if the defendant articulates a non-discriminatory reason for the adverse action, the plaintiff must adduce record evidence from which a reasonable jury could find pretext.  *Kocsis*, 788 F. App'x at 687 (applying *McDonnell Douglas* to a Title IX retaliation claim).  The report erred by failing to consider whether USF articulates a non-discriminatory reason for the adverse action and

whether Garrett adduces proof from which a reasonable jury could find that the proffered reason serves as a pretext for discrimination.

B.  USF proffers a non-discriminatory reason for investigating Garrett.

    After the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Kocsis*, 788 F. App'x at 686–87. USF explains that Garrett was charged under the Student Code of Conduct because Garrett admitted to her victim's advocate that Garrett recorded — illicitly and, of course, without permission — the May 18, 2017 meeting with Coombes. The Student Code of Conduct prohibits a student's violating Florida law (Doc. 84-1 at 127), and Section 934.03, Florida Statutes, prohibits a person's "intentionally intercept[ing] . . . any . . . oral . . . communication" unless "all parties to the communication have given prior consent . . . ." Because Garrett's admitted conduct that falls comfortably within the prohibition of Section 934.03, Florida Statutes, USF has identified a legitimate, non-discriminatory reason to charge Garrett under the Student Code of Conduct: Garrett admitted the violation with which Garrett was charged.

C.  Garrett fails to demonstrate pretext.

    Because USF articulates a legitimate, non-discriminatory reason for the adverse action, Garrett "must demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." *Kocsis*, 787 F. App'x at 687. In other words, the plaintiff must adduce evidence "sufficient to permit a reasonable

factfinder" to conclude that the proffered reasons for the adverse action "were not the real reasons." *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) ("Retaliation is, by definition, an intentional act.") The plaintiff must adduce "concrete evidence in the form of specific facts" — "conclusory allegations and assertions" are insufficient. *Bryant*, 575 F.3d at 1308. The plaintiff can establish pretext by identifying "such weaknesses, implausibilities, inconsistencies, incoherences or contradictions in [the defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Cust. Mgmt. Grp.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (per curiam).

Although she admittedly and illicitly recorded the conversation with Coombes, Garrett argues that USF charged her under the Student Code of Conduct as a means to retaliate against Garrett's opposing the disposition of the complaint. Garrett identifies three purported weaknesses in USF's decision. First, Garrett argues that USF's response was pretextual because USF obtained no legal opinion before deciding that Garrett's illicitly recording the conversation with Coombes violates the Student Code of Conduct. (Doc. 107 at 19) But the Student Code of Conduct prohibits a student's violating state law "as determined by the University." (Doc. 82-1 at 17) After the hearing, the conduct board determined "that it is more likely than not the student violated policy 4.21 based on our interpretation of 2016 Florida Statute Chapter 934." (Doc. 82-1 at 170) Garrett advances neither an

argument that the conduct board incorrectly interpreted the statute nor an argument that the conduct board's interpretation was so defiant of, or athwart, common sense as to demonstrate pretext. Rather, Garrett's conduct appears to fall easily within the precise prohibition of Section 934.03, Florida Statutes.

Second, Garrett argues that because Garrett had voiced to Coombes, whom Garrett illicitly recorded, criticism about USF's disposition of Garrett's complaint and because Coombes drafted a "written submission" requesting that the conduct board sanction Garrett, USF must have charged Garrett in retaliation for her criticizing USF. However, the conduct board never considered Coombes's written submission and Coombes did not testify at the hearing. (Doc. 85-4 at 5) Regardless, Garrett identifies no evidence that Coombes requested that the conduct board sanction Garrett in retaliation for Garrett's criticizing the Title IX process rather than in response to Garrett's allegedly violating Coombes's rights under Florida law. No material in the record plausibly suggests that a desire to punish Garrett for criticizing USF's Title IX process served as the "real reason" for charging Garrett under the Student Code of Conduct.

Third, Garrett argues that USF charged Garrett under the Student Code of Conduct as a pretext to "destroy" Deremiah's duty of confidentiality to Garrett. (Doc. 107 at 19) After receiving advice from an outside Title IX consultant, USF's associate general counsel determined that Deremiah could disclose without breaching her duty of confidentiality that Garrett had allegedly violated Florida law

by recording Coombes without consent.  (Doc. 90-1 at 27–28)  Nothing in the record plausibly suggests that USF attempted to acquire or intercept or surveil communications between Deremiah and Garrett unrelated to Garrett's admitted misconduct.

No reasonable jury could find that the purported weaknesses identified by Garrett — whether considered singly or collectively — demonstrate that USF's charging Garrett under the Student Code of Conduct was pretextual.  Because no material dispute remains about whether Garrett engaged in a protected activity, whether causation exists, or whether USF's proffered explanation was pretextual, USF is entitled to summary judgment on the retaliation claim.

## CONCLUSION

The report's recommendation (Doc. 105) is **DECLINED**, USF's objections (Doc. 106) are **SUSTAINED**, and USF's motion (Doc. 73) for summary judgment is **GRANTED**.  The clerk is directed (1) to enter judgment on each count for USF and against Garrett, (2) to terminate the pending motions, and (3) to close the case.

ORDERED in Tampa, Florida, on March 24, 2020.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE